**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MAURICE SHNAIDER, *et al.*,

                *Plaintiffs*,

      v.

AL JAZEERA MEDIA NETWORK

and

AL JAZEERA INTERNATIONAL
(USA) LLC,

                *Defendants*.

Civil Action No. 1:25-cv-00538-ABJ

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ........................................................................................................... 1

FACTUAL ALLEGATIONS ......................................................................................... 5

    A.    The Parties ......................................................................................... 5

    B.    Allegations Regarding Al Jazeera Journalists ...................................... 8

    C.    The October 7, 2023, Terrorist Attacks and Post-October 7 Attacks ..... 9

    D.    The Defendants' Alleged Role in the October 7 Attacks ..................... 10

    E.    Plaintiffs' Use of Footnoted Sources ................................................. 12

ARGUMENT ................................................................................................................ 13

I.    CLAIMS AGAINST AL JAZEERA MEDIA NETWORK MUST BE
    DISMISSED FOR LACK OF PERSONAL JURISDICTION AND
    INSUFFICIENT SERVICE OF PROCESS ................................................... 13

    A.    The Court Lacks General Personal Jurisdiction over AJMN ............... 15

    B.    The Court Lacks Specific Personal Jurisdiction over AJMN .............. 18

        1.    The D.C. Long-Arm Statute, D.C. Code § 13-423, Does Not
            Provide a Basis for Specific Personal Jurisdiction over AJMN ..... 18

        2.    The Exercise of Specific Personal Jurisdiction over AJMN Under
            Rule 4(k)(1) Does Not Comport with Fourteenth Amendment Due
            Process ................................................................................. 22

    C.    The Exercise of Personal Jurisdiction Under Fed. R. Civ. P. 4(k)(2) Does
        Not Comport with Fifth Amendment Due Process ............................. 23

    D.    Plaintiffs Failed to Effectuate Service on AJMN Under State or Federal
        Statute, Providing an Independent Basis for Dismissal ...................... 26

II.    PLAINTIFFS' DIRECT LIABILITY CLAIMS MUST BE DISMISSED
    FOR FAILURE TO STATE A CLAIM ........................................................ 27

    A.    The Complaint Fails to Plausibly Allege That Either Defendant's Alleged
        Conduct Constitutes an "Act of International Terrorism" ................... 29

        1.    The Complaint Does Not Plausibly Allege a Violation of § 2339A ......... 29

        2.    The Complaint Does Not Plausibly Allege a Violation of § 2339B ......... 34

        3.    The Complaint Does Not Even Attempt to Allege That Defendants
            Engaged in Any Activities That Satisfy § 2331(1)(B)'s "Appear to
            Be Intended" Requirement ..................................................... 38

    B.    The Complaint Fails to Plausibly Allege Proximate Causation ........... 39

i

III.   THE SECONDARY LIABILITY CLAIMS MUST BE DISMISSED FOR
       FAILURE TO STATE A CLAIM ................................................................... 43

       A.   The Section 2333(d) Aiding and Abetting Standard: *Halberstam* and
            *Twitter* .................................................................................................... 44

       B.   The Complaint Does Not Plausibly Allege That Defendants Were
            "Generally Aware" They Were Playing a Role in the Terrorist Attacks ............. 45

       C.   The Complaint Does Not Plausibly Allege Defendants "Knowingly
            Provided Substantial Assistance" to Hamas and PIJ in Connection with the
            Terrorist Attacks ........................................................................................... 48

       D.   The Complaint Does Not Allege Defendants Conspired with Hamas or PIJ
            to Carry Out the Terrorist Attacks .......................................................... 54

IV.    SOME OF THE PLAINTIFFS' LACK STANDING TO BRING SOME OR
       ALL OF THEIR CLAIMS .......................................................................... 56

       A.   Plaintiffs Who Are Suing as Personal Representatives of Estates of
            Decedents Who Are Not U.S. Nationals Do Not Have an ATA Claim ............... 56

       B.   Plaintiffs Shnaider and Newman-Kelmanson Have No ATA Claims for
            Emotional Injury Related to Harm to Non-U.S., Non-Immediate Family
            Members ..................................................................................................... 56

CONCLUSION .................................................................................................. 57

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).........................................................................................................28

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).........................................................................................................28

*\*Bernhardt v. Islamic Republic of Iran*,
  47 F.4th 856 (D.C. Cir. 2022)................................................................................. *passim*

*Biton v. Palestinian Interim Self-Government Auth.*,
  310 F. Supp. 2d 172 (D.D.C. 2004) ................................................................................56

*Bristol-Myers Squibb Co. v. Superior Court*,
  582 U.S. 255 (2017)...................................................................................................16, 22

*D'Onofrio v. SFX Sports Grp.*,
  534 F. Supp. 2d 86 (D.D.C. 2008) ..................................................................................15

*\*Daimler AG v. Bauman*,
  571 U.S. 117 (2014)...................................................................................15, 16, 17, 18

*Dole Food Co. v. Patrickson*,
  538 U.S. 468 (2003).........................................................................................................17

*Duarte v. Nolan*,
  190 F. Supp. 3d 8 (D.D.C. 2016) ....................................................................................18

*Erwin-Simpson v. Berhad*,
  985 F.3d 883 (D.C. Cir. 2021).........................................................................................16

*Farron v. Islamic Republic of Iran*,
  No. 1:24-cv-00358-CJN (D.D.C. filed Feb. 6, 2024) ...............................................6, 42

*\*Fawzi v. Al Jazeera Media Network*,
  273 F. Supp. 3d 182 (D.D.C. 2017) .....................................................................14, 17, 18

*Fields v. Twitter, Inc.*,
  217 F. Supp. 3d 1116 (N.D. Cal. 2016), *aff'd*, 881 F.3d 739 (9th Cir. 2018) ........................41

*Fritz v. Islamic Republic of Iran*,
  324 F. Supp. 3d 54 (D.D.C. 2018) ...................................................................................57

*Gilmore v. Palestinian Interim Self-Government Auth.*,
  843 F.3d 958 (D.C. Cir. 2016) ....................................................................18

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  564 U.S. 915 (2011) ...................................................................................16

*GTE New Media Servs., Inc. v. Ameritech Corp.*,
  21 F. Supp. 2d 27 (D.D.C. 1998) ...............................................................15

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) ........................................................... *passim*

*Halley v. Blinken*,
  No. 1:24-cv-00571, 2024 U.S. Dist. LEXIS 212365 (D.D.C. Nov. 21, 2024) .........................7

*Estate of Heiser v. Islamic Republic of Iran*,
  659 F. Supp. 2d 20 (D.D.C. 2009) ..............................................................57

*Heping Li v. Keqiang Li*,
  No. 23-7052, 2024 U.S. App. LEXIS 27508 (D.C. Cir. Oct. 29, 2024) ................................19

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) .................................................................................1, 36

*Kaplan v. Al Jazeera*,
  10 Civ. 5298, 2011 U.S. Dist. LEXIS 61373 (S.D.N.Y. June 7, 2011) .....................31, 32, 41

*Kemper v. Deutsche Bank AG*,
  911 F.3d 383 (7th Cir. 2018) .....................................................................39

*Keren Kayemeth Leisrael-Jewish Nat'l Fund v. Educ. for a Just Peace in the
  Middle East*,
  530 F. Supp. 3d 8 (D.D.C. 2021), *aff'd*, 66 F.4th 1007 (D.C. Cir. 2023) ................40, 51, 52

*\*Keren Kayemeth LeIsrael-Jewish Nat'l Fund v. Educ. for a Just Peace in the
  Middle East*,
  66 F.4th 1007 (D.C. Cir. 2023) ........................................................... *passim*

*Leitner-Wise v. Clark*,
  No. 18-771, 2018 U.S. Dist. LEXIS 215927 (D.D.C. Dec. 26, 2018) ....................................17

*Lewis v. Mutond*,
  62 F.4th 587 (D.C. Cir. 2023) .....................................................................25

*Light v. Wolf*,
  816 F.2d 746 (D.C. Cir.1987). ....................................................................26

*Linde v. Arab Bank, PLC,*
    882 F.3d 314 (2d Cir. 2018)................................................................38, 46

*Livnat v. Palestinian Auth.,*
    851 F.3d 45 (D.C. Cir. 2017) ................................................................14

*Miller v. Cartel,*
    No. 1:20-cv-00132, 2022 U.S. Dist. LEXIS 112463 (D.N.D. June 24, 2022) .......................57

*Mwani v. Bin Laden,*
    417 F.3d 1 (D.C. Cir. 2005)................................................................23

*NAACP v. Claiborne Hardware Co.,*
    458 U.S. 886 (1982)................................................................38

*\*Newman v. AP,*
    758 F. Supp. 3d 1357 (S.D. Fla. 2024) ........................................................ *passim*

*\*Ofisi v. BNP Paribas, S.A.,*
    77 F.4th 667 (D.C. Cir. 2023) ........................................................ *passim*

*Owens v. BNP Paribas, S.A.,*
    235 F. Supp. 3d 85 (D.D.C. 2017), *aff'd*, 897 F.3d (D.C. Cir. 2018)................................38, 40

*\*Owens v. BNP Paribas, S.A.,*
    897 F.3d 266 (D.C. Cir. 2018) ................................................................28, 40

*Page v. Comey,*
    628 F. Supp. 3d 103 (D.D.C. 2022) ................................................................28

*Pollard v. District of Columbia,*
    285 F.R.D. 125 (D.D.C. 2012)................................................................27

*Raanan v. Binance Holdings Ltd.,*
    No. 24-cv-697 (JGK), 2025 U.S. Dist. LEXIS 33874 (S.D.N.Y. Feb. 25, 2025)..............56, 57

*Rothstein v. UBS AG,*
    708 F.3d 82 (2d Cir. 2013)................................................................40

*Rush v. Savchuk,*
    444 U.S. 320 (1980)................................................................15

*Safex Found., Inc. v. SafeLaunch Ventures Ltd.,*
    694 F. Supp. 3d 1 (D.D.C. 2023) ................................................................22

*Shnaider v. American Muslims for Palestine,*
    No. 8:24-cv-01067-MSS-SPF (M.D. Fla. filed May 2, 2024)................................................6

*Stallard v. Goldman Sachs Grp.*,
   No. CV 20-2703, 2022 U.S. Dist. LEXIS 2904 (D.D.C. Jan. 6, 2022) ...................................27

*In re Terrorist Attacks on Sept. 11, 2001*,
   No. 03 MDL 1570, 2023 U.S. Dist. LEXIS 55720 (S.D.N.Y. Mar. 30, 2023) ......................56

*Toumazou v. Turkish Republic of Northern Cyprus*,
   71 F. Supp.3d 7 (D.D.C. 2014) .................................................................................................28

*Triple Up Ltd. v. Youku Tudou Inc.*,
   235 F. Supp. 3d 15 (D.D.C. 2017), *aff'd*, No. 17-7033, 2018 U.S. App. LEXIS
   19699 (D.C. Cir. July 17, 2018).........................................................................................14, 25

*Troell v. Binance Holdings Ltd.*,
   No. 1:24-cv-07136-JAV (S.D.N.Y. filed Sept. 20, 2024) ..........................................................6

*\*Twitter v. Taamneh*,
   598 U.S. 471 (2023)...........................................................................................44, 45, 51, 54

*Walden v. Fiore*,
   571 U.S. 277 (2014)...........................................................................................................22, 26

*Whitehead v. CBS/Viacom, Inc.*,
   221 F.R.D. 1 (D.D.C. 2004).....................................................................................................26

*Yan Zhao v. Keqiang Li*,
   Nos. 22-7138, 22-7152, 2023 U.S. App. LEXIS 20999
   (D.C. Cir. Aug. 10, 2023) ........................................................................................................17

*In re Zinc Antitrust Litig.*,
   155 F. Supp. 3d 337 (S.D.N.Y. 2016).....................................................................................29

**Statutes**

18 U.S.C. § 2331 ...............................................................................................................29, 38

18 U.S.C. § 2333 ...................................................................................................... *passim*

18 U.S.C. § 2339A ................................................................................................... *passim*

18 U.S.C. § 2339B ................................................................................................... *passim*

D.C. Code § 13-334 .................................................................................................................26

D.C. Code § 13-422 .................................................................................................................16

D.C. Code § 13-423 ..................................................................................................18, 19, 21, 22

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852
(2016) ................................................................................................................44

**Other Authorities**

Fed. R. Civ. P. 4 ........................................................................................... *passim*

Fed. R. Civ. P. 8 .....................................................................................12, 28, 37, 55

Fed. R. Civ. P. 11 ...........................................................................................12

Fed. R. Civ. P. 12 .......................................................................................... *passim*

**INTRODUCTION**

This lawsuit seeks to use the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*, to hold a Qatari-based global media network and its U.S. subsidiary responsible for Hamas and Palestinian Islamic Jihad ("PIJ") terrorist attacks in Israel on October 7, 2023. Defendants Al Jazeera Media Network ("AJMN") and Al Jazeera International (USA) LLC ("AJI") (collectively, "Defendants" or "Al Jazeera") acknowledge the tragic loss of life and the pain and suffering of the victims of the October 7 attacks and their families. Al Jazeera is not, however, responsible for the events it covers any more than news organizations covering the attacks of September 11 were responsible for the acts of Al-Qaeda.

The Complaint alleges that "Defendants acted as a critical vehicle for Hamas and the PIJ to incite violence" and provided material support to Hamas and PIJ "[b]y providing live coverage, violent images, and inciting language of the October 7 Terrorist Attacks and the aftermath." Compl. ¶¶ 160, 244, 257. But, as the Complaint acknowledges, the "October 7 Terrorist Attacks were widely publicized and televised, along with the subsequent war in Gaza." *Id.* ¶ 159. Many news organizations covered the October 7 attacks and broadcast images, including scenes of violence, on and after that day. Following October 7, Al Jazeera has been the most persistent media presence covering Israel's military operation in Gaza and the death and famine that it has caused. *Id.* ¶ 100 ("Throughout the ensuing war in Gaza following the October 7 Terrorist Attacks, Al Jazeera has had more cameras in Gaza than any other news outlet."). But for good reason, covering news does not give rise to ATA liability. The First Amendment protects the freedom of the press, and the ATA is not intended to abridge those protections. *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010); 18 U.S.C. § 2339B(i). A federal court already has dismissed a similar lawsuit seeking to hold the Associated Press ("AP") liable under the ATA for its coverage of the terrorist attacks on October 7. *Newman v. AP*, 758 F. Supp. 3d

1

1357 (S.D. Fla. 2024). Incitement is not protected by the First Amendment, but the Complaint

fails to identify any Al Jazeera coverage that would constitute incitement of the October 7

attacks, and Plaintiffs' incitement theory is undermined by their own allegations that "Hamas and

the PIJ had planned and trained for this terrorist attack for years." Compl. ¶ 155.

      This case comes to the Court while the trauma of the October 7 attacks continues. Several

of the hostages taken by Hamas and PIJ during the initial attacks remain captive in Gaza, and the

Israel Defense Force's ("IDF") ground and air campaign in response has killed more than 50,000

Palestinians, nearly a third of whom are children.[1] Journalists, including Al Jazeera journalists,

who cover the Gaza war do so at great personal risk. According to the Committee for the

Protection of Journalists ("CPJ"):

> As of June 16, 2025, CPJ's preliminary investigations showed at least 185
> journalists and media workers were among the more than tens of thousands killed
> in Gaza, the West Bank, Israel, and Lebanon since the war began, making it
> the deadliest period for journalists since CPJ began gathering data in 1992.
>
> Journalists in Gaza face particularly high risks as they try to cover the conflict,
> including devastating Israeli airstrikes, famine, the displacement of 90% of Gaza's
> population, and the destruction of 80% of its buildings. CPJ is investigating more
> than 130 additional cases of potential killings, arrests and injuries, but many are
> difficult to document amid these harsh conditions.[2]

"At least 17 journalists and two media workers were directly targeted by Israeli forces in killings

which CPJ classifies as murders," including four journalists referenced in the Complaint: Hamza

---

[1] Nidal Al-Mughrabi & Emma Farge, *Gaza death toll: how many Palestinians has Israel's offensive killed?*, Reuters (Mar. 24, 2025), https://www.reuters.com/world/middle-east/how-many-palestinians-has-israels-gaza-offensive-killed-2025-01-15/.

[2] *Journalist casualties in the Israel-Gaza war*, CPJ, https://cpj.org/2023/10/journalist-casualties-in-the-israel-gaza-conflict/ (last updated June 16, 2025); *see also* Mohamed A. Hussein & Hanna Duggal, *Know their names: Palestinian journalists killed by Israel in Gaza*, Al Jazeera (Dec. 31, 2024), https://www.aljazeera.com/features/longform/2024/12/31/know-their-names-the-palestinian-journalists-killed-by-israel-in-gaza; *War in Gaza: Israel must be held accountable*, International Federation of Journalists, https://www.ifj.org/war-in-gaza (last visited June 30, 2025).

Al Dahdouh, Mustafa Thuraya, Ismail Al Ghoul, and Hossam Shabat.[3] Indeed, in many instances, the first time a journalist is branded as having ties to Hamas is *after* the IDF has killed or injured that journalist. The banning of Al Jazeera broadcasts in Israel (Compl. ¶ 146), the targeting of Al Jazeera journalists by branding Al Jazeera as a "Hamas mouthpiece" (*id.*), and the accusation that Al Jazeera's Gaza journalists have ties to Hamas are common tools used to mitigate the reputational harm that Al Jazeera's coverage of the Gaza military operations have caused. Plaintiffs rest their case on these unsubstantiated claims. More objective sources have recognized Al Jazeera for its coverage of the conflict. Al Jazeera English's *Fault Lines' The Night Won't End* and Al Jazeera Digital's *One Day in Gaza: Close Up* both won prestigious Peabody Awards last year.[4] *Fault Lines' The Night Won't End, All That Remains*, and *Starving Gaza* have been nominated for 2025 Emmy awards.[5]

Although the Complaint accuses (wrongly and summarily) Al Jazeera of providing a "platform" for Hamas, broadcasting "inciting" content, and employing Hamas "operatives," it never plausibly connects that rhetoric to the elements of an ATA claim for either direct (primary) or indirect (secondary) liability. Grasping to find any theory that Defendants provided material support to or aided and abetted Hamas or PIJ, Plaintiffs allege that Al Jazeera paid salaries to some journalists that the IDF, posthumously, linked to Hamas or PIJ. Even if these allegations are to be credited for purposes of the motion to dismiss, the Complaint does not plausibly allege any knowledge by Al Jazeera that its journalists were affiliated with Hamas or PIJ and does not

---

[3] CPJ, *supra* note 2.

[4] *The Night Won't End*, Peabody Awards, https://peabodyawards.com/award-profile/the-night-wont-end/ (last visited June 30, 2025); *One Day in Gaza: Close Up*, Peabody Awards, https://peabodyawards.com/award-profile/one-day-in-gaza-close-up/ (last visited June 30, 2025).

[5] National Academy of Television Arts & Science, *The 46th Annual News & Documentary Emmy Nominees*, https://theemmys.tv/news-46th-nominations-gallery/ (last visited June 30, 2025).

allege that any of the journalists played any role in planning or carrying out any of the attacks that injured Plaintiffs. Instead, Plaintiffs point to the journalists' protected political speech on personal social media posts and news coverage of Hamas officials, neither of which creates ATA liability for Defendants.

Setting aside the repeated conclusory allegations regarding Al Jazeera, one is left with a Complaint that fails at every turn to allege essential elements of Plaintiffs' causes of action. As to AJMN, as discussed in Part I of the Argument, Plaintiffs do not plausibly allege any basis for the exercise of personal jurisdiction over the Qatari corporation because the Plaintiffs' claims do not bear a sufficient relationship to any D.C.- or even U.S.-based conduct of AJMN. Accordingly, AJMN moves to dismiss pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(2). AJMN moves to dismiss under Rule 12(b)(5) for the additional reason that Plaintiffs failed to adequately serve AJMN because they purported to effect service through service on *AJI's*, not AJMN's, agent for service of process.

Both Defendants move to dismiss under Rule 12(b)(6) for failure to state a claim. Turning to Plaintiffs' direct liability claims under 18 U.S.C. § 2333(a), as discussed in Part II, Plaintiffs fail to plausibly allege that either AJMN or AJI engaged in any "act of international terrorism," either Defendant acted with the requisite scienter, or either Defendant's conduct proximately caused their injuries. Plaintiffs' claims under 18 U.S.C. § 2333(d) for aiding and abetting and conspiracy fare no better. As discussed in Part III, the Complaint does not plausibly allege that Defendants knowingly provided substantial assistance to Hamas or PIJ or conspired with them to engage in terrorist acts. And, even though most of Plaintiffs' claims require a showing that the attack was planned or committed by a designated foreign terrorist organization ("FTO"), nearly half of the Plaintiffs do not allege they were injured in an FTO attack but instead

allege an attack by unidentified "terrorists," with no allegation that Defendants materially supported, aided and abetted, or conspired with those unidentified "terrorists."

In sum, the harm Plaintiffs suffered at the hands of Hamas, PIJ, and the unknown terrorists who planned and carried out the attacks bears no legal connection to AJMN and AJI, whose coverage of the ongoing Israeli-Palestinian conflict and the attacks of October 7 do not constitute violations of the ATA under any theory. For the reasons set forth below, the Complaint should be dismissed with prejudice.

## FACTUAL ALLEGATIONS

### A.    The Parties

**Plaintiffs.** Plaintiffs bring this action under the ATA, seeking to impose liability on AJMN and AJI for Hamas or PIJ terrorist attacks on October 7, 2023, and for attacks by unidentified "terrorists" in the Israel-Gaza war that followed. The ATA's civil liability provision creates a private cause of action for "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs." 18 U.S.C. § 2333(a).

Ten of the Plaintiffs bring suit solely in their capacity as a personal representative of the estate of someone killed in the attacks at issue, all but one of whom do not allege any familial relationship with the decedent. *See* Laura G. Ferguson Decl. ("Ferguson Decl."), Ex. 1, tbl.1. Another four bring suit both individually *and* as a personal representative. *Id.* tbl.2. Of the fourteen Plaintiffs suing as personal representatives, three are personal representatives of estates of decedents who are not alleged to be U.S. nationals, and therefore these Plaintiffs have no ATA claim in their capacity as personal representatives: Friedman, Gitler, and Bernstein. *Id.* tbls.1–2. Moreover, seven of the fourteen personal representative Plaintiffs allege injury for post-October 7 attacks where the organization responsible for the attack is not identified. *Id.* tbls.1–2; *see also*

5

tbl.5. Unable to allege who planned, orchestrated, or carried out the attack, those Plaintiffs (the Lubins, Friedman, Hexter, Tatelbaum, Gitler, and Zenilman) cannot state a claim that Defendants provided any material support to the organization that carried out the attack or aided and abetted or conspired with the organization.

Five of the Plaintiffs allege physical injuries from terrorist attacks, but four of the five (Margulies, Bollag, Merkin, and Kamer) allege injuries in post-October 7 attacks by unidentified "terrorists," with no allegation of any involvement by Hamas or PIJ. *Id.* tbl.3. All told, eleven of the Plaintiffs—or nearly half—allege injury from post-October 7 attacks but do not allege any Hamas or PIJ role in those attacks. *Id.* tbl.5.

Five of the Plaintiffs allege purely emotional injury related to October 7, but some of those claims impermissibly seek damages for concern for, or loss of, non-immediate family members, including brothers-in-laws, a niece and nephew-in-law, and children of a niece. *Id.* tbl.4 (Shnaider and Newman-Kelmanson).

All the Plaintiffs have brought other lawsuits alleging that different defendants caused their injuries by materially supporting or aiding and abetting Hamas. Some have brought as many as four separate lawsuits, most involving multiple defendants. *Id.* tbl.6. All but one of the Plaintiffs (Kamer) sued Iran, alleging that Iran is responsible for their injuries. *Farron v. Islamic Republic of Iran*, No. 1:24-cv-00358-CJN (D.D.C. filed Feb. 6, 2024). Ten of the Plaintiffs sued several U.S. based pro-Palestinian organizations and individuals associated with them for allegedly materially supporting Hamas and aiding and abetting the October 7 attacks by supporting pro-Palestinian activism on U.S. college campuses. *Shnaider v. American Muslims for Palestine*, No. 8:24-cv-01067-MSS-SPF (M.D. Fla. filed May 2, 2024). Eighteen Plaintiffs have sued Binance, alleging it materially supported and aided and abetted Hamas. *Troell v.*

*Binance Holdings Ltd.*, No. 1:24-cv-07136-JAV (S.D.N.Y. filed Sept. 20, 2024). Nine of the Plaintiffs sued the U.S. Secretary of State, among others, for permitting U.S. funding of the United Nations Relief and Work Agency for Palestinian Refugees in the Near East, which Plaintiffs claim provided material support to Hamas in connection with the October 7 attacks. *Halley v. Blinken*, No. 1:24-cv-00571, 2024 U.S. Dist. LEXIS 212365 (D.D.C. Nov. 21, 2024). That lawsuit already has been dismissed. *Id.* at *18.

**Defendants.** Plaintiffs sue two Al Jazeera entities: AJMN and AJI. The Complaint alleges AJMN is a "global media conglomerate headquartered in Doha, Qatar." Compl. ¶ 40. "Established in 1996, the network operates multiple channels, including Al Jazeera Arabic and Al Jazeera English, distributing content worldwide via television, online platforms, and social media." *Id.*

AJI is a "Delaware limited liability company and a subsidiary of Al Jazeera Media Network," with its main office in Washington, D.C. *Id.* ¶ 41. According to the Complaint, AJI "serves as a primary hub for the network's U.S. activities, including Al Jazeera English." *Id.* Al Jazeera English, in turn, produces and broadcasts *UpFront* and *Fault Lines*. *Id.* ¶ 10. Outside of the personal jurisdiction allegations, the Complaint mentions Al Jazeera English only once, referencing social media posts of an Al Jazeera English journalist who is not alleged to have any affiliation with Hamas or PIJ. *Id.* ¶ 134. The only non-jurisdictional allegation as to *UpFront* is the allegation that *UpFront* interviewed the Head of the International Relations Department of Hamas in 2017 and in 2023 and "likely compensated" him for the interviews. *Id.* ¶ 114. *Fault Lines* is not discussed in the Complaint other than the jurisdictional allegation that it is a program based in Washington, D.C. *Id.* ¶ 10. The Complaint does not allege that AJI employed any of the journalists alleged to be Hamas operatives. Thus, aside from the two interviews, spaced six years

apart, of the Head of the International Relations Department of Hamas, which are not alleged to contain any inciting content, the Complaint does not allege *any connection* between AJI and Hamas or PIJ.

### B.    Allegations Regarding Al Jazeera Journalists

The Complaint alleges that ten "Al Jazeera" journalists have been accused by the IDF of being Hamas operatives. Compl. ¶¶ 57 (Abu Omar), 66 (Washah), 69 (Al-Dahdouh and Thuria), 73 (Al-Ghoul)*,* 130 (Al-Sharif), 79 (Salameh, Shabat, Al-Sarraj, and Al-Arrouqi). The Complaint does not allege that either Defendant employed these journalists, as opposed to a different Al Jazeera legal entity not party to this suit. Only two of the ten (Abu Omar and Al-Ghoul) are alleged to have worked in coordination with Hamas on October 7, and neither is alleged to have been acting as an Al Jazeera journalist on October 7 or even to have been employed by Al Jazeera on October 7. *See id.* ¶¶ 90–98 (alleging Abu Omar provided live updates on his personal Telegram account); *id.* ¶¶ 70, 73 & n.43 (citing IDF claim that Al-Ghoul participated in the October 7 attacks as a member of Hamas's Nukhba force and alleging Al-Ghoul was not hired by Al Jazeera until November 2023). A third journalist (Al-Sharif) is alleged to have made inciting posts on October 7 on his personal Telegram account, but, again, the Complaint does not allege that he was employed as an Al Jazeera journalist when making those posts or acting within the scope of his employment. *Id.* ¶¶ 128–30.[6] The other seven are not alleged to have any involvement in the October 7 attacks or the post-October 7 incidents in which some of the Plaintiffs were injured.

---

[6] In 2024, Amnesty International awarded Anas Al-Sharif its Human Rights Defender award. *Human Rights Defender Awards*, Amnesty International (Dec. 12, 2024), https://www.amnesty.org.au/human-rights-defender-awards-2024/.

Moreover, the Complaint does not allege that Defendants had any knowledge of the ten journalists' supposed Hamas affiliation at the time of the October 7 attacks. The claims of Hamas affiliation were made by the IDF in 2024 (most in October), more than a year after the attacks. *Id.* ¶¶ 57 & n.24, 66 & n.37, 69 & n.40, 70, 73 & n.43, 79 & n.51.[7] The Complaint improbably claims that AJMN "should have known" of the Hamas affiliations—supposed affiliations that the IDF and Israeli intelligence themselves did not "uncover" until well after the October 7 attacks—because AJMN interviews employees before hiring them and conducts background checks of those who have accepted employment offers. *Id.* ¶¶ 85–87. In addition to the implausibility of this allegation, a "should have known" negligence standard does not satisfy the scienter requirements for Plaintiffs' claims. Defendants also are faulted for failing to terminate the journalists after the IDF made its claims about their supposed Hamas affiliation. *Id.* ¶ 88. But by the time the IDF made those claims in 2024, as noted, three of the journalists had been killed and all the attacks alleged to have been carried out by Hamas (the October 7 attacks) already had occurred, as the Complaint does not allege that Hamas planned or carried out the post-October 7 attacks at issue.

### C.    The October 7, 2023, Terrorist Attacks and Post-October 7 Attacks

Just over half (12 of 23) of the Plaintiffs claim injury for the attacks that occurred on October 7, 2023. The Complaint alleges that "[i]n the early morning hours . . . , approximately six thousand terrorists from Hamas and the PIJ in the Gaza Strip perpetrated a cross-border

---

[7] The IDF claimed Abu Omar was a Hamas operative a few days after injuring him in an airstrike that resulted in the amputation of his right leg. *Al-Jazeera reporter, cameraman, critically injured by Israeli drone strike in Rafah*, CPJ (Feb. 13, 2024), https://cpj.org/2024/02/al-jazeera-reporter-cameraman-critically-injured-by-israeli-drone-strike-in-rafah/; Compl. ¶ 57 n.24. Similarly, the IDF claimed that Al-Dahdouh, Thuria, and Al-Ghoul were Hamas operatives a few days after claiming credit for intentionally killing them. Compl. ¶69 n.40; *id.* ¶¶ 77, 73 n.43.

infiltration into Israel, through its southern security fence, and massacred more than 1,200 people." *Id.* ¶ 148. "While the October 7 Terrorist Attacks were planned and led by Hamas, other Palestinian terrorist groups also participated in the attacks, including the PIJ." *Id.* ¶ 153. The United States has designated both Hamas and PIJ as FTOs. *Id.* ¶¶ 43, 49. "According to Israeli intelligence reports, Hamas and the PIJ had planned and trained for this terrorist attack for years, organizing every detail and eventuality." *Id.* ¶ 155.

The remaining eleven Plaintiffs allege injury from violence that occurred *after* October 7. Six of those Plaintiffs bring claims related to the injury to or killing of IDF soldiers while on duty, another two Plaintiffs bring claims on behalf of an individual who was killed while on duty with the Israeli Border Police, and three Plaintiffs allege injury from a car attack at a bus stop. *See* Ferguson Decl., Ex. 1, tbl.5. The Complaint alleges that these attacks were carried out by unidentified "terrorists," and alleges no Hamas or PIJ responsibility for the attacks. Compl. ¶¶ 168, 170, 172, 176–77, 195–96, 199–200, 203, 205, 223, 230, 232. The Complaint does not allege that Defendants or their employees had any role in these attacks or even provided news coverage of the attacks other than general claims that Al Jazeera covered the Israel-Gaza war.

### D.    The Defendants' Alleged Role in the October 7 Attacks

The Complaint alleges that Al Jazeera provided "live coverage, violent images, and inciting language of the October 7 Terrorist Attacks and the aftermath." *Id.* ¶ 244; *see also id.* ¶ 257. It acknowledges that the "October 7 Terrorist Attacks were widely publicized and televised, along with the subsequent war in Gaza," *id.* ¶ 159, and does not articulate any way in which Al Jazeera's coverage on October 7 differed from that of other news organizations or conceivably could constitute an "act of international terrorism." Indeed, aside from a reference to Al Jazeera broadcasting images of kidnapped Israelis "being paraded through the streets of

Gazan cities," *id.* ¶ 151, the Complaint does not describe *any* coverage *by Al Jazeera* on October 7. Instead, the Complaint focuses on October 7 posts on "personal social media accounts," *id.* ¶ 243, of two alleged Al Jazeera employees. *Id.* ¶¶ 90–98, 128. The Complaint makes repeated claims that Al Jazeera engages in "incitement," but remarkably does not identify any broadcasts or Al Jazeera content in the days, weeks, or even months preceding the October 7 attacks that could be characterized as inciting the attacks.

Plaintiffs also allege that Al Jazeera provides a "platform" for Hamas and PIJ to "organize their terrorist agenda, communicate their terrorist plans, recruit terrorist members, and incite violence." *Id.* ¶ 5; *see also id.* ¶¶ 52, 119. The Complaint, however, provides no factual allegations that, if true, would support these claims. Instead, the Complaint alleges instances in which Al Jazeera journalists, consistent with their role as members of a news organization covering the Gaza Strip, interviewed Hamas or PIJ leaders. *See, e.g.*, *id.* ¶ 103 ("Al Jazeera has hosted, conducted, and televised interviews with high-ranking members of Hamas and the PIJ on numerous occasions, and continues to do so."). The Complaint repeatedly draws entirely baseless inferences about these interviews, such as alleging that an Al Jazeera reporter's interview of a PIJ spokesperson outside the Al Shifa Hospital in Gaza, a "sensitive location," "signif[ied] their close coordination," *id.* ¶ 111, or that Al Jazeera "likely" paid a Hamas official for two interviews and "reportedly" pays other Hamas or PIJ officials for interviews because a 2019 story posted on Medium by someone with no connection to Al Jazeera described "[s]ome large media outlets" paying *journalists* appearing on their shows to talk about their work or weigh in on current events amounts ranging from $50–$150, *id.* ¶¶ 114, 117 n.132.

Numerous allegations long pre-date the October 7 attacks and have no conceivable relevance to any role of Defendants in the Plaintiffs' injuries. Examples include allegations

regarding Al Jazeera hosting the Head of the International Relations Department of Hamas at a 2015 panel discussion (*id.* ¶ 114), a 2017 interview with Hamas leader Khaled Meshaal (*id.* ¶ 106), a 2017 post on a journalist's X account (*id.* ¶ 83), and a 2011 Jerusalem Post story about a former Al Jazeera Afghanistan bureau chief admitting to Shin Bet during an interrogation that he was a Hamas operative from 1993–2004, as a condition of his release from prison (*id.* ¶ 82 & n.59). Many other allegations of supposed Al Jazeera affiliations with Hamas or platforming of Hamas relate to news coverage of the war in Gaza, which post-dates the October 7 attacks. *See, e.g.*, *id.* ¶¶ 99, 101–02, 105, 109, 115–16, 121–22, 126, 137–42. As noted, the Complaint alleges no Hamas role in the post-October 7 attacks that injured some of the Plaintiffs. In any event, the "platforming" allegations relate to Defendants' First Amendment-protected news coverage, including post-October 7 coverage of the war, and do not describe any conduct that would constitute an act of international terrorism or knowingly providing any substantial assistance to a designated FTO, which are necessary for Plaintiffs to plead a basis for ATA liability.

### E.    Plaintiffs' Use of Footnoted Sources

Plaintiffs make extensive use of footnotes, quoting from or referencing footnoted sources throughout the Complaint. The 76-page Complaint includes just over 200 footnotes. The use of footnotes violates the spirit if not the letter of Rules 8(a) and 11(b)(3) pleading requirements in a number of respects: (1) the sheer volume of the footnotes violates Rule 8(a)(2)'s requirement that the Complaint include "a short and plain statement of the claim"; (2) some of the footnotes reference social media posts or videos that are not available at the address provided; (3) many of the footnotes reference material that is in Arabic, and no certified English translation is provided; (4) for many of the footnotes, the Complaint does not provide, and it is burdensome to determine, the date and underlying source of the information; and (5) in many cases, the source

material is not accurately described in the Complaint, to put it mildly. This is especially troubling given the prominent role that advocacy groups played in preparing the Complaint and the English translations included in the Complaint.[8] If Plaintiffs are to rely on footnoted sources in their Complaint allegations, they should provide Defendants and the Court a copy of the referenced material, with certified translations of non-English material. Otherwise, reference to any footnoted material not subject to judicial notice should be stricken.

## ARGUMENT

### I.    Claims Against Al Jazeera Media Network Must Be Dismissed for Lack of Personal Jurisdiction and Insufficient Service of Process

This Court should dismiss the Complaint against AJMN for lack of personal jurisdiction because there is no statutory basis for the exercise of jurisdiction over AJMN and, in any event, the exercise of jurisdiction over AJMN would not comport with due process. The Qatari-based AJMN is not "at home" in the District of Columbia, so there is no general personal jurisdiction over AJMN. *See* Part I.A. And, because the Complaint does not allege suit-related D.C. conduct by AJMN, AJMN also is not subject to specific personal jurisdiction. *See* Part I.B. Moreover, even if the forum is treated as the United States as a whole, the Complaint fails to allege a basis for exercising jurisdiction over AJMN. *See* Part I.C. Finally, exercise of personal jurisdiction depends on service of process, *see* Rule 4(k)(1)–(2), and here Plaintiffs did not sufficiently serve

---

[8] "Jordan Cope, Director of Policy Education for StandWithUs and a legal consultant and researcher on the lawsuit stated, 'StandWithUs has assisted Shurat HaDin to prepare this lawsuit including providing critical research, legal theory and consulting, and Arabic translations in order to help expose Al Jazeera journalists and their affiliations to terrorist groups—including Hamas and the Islamic Jihad.'" *Shurat HaDin Sues Al Jazeera on Behalf of Victims of Terrorism*, StandWithUs, https://www.standwithus.com/post/shurat-hadin-sues-al-jazeera-on-behalf-of-victims-of-terrorism (updated Mar. 4, 2025).

process on AJMN because they improperly attempted to effect service by serving *AJI's* agent for service of process. AJMN has no agent for service of process in the United States. *See* Part I.D.

      ***A Note on Plaintiffs' Burden of Proof.*** Plaintiffs bear the burden of establishing that jurisdiction is proper by making "a prima facie showing of the pertinent jurisdictional facts." *Livnat v. Palestinian Auth.*, 851 F.3d 45, 56–57 (D.C. Cir. 2017). "[T]he Court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts. Mere conclusions or bare allegations do not constitute the prima facie case for jurisdiction that this standard requires." *Fawzi v. Al Jazeera Media Network*, 273 F. Supp. 3d 182, 185–86 (D.D.C. 2017) (cleaned up). In deciding a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the Court need not treat the Complaint's allegations as true but may instead "weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts." *Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 20 (D.D.C. 2017), *aff'd*, No. 17-7033, 2018 U.S. App. LEXIS 19699 (D.C. Cir. July 17, 2018).

      Here, Plaintiffs fail to allege facts that would establish any basis for the exercise of personal jurisdiction over AJMN. The Complaint alleges that AJMN is based in Qatar, not Washington, D.C. or the United States, and a declaration from an AJMN representative confirms there is no basis for the exercise of general personal jurisdiction. Eithar Abutaha Decl. ("Abutaha Decl."). Further, the Complaint does not allege any forum-based suit-related conduct. It does not allege that AJMN has any employees in Washington, D.C. or the United States that are members of Hamas or PIJ, that any D.C.- or U.S.-based programming incited the October 7 attacks, or that any form of material support or substantial assistance from AJMN was made from Washington, D.C. or the United States. Indeed, the Complaint fails to identify *any* U.S.-based nexus with the

attacks that injured Plaintiffs, other than the U.S. citizenship of many of the Plaintiffs, which is insufficient to create jurisdiction over AJMN.

Moreover, jurisdictional facts must be pled as to *each* defendant; "plaintiff cannot aggregate factual allegations concerning multiple defendants in order to demonstrate personal jurisdiction over any individual defendant." *D'Onofrio v. SFX Sports Grp.*, 534 F. Supp. 2d 86, 90 (D.D.C. 2008) (citing *Rush v. Savchuk*, 444 U.S. 320, 331–32 (1980)). Here, the Complaint repeatedly refers to "Al Jazeera" or "Defendants" without specifying which Defendant entity is responsible for the conduct alleged. *See, e.g.*, Compl. ¶ 10 ("Al Jazeera explicitly targets American audiences"); *id.* ("Defendants" distribute content to U.S. audiences); *id.* ¶ 12 ("Defendants are compensating designated terrorists out of Washington, D.C."); *id.* ("Defendants . . . purposefully direct content toward U.S. audiences"). None of the allegations related to targeting U.S. and D.C. audiences through Al Jazeera media content is specific to AJMN. They are, instead, the sort of "bare allegations or conclusory statements" that fail to "allege specific facts connecting *each defendant* with the forum." *GTE New Media Servs., Inc. v. Ameritech Corp.*, 21 F. Supp. 2d 27, 36 (D.D.C. 1998) (emphasis added).

## A.    The Court Lacks General Personal Jurisdiction over AJMN

Under Rule 4(k)(1)(A), "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant" who is "subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Fed. R. Civ. P. 4(k)(1). Thus, "[f]ederal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (citing Rule 4(k)(1)). As discussed in Part I.D. below, AJMN has not been properly served so the service requirement of Rule 4(k)(1) has not been met. But, in any event, the District of Columbia's jurisdictional statutes do not provide a basis for the exercise of jurisdiction.

15

The Complaint wrongly contends (Compl. ¶ 9) that general personal jurisdiction exists under Section 13-422 of D.C. Code, which provides: "A District of Columbia court may exercise personal jurisdiction over a person domiciled in, organized under the laws of, or maintaining his or its principal place of business in, the District of Columbia as to any claim for relief." D.C. Code § 13-422. The Complaint does not allege that AJMN is incorporated in the District of Columbia or maintains its principal place of business here. To the contrary, the Complaint alleges—correctly—that AJMN is headquartered in Doha, Qatar. Compl. ¶¶ 10, 40. Indeed, AJMN is organized under the laws of Qatar and maintains its principal place of business in Doha, Qatar; it is not incorporated in any U.S. jurisdiction. Abutaha Decl. ¶¶ 3, 4. Given that AJMN meets none of the requirements of Section 13-422, that statute cannot provide a basis for the exercise of jurisdiction. *Erwin-Simpson v. Berhad*, 985 F.3d 883, 889 (D.C. Cir. 2021) ("a Malaysian corporation without a principal place of business in the District, clearly does not meet the conditions of section 13-422").

In addition, the exercise of general personal jurisdiction over AJMN would not comport with Fourteenth Amendment due process. "[O]nly a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there." *Daimler*, 571 U.S. at 137. "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A.* v. *Brown*, 564 U.S. 915, 924 (2011); *see also Daimler*, 571 U.S. at 137; *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255, 262 (2017). "With respect to a corporation, the place of incorporation and principal place of business are paradigm bases for general jurisdiction." *Daimler*, 571 U.S. at 137 (cleaned up). "Those affiliations have the virtue of being unique—that is, each ordinarily indicates only one

place—as well as easily ascertainable." *Id.* AJMN is not "at home" in Washington, D.C., as it is neither incorporated in Washington, D.C. nor is its principal place of business located here. Abutaha Decl. ¶¶ 3, 4. As noted, the Complaint alleges that AJMN is headquartered in Doha, Qatar. Compl. ¶¶ 10, 40.

The Complaint alleges that AJI, a subsidiary of AJMN, is based in Washington, D.C., *id.* ¶¶ 9, 41, but jurisdiction over AJMN may not be based on AJI's or any other subsidiary's jurisdictional contacts. AJMN and AJI are separate legal entities, and the Complaint alleges no basis for disregarding corporate form. "A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474–75 (2003). Establishing that an AJMN subsidiary is at home in Washington, D.C. "is simply not enough" under *Daimler* to establish general jurisdiction over AJMN. *Fawzi*, 273 F. Supp. 3d at 187 (holding that AJMN's U.S. subsidiary's jurisdictional contacts could not be imputed to AJMN); *see also Yan Zhao v. Keqiang Li*, Nos. 22-7138, 22-7152, 2023 U.S. App. LEXIS 20999, at *4 (D.C. Cir. Aug. 10, 2023) ("[T]he presence of an in-state subsidiary or affiliate alone is not sufficient to establish personal jurisdiction over an out-of-state corporation."); *Leitner-Wise v. Clark*, No. 18-771, 2018 U.S. Dist. LEXIS 215927, at *12 (D.D.C. Dec. 26, 2018) ("[A] subsidiary's forum contacts are not ordinarily attributed to the parent entity.").

The allegation that AJMN maintains an office in Washington, D.C., which "serves as a primary hub for Al Jazeera's U.S. operations" including "produc[ing], film[ing], and air[ing] programming" in Washington, D.C., Compl. ¶ 10, does not make AJMN "at home" in Washington, D.C. *Daimler*, 571 U.S. at 138 (holding that a formulation that allows for the exercise of general jurisdiction in every forum in which a corporation "engages in a substantial,

continuous, and systematic course of business" is "unacceptably grasping"); *see also Fawzi*, 273 F. Supp. 3d at 186 (concluding that the presence of AJMN employees in District of Columbia is "plainly insufficient for establishing general jurisdiction"); *Gilmore v. Palestinian Interim Self-Government Auth.*, 843 F.3d 958, 965 (D.C. Cir. 2016) (stating that conferral of general jurisdiction over a foreign corporation based on having a "branch office" in the forum is not authorized by D.C.'s long-arm statute and is constitutionally impermissible after *Daimler*). Allegations that AJMN solicited jobs in the D.C. area, Compl. ¶ 10, even in combination with an alleged office in the jurisdiction, likewise cannot provide a basis for general personal jurisdiction. *See Duarte v. Nolan*, 190 F. Supp. 3d 8, 15 (D.D.C. 2016) ("Moreover, that Helix maintains an office in nearby Chantilly, Virginia and once advertised four open positions in Washington, D.C. are insufficient to demonstrate that its affiliations with the District of Columbia are so constant and pervasive as to render it essentially at home here") (cleaned up). In any event, AJMN does not maintain an office in Washington, D.C. Abutaha Decl. ¶ 6.

> **B.    The Court Lacks Specific Personal Jurisdiction over AJMN**
>
> > *1.    The D.C. Long-Arm Statute, D.C. Code § 13-423, Does Not Provide a Basis for Specific Personal Jurisdiction over AJMN*

The Complaint alleges that specific jurisdiction exists under Section 13-423 of the D.C. Code, D.C.'s long-arm statute, which provides for jurisdiction over persons for claims "arising from" certain acts. Compl. ¶ 12. Relevant to the allegations in the Complaint, Section 13-423(a)(1) provides for jurisdiction over persons "transacting any business in the District of Columbia," and Section 13-423(a)(3) provides jurisdiction over persons "causing tortious injury in the District of Columbia by an act or omission in the District of Columbia." D.C. Code § 13-423(a)(1), (3).

Section 13-423(a)(1) does not provide a basis for the exercise of jurisdiction over AJMN. The Complaint simply does not allege how Plaintiffs' injuries in the October 7 attacks and the conflict that followed "arise from [AJMN's] particular transaction of business in the District." *Heping Li v. Keqiang Li*, No. 23-7052, 2024 U.S. App. LEXIS 27508, at *5 (D.C. Cir. Oct. 29, 2024) (cleaned up). All the attacks are alleged to have occurred in Israel and Gaza, and the Complaint draws no connection between those attacks and AJMN's alleged D.C. contacts. These contacts are addressed in turn.

First, the Complaint alleges that "Al Jazeera's presence in Washington D.C. has included over 100 staff credentialed for Congressional press galleries." Compl. ¶ 10. Even assuming this relates to AJMN staff and is accurate,[9] Plaintiffs' claims do not relate to Al Jazeera's coverage of the U.S. Congress.

Second, the Complaint alleges that "[i]n recent months, [AJMN] has solicited jobs based in the Washington, D.C. area." *Id.* Again assuming this is accurate, there are no allegations that Plaintiffs' claims arise from AJMN's recent recruiting of employees. None of the Al Jazeera journalists alleged to be associated with Hamas or PIJ are alleged to have been recruited in District of Columbia or even to have ever worked here.

Third, the Complaint alleges that AJMN "actively manages social media pages for both Al Jazeera English and *UpFront*, specifically targeting and engaging U.S. audiences, including those in D.C." *Id.* ¶ 12 (footnote omitted). The Complaint, however, does not include any allegations linking programming on *UpFront* or any other Al Jazeera English show, or social media posts for Al Jazeera English or *UpFront*, to the Hamas/PIJ October 7 attacks or the Israel-

---

[9] The Complaint cites a source for this allegation from 2017–2018, which is not probative of AJMN's contacts with District of Columbia in 2023, when Plaintiffs' claims arose.

Gaza war that followed. Indeed, the information regarding these programs that Plaintiffs cite demonstrates a lack of connection to the Complaint's substantive allegations. The Complaint cites a list of *Fault Lines* episodes between 2009 and 2023, for example, and none of the titles seem to be related to Israel, Gaza, or Hamas. *Id*. ¶ 10 n.6.

Fourth, and even more improbably, the Complaint alleges that "by interviewing designated terrorists on *UpFront*, a show produced in Washington, D.C., Defendants are compensating designated terrorists out of Washington, D.C." *Id.* ¶ 12. Assuming this claim somehow relates to AJMN and leaving aside there is no "designated terrorist" classification in the ATA, the Plaintiffs still fail to allege who they claim was compensated, or to establish any role by the supposedly compensated interviewee in attacks giving rise to the Plaintiffs' injuries. Plaintiffs point to an October 13, 2023, interview of Hamas spokesperson Osama Hamdan on *UpFront. Id.* ¶ 114. The Complaint speculates without basis that it is "likely" Mr. Hamdan was compensated "from the Washington, D.C.-based show" for the interview. *Id.* Significantly, the Complaint does not allege that this interview is one in which Al Jazeera supposedly gave Hamas a platform to "organize their terrorist agenda, communicate their terrorist plans, recruit terrorist members, and incite violence." *See id.* ¶ 5. Indeed, the cited video, posted on the interviewer's YouTube channel, is captioned: "Marc Lamont Hill CONFRONTS Hamas Spokesperson About Targeting Israeli Civilians!!!" *Id.* ¶ 114 n.125 (emphasis in original). And the exchanges between Hamdan and the interviewer are indeed heated, with the interviewer pressing Hamdan to acknowledge civilian casualties and Hamdan claiming that the interviewer was repeating Israeli talking points. So even if it were plausible that AJMN paid this interview subject from District of Columbia—and it is not—any inference of support or "platforming" is undercut by the interview

itself. Moreover, Hamdan is not alleged to have any role in the October 7 attacks, and statements he made *after* the attacks on October 13 obviously could not have incited those attacks.[10]

Neither may Section 13-423(a)(3) of D.C. Code provide a basis for the exercise of jurisdiction over AJMN. Plaintiffs claim that "Defendants caused tortious injury within the District" by broadcasting programming "with designated terrorists," "airing terrorist-related content," and "featur[ing] interviews with individuals affiliated with terrorist organizations" that "was accessible" in District of Columbia and "incited violence" and "impacted viewers." *Id.* ¶ 12. First, this allegation is not specific to AJMN. Second, the Complaint identifies no D.C.-based "terrorism-related content" other than the interview with Hamdan, which, as discussed, could not have incited the Plaintiffs' injuries as those injuries occurred before the interview took place and, in any event, does not evidence any incitement by AJMN. Third, and most problematically, none of Plaintiffs' injuries are alleged to have occurred in the District of Columbia. Plaintiffs allege injury from attacks in Israel and Gaza; none of the plaintiffs are alleged to reside here or to have been injured here. The claim that broadcasts "impacted viewers" is vague, seemingly irrelevant to Plaintiffs' claims, and entirely unsubstantiated.[11]

Finally, Section 13-423 of D.C. Code provides that claims arising from the acts of a person's agent may establish personal jurisdiction, but the Complaint fails to allege a factual

---

[10] Plaintiffs also reference a 2017 *UpFront* interview with Hamdan about moving the U.S. Embassy to Jerusalem. Compl. ¶ 114 & n.124. The Complaint does not allege how this interview is even remotely related to their claims arising from the October 7 attacks, over six years later.

[11] Section 13-423(a)(4) of D.C. Code also provides for jurisdiction over a person "causing tortious injury in the District of Columbia," in this case "by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia." D.C. Code § 13-423(a)(4). Plaintiffs failed to allege a tortious injury in District of Columbia in the first instance, so Section 13-423(a)(4), like Section 13-423(a)(3), is inapplicable regardless of whether the alleged conduct is understood to have taken place here or elsewhere.

basis for an agency relationship between AJMN and any of its affiliates. The Complaint

suggests, almost in passing, that "Al Jazeera English and Al Jazeera's Arabic Channels (Al

Jazeera Arabic and Al Jazeera Mubasher)" are the "agents" of "Defendants." *Id*. ¶ 12. Plaintiffs

do not substantiate this bare assertion, and, in any event and as articulated above, Plaintiffs'

claims do not arise out of any of the forum contacts allegedly created by Al Jazeera's

programming.

> 2.    *The Exercise of Specific Personal Jurisdiction over AJMN Under Rule 4(k)(1) Does Not Comport with Fourteenth Amendment Due Process*

Plaintiffs' jurisdictional allegations also cannot survive the Fourteenth Amendment due

process inquiry. "For a State to exercise jurisdiction consistent with due process, the defendant's

suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*,

571 U.S. 277, 284 (2014). For specific jurisdiction, "a defendant's general connections with the

forum are not enough." *Bristol-Myers Squibb*, 582 U.S. at 264. The defendant must

"purposefully avail[] itself of the privilege of conducting activities" in the forum, and the

plaintiff's claims must "arise out of or relate to any such activities." *Safex Found., Inc. v.

SafeLaunch Ventures Ltd.*, 694 F. Supp. 3d 1, 9 (D.D.C. 2023).

For all the reasons stated in Part I.B.1 above that the Complaint's jurisdictional

allegations fail to meet the requirements of the D.C. long-arm statute, they also fail to satisfy due

process. *See id.* at 8 (citing cases for the proposition that Section 13-423(a)(1) of D.C. Code is

"coextensive with the due process clause"). The Complaint fails to allege any AJMN activities in

or purposefully directed at the District of Columbia that are related to Plaintiffs' claims or

injuries. Stated another way, all the alleged "suit-related conduct" occurred in Israel or Gaza, not

in the District of Columbia (or even the United States, as discussed in Part I.C below).

The closest the Complaint comes to alleging a connection between the October 7 attacks and Plaintiffs' resulting injuries and AJMN's D.C.-focused conduct is in the allegation that *UpFront* interviewed a Hamas spokesperson almost a week *after* October 7. Compl. ¶ 114. As noted, the interview is not "suit-related" because it does not reflect any material support or aiding and abetting conduct by AJMN and because an October 13, 2023 interview logically has no causal connection to the October 7 attacks and the Plaintiffs do not allege any Hamas role in the later attacks. With no link between AJMN's alleged D.C. conduct and Plaintiffs' injuries, due process does not permit the exercise of specific jurisdiction over AJMN.

### C.    The Exercise of Personal Jurisdiction Under Fed. R. Civ. P. 4(k)(2) Does Not Comport with Fifth Amendment Due Process

At the conclusion of the Complaint's jurisdictional allegations, Plaintiffs briefly assert that this Court may assert personal jurisdiction under Rule 4(k)(2). Compl. ¶ 13. Rule 4(k)(2) permits the exercise of personal jurisdiction for a claim arising under federal law where a summons has been served, and "(A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2). Under Rule 4(k)(2) the proper forum for assessing whether jurisdiction satisfies Fifth Amendment due process is "the United States as a whole." *Mwani v. Bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005). Rule 4(k)(2) was added to the Federal Rules of Civil Procedure in 1993. As the Advisory Committee Notes to the 1993 amendments explain: "There remain constitutional limitations on the exercise of territorial jurisdiction by federal courts over persons outside the United States. . . . The Fifth Amendment requires that any defendant have affiliating contacts with the United States sufficient to justify the exercise of personal jurisdiction over that party." Fed. R. Civ. P. 4(k)(2), Advisory Committee Notes to 1993 Amendments. Aside from vague, general claims of targeting U.S.

audiences, the U.S.-related conduct of AJMN is all tied to the District of Columbia, so the Complaint's jurisdictional allegations are insufficient under Rule 4(k)(2) for the same reason they are insufficient under Rule 4(k)(1). Plaintiffs' allegations—such as they are—that AJMN provided material support to Hamas or PIJ or knowingly provided substantial assistance to Hamas or PIJ in connection with the October 7 attacks, all relate to "live coverage" of October 7 from Israel, allegations of incitement in personal social media content not directed at U.S. audiences, or the employment of supposed Hamas-affiliated journalists outside the United States. Plaintiffs make no credible effort to link their injuries to U.S. conduct of AJMN.

"Pleading specific personal jurisdiction under Rule 4(k)(2) requires demonstrating a close nexus between the United States, the foreign defendant's conduct, and the plaintiff's claim. The plaintiff must show that the foreign defendant has purposefully directed his activities at residents of the forum, and that the alleged injuries arise out of or relate to those activities." *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 864 (D.C. Cir. 2022) (internal quotation marks omitted). Here, the Complaint fails to allege that the Plaintiffs' injuries in the October 7 terrorist attacks and the war that followed arise out of or relate to any activities AJMN has purposefully directed at the United States. The Complaint alleges that AJMN operates channels, including Al Jazeera English, that distribute content worldwide. Compl. ¶ 40; *id.* ¶ 51 (alleging that Al Jazeera English was launched with the aim of "reaching a global audience"); *id.* ("Al Jazeera has extensive reach across the globe and is distributed in over 150 countries"). The fact that U.S. audiences can access Al Jazeera English on "platforms like Sling TV, YouTube, and streaming services such as Roku, Amazon Fire TV, and Apple TV," *id.* ¶ 41, or that the *UpFront* and *Fault Lines* programs are produced in the United States, *id.* ¶ 10, does not support the inference that AJMN is "purposefully directing" its activities at a U.S. rather than a global audience. The "mere

accessibility" of content over the internet "cannot by itself establish the necessary minimum contacts" to satisfy due process. *Triple Up Ltd.*, 235 F. Supp. 3d at 23 (cleaned up).

But, even if the Complaint's conclusory allegations of "targeting" First Amendment protected speech towards U.S. audiences were sufficient to establish AJMN's minimum contacts with the United States, the Complaint comes nowhere close to satisfying the due process *relatedness* requirement. There simply is no allegation that Plaintiffs' "alleged injuries 'arise out of or relate to'" any activities of AJMN deliberately targeted at the United States. *Bernhardt*, 47 F.4th at 864. Allegations that Defendants, as news organizations, provided U.S.-accessible news coverage of terrorist attacks and interviewed Hamas or PIJ leaders, which Plaintiffs falsely characterize as "airing terrorist-related content," Compl. ¶ 12, do not establish a connection between AJMN's U.S. programming and Plaintiffs' injuries. Plaintiffs allege no role that AJMN's U.S. programming, with its English language content, played in the October 7 Hamas/PIJ attacks or in later attacks by unidentified "terrorists." As Plaintiffs allege, "Hamas and the PIJ had planned and trained for [the October 7] terrorist attack for years, organizing every detail and eventuality," *id.* ¶ 155, and the Complaint does not allege that the organizers or perpetrators of the post-October 7 attacks were incited to act by any U.S.-directed, English language content on Al Jazeera networks. In any event, it is not enough to draw a "possible connection" between Defendants and "terrorism generally"; rather, Plaintiffs must draw the necessary U.S. suit-related connection to the individuals or organizations that carried out the attacks at issue. *Bernhardt,* 47 F.4th at 865.

Further, the fact that U.S. citizens were killed or injured in the attacks is insufficient. *See Lewis v. Mutond,* 62 F.4th 587, 593 (D.C. Cir. 2023) (holding that the torture of an American abroad is insufficient to demonstrate minimum contacts with the United

25

States); *Walden*, 571 U.S. at 285 ("[T]he plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him.").

Finally, Rule 4(k)(2) cannot provide a basis for jurisdiction because it requires service of a summons on AJMN, *see* Fed. R. Civ. P. 4(k)(2), and, as discussed immediately below, AJMN has not been served.

### D.    Plaintiffs Failed to Effectuate Service on AJMN Under State or Federal Statute, Providing an Independent Basis for Dismissal

Section 13-334 of the D.C. Code establishes the method of effectuating service on foreign corporations in Washington, D.C., but that statute does not apply here because Plaintiffs attempted to serve AJMN in Florida, not the District of Columbia. Return of Service, Apr. 24, 2025, ECF No. 7. Plaintiffs also have not served AJMN in accordance with the Federal Rules of Civil Procedure. Failure to properly effectuate service of process provides an independent ground for dismissal of the Complaint against AJMN under Rule 12(b)(5). *See Whitehead v. CBS/Viacom, Inc.*, 221 F.R.D. 1, 2 (D.D.C. 2004) ("Courts routinely dismiss complaints for insufficient service of process."). The plaintiff has the burden of demonstrating, by a preponderance of the evidence, "that the procedure employed satisfied the requirements of the relevant portions of Rule 4" of the Federal Rules of Civil Procedure. *Light v. Wolf*, 816 F.2d 746, 751 (D.C. Cir.1987).

Rule 4(h) prescribes the manner in which a corporation may be properly served in federal court. *See* Fed. R. Civ. P. 4(h)(1)(A)–(B) (describing the manner for serving a summons on a corporation, partnership, or association in the United States); *id.* at 4(h)(2) (describing the manner for serving a summons on a corporation, partnership, or association "at a place not within any judicial district of the United States"). Plaintiffs purported to serve AJMN in Florida

via a registered agent, the Corporation Service Company. Return of Service, Apr. 24, 2025, ECF No. 7. Rule 4(h)(1)(B) provides for service in the United States "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, *or any other agent authorized by appointment or by law* to receive service of process." Fed. R. Civ. P. 4(h)(1)(B) (emphasis added). A signed return of service showing that the summons was "not served upon someone authorized to accept service" is not prima facie evidence of valid service. *See Stallard v. Goldman Sachs Grp.*, No. CV 20-2703, 2022 U.S. Dist. LEXIS 2904, at *19–20 (D.D.C. Jan. 6, 2022). The plaintiff must show evidence of "actual appointment" by the defendant of an agent for purposes of service; a claim of authority by the alleged agent is not sufficient. *See Pollard v. District of Columbia*, 285 F.R.D. 125, 127–29 (D.D.C. 2012).

Corporation Service Company in Florida is not AJMN's registered agent for service of process. Abutaha Decl. ¶ 9.[12] AJMN does not have an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process in the United States. *Id.* ¶ 7. The Plaintiffs have shown no other evidence of "actual appointment" by AJMN of Corporation Service Company. *Pollard*, 285 F.R.D. at 127–29. As such, Plaintiffs have not met their burden of demonstrating sufficient service of process, and the Court therefore should dismiss the Complaint against AJMN under Rule 12(b)(5).

## II.    Plaintiffs' Direct Liability Claims Must Be Dismissed for Failure to State a Claim

Plaintiffs' first two causes of action seek to impose direct liability on AJI and AJMN under 18 U.S.C. § 2333(a), which creates a civil cause of action when a U.S. national is "injured

---

[12] *See also Division of Corporations*, Florida Department of State, https://search.sunbiz.org/Inquiry/CorporationSearch/ByName (last visited June 30, 2025) (AJMN not listed as a registered corporation in Florida so as to be required to have a registered agent in the jurisdiction).

in his or her person, property, or business by reason of an act of international terrorism." Thus, to maintain a direct liability claim under the ATA, plaintiffs must plausibly allege (1) an injury to a U.S. national, (2) by act of international terrorism, and (3) proximate causation. *Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667, 677 (D.C. Cir. 2023). Here, Plaintiffs fail to plausibly allege that either AJI or AJMN engaged an act of international terrorism or that any conduct alleged to be an act of international terrorism proximately caused Plaintiffs' injuries.

   ***Rule 12(b)(6) Standard of Review.*** "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A complaint alleges a facially plausible claim only if it sets forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. A complaint cannot state a claim through mere "labels and conclusions[,] a formulaic recitation of the elements of a cause of action . . . , [or] naked assertions devoid of further factual enhancement," *id.* (cleaned up), and a plaintiff's claim must rise "above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

   In reviewing the Complaint, the Court "need not accept inferences unsupported by facts or legal conclusions cast in the form of factual allegations" nor must it "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice." *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 272–73 (D.C. Cir. 2018).

   Moreover, Plaintiffs cannot satisfy the Rule 8(a) pleading standard by "lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct." *Toumazou v. Turkish Republic of Northern Cyprus*, 71 F. Supp.3d 7, 21 (D.D.C. 2014); *accord Page v. Comey*, 628 F. Supp. 3d 103, 128 (D.D.C. 2022). Plaintiffs sue AJMN and AJI, two

separate legal entities, and the Complaint alleges no basis for disregarding their separate legal status. Throughout, the Complaint fails to provide each Defendant notice of the claims against it. In the 76-page Complaint, AJI is referenced only 3 times. Compl. ¶¶ 9, 14, 41 (in sections captioned "Jurisdiction and Venue" and "Parties"). AJMN is referenced only eleven times. *Id.* ¶¶ 9. 10, 40, 41, 84–86 (in sections captioned "Jurisdiction and Venue," "Parties," and "Al Jazeera's Hiring Process"). Throughout, and consistently as to allegations of conduct supposedly giving rise to liability, the Complaint refers to AJI and AJMN collectively as "Al Jazeera." This type of group pleading is insufficient, even for affiliated corporate entities. *See In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016).

### A.    The Complaint Fails to Plausibly Allege That Either Defendant's Alleged Conduct Constitutes an "Act of International Terrorism"

For an act to qualify as "international terrorism," it must (A) "involve violent acts or acts dangerous to human life that are . . . or that would be a criminal violation if committed within the jurisdiction of the United States or of any State"; (B) "appear to be intended" "to intimidate or coerce a civilian population" or "to influence the policy of a government by intimidation or coercion"; and (C) "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries." 18 U.S.C. § 2331(1)(A)–(C). With respect to the first requirement—the predicate criminal act requirement—Plaintiffs allege that AJI and AJMN violated 18 U.S.C. § 2339A and § 2339B. The Complaint, however, fails to plausibly allege a violation of either statute. It also fails to allege any conduct that appears to have the requisite intent to intimidate or coerce.

#### 1.    The Complaint Does Not Plausibly Allege a Violation of § 2339A

Plaintiffs' first cause of action seeks to impose liability on AJI and AJMN for providing material support to terrorists in violation of 18 U.S.C. § 2339A. Section 2339A prohibits the

provisions of "material support or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out, a violation of" one or more of the crimes enumerated in the statute.[13] 18 U.S.C. § 2339A(a). The Complaint conclusorily alleges that the Defendants provided "expert assistance, communications equipment, and personnel to Hamas and the PIJ" by "providing live coverage, violent images, and inciting language of the October 7 Terrorist Attacks and the aftermath." Compl. ¶ 244. Plaintiffs' theory fails for three reasons.

First, the Complaint does not include any factual allegations about AJI's or AJMN's contemporaneous "live" coverage of the October 7 attacks. The Complaint alleges only that Ismail Abu Omar and Anas al-Sharif posted on their *personal* Telegram accounts on October 7 or soon thereafter. *Id.* ¶¶ 90–98 (Abu Omar), 128 (al-Sharif); *see also id.* ¶ 243 ("Al Jazeera employees . . . shared live updates of the October 7 Terrorist Attacks on their *personal* social media accounts as they occurred") (emphasis added). The Complaint does not allege that either Abu Omar or al-Sharif were employed by AJI or AJMN on October 7 or made these posts in the scope of his employment with AJI or AJMN or that either AJI or AJMN was aware of or approved of the posts.[14] *See id.* ¶ 55 & n.20 (alleging only that Al Jazeera referred to Abu Omar as an Al Jazeera journalist in February 2024); *id.* ¶ 128 (alleging only that al-Sharif currently is

---

[13] "Material support or resources" is defined as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials." 18.U.S.C. § 2339A(b)(1).

[14] Personal social media posts of other alleged Al Jazeera journalists from years before or well after the October 7 attacks also are not plausibly related to any alleged material support *by Defendants*, nor are they plausibly causally related to the October 7 attacks. *See, e.g.*, Compl. ¶¶ 131 (July 2019 X post and a July 2017 Instagram post of Hisham Zaqout), 133 (2017 and 2018 Instagram posts of Ashraf Amra, when Amra is not even alleged to have been employed by Al Jazeera), 135 (Hind Al Khoudary May 2023 social media post "liking" another post and predating employment with "Al Jazeera"), 137 (October 2024 X post of Jamal Rayyan).

an Al Jazeera journalist, not that he was employed by any Al Jazeera entity on October 7).

Notably the Complaint does not identify any Al Jazeera broadcasts of the October 7 attacks, or

broadcasts in the days or weeks preceding October 7, that included "inciting language."

Second, the theory that Defendants provided "expert assistance, communications

equipment, and personnel" to Hamas or PIJ simply by covering the October 7 attacks defies

common sense and, more importantly, First Amendment protections for the press. The

Complaint does not identify any "expert assistance" or "communications equipment" that AJI or

AJMN provided to Hamas or PIJ on October 7 or at any other time.[15] The Complaint alleges that

the IDF has claimed some Al Jazeera journalists were affiliated with Hamas or PIJ but does not

allege that (1) AJI or AJMN "provided" them as "personnel" to Hamas or PIJ, (2) AJI or AJMN

had knowledge of this alleged affiliation, or (3) these journalists played any role in planning or

carrying out the October 7 attacks. If covering a terrorist attack constitutes providing material

support to the terrorist organization, then every news organization that covered 9/11 equally

would have been liable for providing material support to Al-Qaeda. "Unlike a financial donation

to a terrorist organization, news coverage of the activities of a terrorist organization can serve an

entirely different and acceptable purpose, namely, delivering important information to the

public." *Kaplan v. Al Jazeera*, 10 Civ. 5298, 2011 U.S. Dist. LEXIS 61373, at *21 (S.D.N.Y.

June 7, 2011).

Third, even leaving aside that Plaintiffs cannot identify any material support provided by

AJI or AJMN, the Complaint does not allege that either AJI or AJMN provided coverage (which

Plaintiffs falsely assert constitutes "expert assistance," "communications equipment," and

---

[15] 18 U.S.C. § 2339A(b)(3) defines "expert advice or assistance" as "advice or assistance derived from scientific, technical or other specialized knowledge."

"personnel") with the requisite scienter. The Complaint does not allege that either Defendant provided coverage of the October 7 attacks "knowing or intending" that this coverage would be "used in preparation for, or in carrying out" the October 7 attacks. *See Id.* at *17–18 (dismissing a § 2339A material support claim alleging that Al Jazeera's coverage of Hezbollah rocket attacks provided material support to Hezbollah because the complaint "failed to allege any facts suggesting that Defendant broadcast news of the Hezbollah Rocket Barrage with the intention of assisting Hezbollah"); *cf. Newman*, 758 F. Supp. 3d at 1377 ("the AP's actions, working with photographers and reporters during the course of breaking news, cannot plausibly suggest that the AP intended to carry out the goals of Hamas").

The Complaint also conclusorily alleges that Defendants made financial payments to leaders of Hamas and PIJ for interviews. Compl. ¶¶ 5, 12, 52, 114, 117, 245, 274. The Complaint identifies only one recipient of such a payment and even then can only speculate that a payment was made. The Complaint alleges that Al Jazeera's *Upfront* show interviewed Osama Hamdan, the Head of the International Relations Department of Hamas, in 2017 and 2023 and that Hamdan was "likely compensated . . . for the interviews." *Id.* ¶ 114. In addition to the purely speculative nature of this allegation, the Complaint does not, as § 2339A requires, allege that Hamdan or any other member of Hamas was compensated for an interview "knowing or intending" that this payment would be "used in preparation for, or in carrying out" the October 7 attacks or even any terrorist attacks. 18 U.S.C. § 2339A(a).

Similarly, the Complaint fails to adequately plead the requisite scienter as to allegations that AJI or AJMN paid salaries to journalists that the IDF later claimed were Hamas operatives. Nowhere does the Complaint allege that the Defendants paid salaries to journalists knowing they were Hamas operatives and "knowing or intending" that the salary payments would be "used in

preparation for, or in carrying out" the October 7 attacks. Implausible allegations that Defendants "should have known" certain journalists supposedly are Hamas operatives because AJMN interviews applicants and conducts background checks before hiring them, Compl. ¶¶ 85–87, are insufficient to establish scienter under Section 2339A. Moreover, the Hamas affiliation allegations were made by the IDF well after the October 7 attacks, usually immediately following the IDF's killing or injury of the journalist.[16]

Even more far-fetched, Plaintiffs allege that Al Jazeera correspondents provided "training" to Hamas and then impliedly impute this training to Defendants. Compl. ¶¶ 246, 259, 277, 287. These conclusory allegations rest on the IDF's claims in October 2024 that Ismail Abu Omar served as a Hamas "training company commander" (*id.* ¶ 57 & n.23) and a February 2024 Facebook photo supposedly showing Muhammad Washah and a few other men in civilian clothes with a drone (*id.* ¶ 65 & n.36), which Plaintiffs describe as showing "Washah training Hamas members on how to use Rocket-Propelled Grenades." *Id.* Plaintiffs fail to connect these allegations to Defendants, as Section 2339A requires. They do not allege that either Abu Omar or Washah provided training to Hamas in his capacity as an Al Jazeera journalist, that Defendants had any pre-October 7 knowledge of any supposed role of either journalist in providing training to Hamas, or even that Abu Omar or Washah were employed by Al Jazeera during the relevant period (on October 7 or the period leading up to October 7).

In sum, Plaintiffs' direct liability claim based on Section 2339A must be dismissed because the Complaint fails to plausibly allege that either AJI or AJMN provided any material support to Hamas or PIJ or that they did so knowing or intending it would be used in preparation for or in carrying out the October 7 attacks. As to the post-October 7 attacks, as previously noted,

---

[16] Compl. ¶¶ 57 & n.24, 66 & n.37, 69 & n.40, 70, 73 & n.43, 79 & n.51.

the Complaint does not allege who carried out those attacks and does not include any allegations that either Defendant provided material support to the unidentified "terrorists" who carried out those attacks, let alone did so with the requisite scienter.

2.    *The Complaint Does Not Plausibly Allege a Violation of § 2339B*

Plaintiffs' second cause of action seeks to impose liability on AJI and AJMN for violating 18 U.S.C. § 2339B, which criminalizes "knowingly provid[ing] material support or resources to a foreign terrorist organization." Plaintiffs allege that Defendants provided material support to designated foreign terrorist organizations Hamas and PIJ. Compl. ¶¶ 254–55. In their § 2339B claim, Plaintiffs allege the same categories of material support as for their § 2339A claim: (1) Al Jazeera employees broadcast the October 7 attacks "as they occurred" and this live coverage provided expert assistance, communications equipment, and personnel to Hamas and PIJ; (2) Defendants provided financial payments by paying Hamas and PIJ leaders for interviews and by paying employees they allege were Hamas or PIJ "operatives"; and (3) Al Jazeera employees trained Hamas members. *Id*. ¶¶ 257–60. These allegations fail to state a claim that the Defendants provided "material support" for the reasons stated in the preceding section.

In addition, recent cases interpreting Section 2339B foreclose Plaintiffs' theory that making salary payments to journalists later alleged to be affiliated with Hamas constitutes knowingly providing material support to Hamas. For example, a federal district court recently dismissed a Section 2339B claim alleging that AP is liable for the October 7 attacks by paying photographers alleged to be Hamas affiliates for photographs providing "real time" coverage of the conduct of Hamas militants. *Newman*, 758 F. Supp. 3d 1357. As here, the *Newman* complaint failed to adequately plead the extent of the news organization's knowledge that the journalists were conduits to Hamas or engaged in terrorism. *Id.* at 1380. And, in *Keren Kayemeth LeIsrael-Jewish National Fund v. Education for a Just Peace in the Middle East*, the Court of Appeals

34

dismissed a Section 2339B claim based on the premise that the U.S. Campaign for Palestinian Rights provided material support to Hamas when it made financial contributions to the Boycott National Committee, an alleged "direct front" for Hamas. 66 F.4th 1007, 1014–15 (D.C. Cir. 2023). The Court of Appeals explained that the complaint's "conclusory allegations amount to nothing more than guilt by association: The web of connections alleged in the Complaint falls far short of establishing that the Boycott National Committee is an extension of Hamas or has been taken over by Hamas." *Id.* at 1015. Here, Plaintiffs allege no pre-October 7 knowledge that any journalists employed by AJI or AJMN were conduits to Hamas or engaged in terrorism.

In addition, Section 2339B(h) forecloses any argument that either Defendant provided "personnel" to Hamas by employing journalists later alleged to be Hamas "operatives." That section provides:

> No person may be prosecuted under this section in connection with the term "personnel" *unless that person has knowingly provided*, attempted to provide, or conspired to provide a foreign terrorist organization with *1 or more individuals* (who may be or include himself) *to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization*. Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control.

18 U.S.C. § 2339B(h) (emphasis added). The Complaint does not allege that either Defendant provided journalists to Hamas or PIJ so that the journalists could work under the direction or control of those organizations. Thus, Plaintiffs may not proceed under a "personnel" theory.

Further, Section 2339B(i) provides: "Nothing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States." 18 U.S.C. § 2339B(i). As the Supreme Court explained, with Section 2339B(i), "most importantly, Congress has avoided any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign

terrorist groups" *Holder*, 561 U.S. at 36; s*ee also id.* at 23–24 (holding that provision of material support in the form of "service" or "personnel" does not include independent advocacy); *id.* at 26 ("the statute is carefully drawn to cover only a narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations"). Accordingly, Plaintiffs may not base a Section 2339B claim on news coverage of the October 7 attacks or on journalists' personal social media posts, both of which are protected under the First Amendment. *See Newman*, 758 F. Supp. 3d at 1379 ("The Court agrees with the AP that any publication of factual, newsworthy photographs would not satisfy the scienter requirement under § 2339B and would be rendered 'independent advocacy.'") (quoting *Holder*, 561 U.S. at 36); *Holder*, 561 U.S. at 26 (holding that § 2339B does not even prevent individuals from becoming a members of a foreign terrorist organizations or from independently advocating on the organization's behalf).

Many allegations in the Complaint regarding Defendants' alleged actions bear no relationship to any recognized category of material support. Rather, Plaintiffs make numerous allegations related to First Amendment protected activity, including: (1) news coverage of Hamas and PIJ, including interviews with Hamas and PIJ leaders (Compl. ¶¶ 103–111, 113–14, 126); (2) coverage of October 7 and the Israel-Gaza war (*id.* ¶¶ 100–02, 126, 138, 140–42); and (3) terminology used on broadcasts or by journalists in personal social media posts, including references to the "occupation army," "martyrs," and "resistance" (*id.* ¶¶ 72, 100, 120–25, 133, 135, 137). None of these allegations, even if true, constitutes "material support" for purposes of the Anti-Terrorism Act because they do not constitute providing "personnel," "communications equipment," or "expert assistance," and, in any event, under *Holder* and Section 2339B(i), they may not give rise to a Section 2339B claim.

Relatedly, Plaintiffs repeatedly conclusorily allege that Defendants offer Hamas or PIJ a "platform" to "incite" violence. *See* Compl. ¶¶ 5, 12, 52, 119, 139, 160, 274, 276, 287. Aside from these conclusory claims, which do not meet the Rule 8(a) standard, the Complaint identifies just two Al Jazeera broadcasts Plaintiffs claim, without basis, incited violence: (1) a March 2024 Al Jazeera documentary on October 7, which noted that some claims that came out in the days immediately following the attacks turned out to be false (*id.* ¶ 101),[17] and (2) an August 2024 interview with Khalil al-Hayya, a member of the Palestinian Legislative Council and official in the Hamas Political Bureau, in which the politician allegedly demanded "a serious Arab and Islamic response to punish the Israeli occupation" (*id.* ¶ 109).[18]

There are numerous flaws in Plaintiffs' incitement theory. First, the Complaint's own allegations counter any theory the October 7 attacks were the result of incitement, because the

---

[17] Although the Complaint alleges that Al Jazeera broadcasts denied Hamas's crimes on October 7 (Compl. ¶ 101), the *October 7* documentary referenced in footnote 86 in fact revealed "widespread human rights abuses by Hamas fighters and others, including the killing of 782 Israelis and foreign nationals." Press Release, Al Jazeera, "October 7" (Mar. 18, 2024), https://network.aljazeera.net/en/press-releases/%E2%80%9Coctober-7%E2%80%9D. Following examination of seven hours of footage from CCTV, dash cams, personal phones, and headcams of dead Hamas fighters and the testimonies of hundreds of survivors, military personnel and first responders, Al Jazeera's Investigative Unit also concluded that some stories that came out in the days following the attack were false, including claims that forty babies had died, many beheaded. *Id.* The Israeli Government has acknowledged that the rumours of the "40 beheaded babies" was not based in fact; two infants were killed on October 7. Assma Maad et al., *'40 beheaded babies': Deconstructing the rumor at the heart of the information battle between Israel and Hamas*, Le Monde (Apr. 3, 2024), https://www.lemonde.fr/en/les-decodeurs/article/2024/04/03/40-beheaded-babies-the-itinerary-of-a-rumor-at-the-heart-of-the-information-battle-between-israel-and-hamas_6667274_8.html.

[18] The full quote from the Complaint's source, which purports to summarize the interview, is: "Hayya demanded that the United Nations Security Council hold an emergency meeting to stop the massacres and Israeli aggression, emphasizing that there is no justification for targeting civilians, including women and children, in the Palestinian territories. Furthermore, Hayya called for 'a serious Arab and Islamic response to punish the Israeli occupation,' *suggesting measures such as closing embassies and recalling ambassadors* in protest of the continued violence and oppression faced by the Palestinian people." Compl. ¶ 109 n.110 (emphasis added). The full context makes clear Hayya was not inciting violence.

Complaint alleges, "[a]ccording to Israeli intelligence reports, Hamas and the PIJ had planned and trained for this terrorist attack *for years*, organizing every detail." Compl. ¶ 155 (emphasis added). Second, the Complaint does not identify any statements that would constitute incitement. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 927–28 (1982) (incitement must be directed at promoting "imminent lawless action" and likely to produce such action). Third, all the Plaintiffs claim injury from attacks that predated the August 2024 interview with al-Hayya, so that interview could not have incited the attacks at issue. Only one plaintiff claims injury from an attack that post-dated the allegedly inciting March 2024 documentary, Marcy Tatelbaum, the mother of an IDF soldier killed by an unidentified "terrorist sniper" on June 28, 2024. Compl. ¶ 232. The Complaint does not allege that the "terrorist sniper" viewed the March 2024 documentary and was incited to shoot an IDF solder because of the documentary. Fourth, Plaintiffs claim that the documentary "promoted Hamas's terrorist agenda," *Id.* ¶ 101, but do not allege that Hamas carried out the June 28, 2024, attack, meaning Ms. Tatelbaum cannot establish that her injury is causally related to any material support Defendants provided to Hamas. Fifth, as noted, a global news organization does not provide "material support" when it produces and airs a documentary about the actions of a terrorist organization.

       3.       *The Complaint Does Not Even Attempt to Allege That Defendants Engaged in Any Activities That Satisfy § 2331(1)(B)'s "Appear to Be Intended" Requirement*

       To plead a direct liability claim, it is not enough for Plaintiffs to allege a violation of one of the material support statutes. To qualify as an act of international terrorism, a defendant's act must also involve violence or endanger human life, 18 U.S.C. § 2331(1)(A), and must appear to be intended to intimidate or coerce a civilian population or to influence or affect a government, *id.* § 2331(1)(B). *Owens v. BNP Paribas, S.A.*, 235 F. Supp. 3d 85, 90 (D.D.C. 2017), *aff'd*, 897 F.3d at 270 n.1; *see also Linde v. Arab Bank, PLC*, 882 F.3d 314, 326 (2d Cir. 2018) (holding

that the district court erred in charging the jury that proof of a bank's material support to an FTO was sufficient to prove the bank's own commission of an act of international terrorism, because "the provision of material support to a terrorist organization does not invariably equate to an act of international terrorism."); *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 390 (7th Cir. 2018) (holding that a bank's alleged material support of a terrorist organization did not constitute an act of international terrorism because its actions "do not appear intended to intimidate or coerce any civilian population or government," but instead, "[t]o the objective observer, its interactions with Iranian entities were motivated by economics, not by a desire to 'intimidate or coerce.'").

Here, the Complaint fails to allege—even conclusorily—that either AJI or AJMN engaged in any actions that "appear intended to intimidate or coerce" a civilian population or influence a government. The Complaint alleges that *PIJ* used violence to intimidate and coerce the Israeli government. Compl. ¶ 48. And, in their aiding and abetting and conspiracy claims, Plaintiffs allege that *the actions of PIJ and Hamas* were intended to intimidate and coerce the civilian populations of Israel and the United States and to influence the Governments of Israel and the United States through intimidation and coercion. *Id.* ¶¶ 269, 283. The Plaintiffs make no such allegations as to AJI or AJMN, which is fatal to their direct liability claim.

In any event, it is not plausible that the actions Plaintiffs attribute to AJI or AJMN (covering the October 7 attacks, interviewing Hamas leaders, paying salaries to journalists it employs) would be viewed by an objective observer as intended to intimidate or coerce a civilian population, as opposed to simply carrying out Defendants' function as a global news organization covering events unfolding in Israel and Gaza.

### B.    The Complaint Fails to Plausibly Allege Proximate Causation

Plaintiffs' direct liability claims fail for the independent reason that they fail to plead the element of proximate cause. To state a claim under § 2333(a), Plaintiffs must plausibly allege that

they were injured "by reason of" an act of international terrorism. 18 U.S.C. § 2333(a). Courts have repeatedly held that the "by reason of" language requires a showing of proximate cause. *See, e.g.*, *Ofisi*, 77 F.4th at 677; *Keren Kayemeth Leisrael-Jewish Nat'l Fund v. Educ. for a Just Peace in the Middle East*, 530 F. Supp. 3d 8, 12 (D.D.C. 2021), *aff'd*, 66 F.4th 1007 (D.C. Cir. 2023); *Owens*, 235 F. Supp. at 97, *aff'd*, 897 F.3d at 273; *Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013) ("The 'by reason of' language had a well-understood meaning, as Congress had used it in creating private rights of action under RICO and the antitrust laws, and it had historically been interpreted as requiring proof of proximate cause.").

Further, the proximate cause standard includes two elements: (1) that defendant's acts must be a "substantial factor in the sequence of events that led to [the plaintiff's] injury," and (2) the plaintiff's injuries must have been "reasonably foreseeable or anticipated as a natural consequence of [the defendant's] conduct." *Owens*, 897 F.3d at 273 (cleaned up); *accord LeIsrael*, 66 F.4th at 1015; *Rothstein*, 708 F.3d at 91. Applying this standard, the Court of Appeals has affirmed dismissals of ATA cases for failure to adequately allege proximate causation. In two related cases, plaintiffs sought to impose liability on international bank BNP Paribas ("BNPP") for Al-Qaeda's 1998 attacks on U.S. embassies in Kenya and Tanzania on the theory that BNPP materially supported Al-Qaeda by assisting Sudanese banks, including one used by Al-Qaeda, evade U.S. sanctions and by processing currency for Sudan, which Sudan allegedly provided to Al-Qaeda. In both cases, the D.C. Circuit held that causation was not adequately pled because the complaints failed "to plausibly allege that any currency processed by BNPP for Sudan was either in fact sent to al Qaeda or necessary for Sudan to fund the embassy bombings." *Owens*, 897 F.3d at 276; *Ofisi*, 77 F.4th at 679 (same). Similarly, in *LeIsrael*, the Court of Appeals affirmed the dismissal of ATA claims where the plaintiffs had sought to impose liability

on U.S. Campaign for Palestinian Rights ("USCPR") for emotional harm and property damage from incendiary devices launched from Gaza into Israel on the theory that USCPR provided material support to an alleged Hamas front (Boycott National Committee), because the plaintiffs did not "allege that the money provided to the Boycott National Committee by USCPR funded incendiary attacks." 66 F.4th at 1015. Similarly, here, the Complaint does not allege that any money provided to Hamas officials for interviews or to Al Jazeera journalists alleged to be affiliated with Hamas or PIJ funded the October 7 attacks.

Courts have consistently dismissed cases against news organizations, including Al Jazeera, for failure to plausibly allege that the actions of the news organizations were the proximate cause of terrorist attacks. *Kaplan*, 2011 U.S. Dist. LEXIS 61373, at *22–23 (S.D.N.Y. June 7, 2011) ("Plaintiffs have not alleged any facts suggesting that Defendant's broadcasts were used by Hezbollah to better target their rockets."); *Newman*, 758 F. Supp. 3d at 1381 ("Applying the 'substantial factor' standard, Plaintiffs have not alleged any facts suggesting that the AP's factual reporting was used by Hamas to advance the October 7 Attack, thereby causing Plaintiffs' injuries."). Direct liability claims against social media companies have failed for similar reasons. *See, e.g.*, *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1127 (N.D. Cal. 2016) (dismissing ATA direct liability claim because plaintiffs failed to plausibly allege the necessary causal connection between Twitter's provision of accounts to ISIS and the particular attack that injured them), *aff'd*, 881 F.3d 739 (9th Cir. 2018).

Here, the Complaint alleges that "Hamas and the PIJ had planned and trained for this terrorist attack for years," Compl. ¶ 155, and that "[i]n the early morning hours of Saturday, October 7, 2023, approximately six thousand terrorists from Hamas and the PIJ in the Gaza Strip perpetrated a cross-border infiltration into Israel, through its southern security fence, and

massacred more than 1,200 people," *id.* ¶ 148. Given the Complaint's own allegations that the attack was planned "for years," and was fully underway in "the early morning hours" of October 7, it is not plausible that contemporaneous coverage by Defendants on or around October 7 was a substantial factor in the attacks. Coverage of the attacks obviously cannot be a causal factor in attacks that were long planned and already in process. And, as Plaintiffs concede, the "October 7 Terrorist Attacks were widely publicized and televised, along with the subsequent war in Gaza." *Id.* ¶ 159. Thus, Al Jazeera was just one of countless news organizations covering the October 7 attacks. Moreover, even if Abu Omar and al-Sharif's personal Telegram posts could be imputed to Defendants, those Telegram posts similarly were not a substantial factor in the attacks leading to Plaintiffs' injuries on October 7.

Plaintiffs' own sources and allegations in a related lawsuit also refute any claim that material support from Defendants was a substantial factor in the October 7 attacks. In announcing terrorism charges against several senior Hamas leaders for their role in October 7, the U.S. Department of Justice stated that Hamas's ability to carry out terrorist attacks, including October 7, "has been fueled in part by the Government of Iran" and that Hamas also has raised "tens of millions of dollars in cryptocurrency payments" through soliciting supporters abroad on social media accounts and other platforms. *Id.* ¶ 45 n.12. Moreover, all but one of the Plaintiffs (Allen Kamer) have filed a separate suit against the Republic of Iran for the same injuries. *Farron v. Islamic Republic of Iran*, No. 1:24-cv-00358-CJN (D.D.C. filed Feb. 6, 2024). In that suit, they allege "Iran provided Hamas and PIJ with massive financial support with the specific intention of causing and facilitating the commission of acts of extrajudicial killing and international terrorism including the terrorist attacks at issue herein." Amended Complaint ¶ 89, *Farron*, ECF No. 7. It strains credulity that a stipend that Plaintiffs speculate was paid to a Hamas spokesperson for an

interview or salaries paid to a handful of journalists—with no claim those salary payments went to Hamas—were a substantial contributing factor to the October 7 attacks in contrast to the "massive financial support" Plaintiffs elsewhere allege Iran provided or the "tens of millions of dollars in cryptocurrency payments" raised from Hamas supporters.

As previously noted, Plaintiffs do not even allege who carried out the post-October 7 attacks and make no effort to draw any causal relationship between Defendants supposed material support of Hamas and those attacks.

In sum, Plaintiffs fail to plausibly allege that Defendants engaged in an act of international terrorist and that they were injured by reason of acts of international terrorism by Defendants. Accordingly, their direct liability claims must be dismissed.

### III.    The Secondary Liability Claims Must Be Dismissed for Failure to State a Claim

Plaintiffs' third and fourth causes of action seek to impose secondary, indirect liability on AJI and AJMN under 18 U.S.C. § 2333(d) for aiding and abetting and conspiracy. Section 2333(d) provides that, in an action under § 2333(a), liability may be imposed on "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism," if the act of international terrorism was "committed, planned, or authorized by an organization that had been designated as a[n] [FTO]" by the U.S. Department of State. 18 U.S.C. § 2333(d).

As in initial matter, only those Plaintiffs injured in the October 7 attacks allege injury by acts of international terrorism "committed, planned, or authorized" by an FTO (Hamas or PIJ). *See* Ferguson Decl., Ex. 1, tbl.5. Accordingly, the Plaintiffs injured in the post-October 7 attacks have not stated Section 2333(d) claims because they failed to plead the prerequisite FTO involvement but instead alleged the responsibility of unidentified "terrorists." *Id.*; *see LeIsrael*, 66 F.4th at 1016–17 (holding that allegations that Sons of al-Zawari, "Palestinian youths," or

"Hamas or others" were responsible for the attacks were insufficient to state a claim for aiding and abetting). As to the October 7 Plaintiffs, they fail to plausibly allege that either Defendant knowingly provided substantial assistance to Hamas or PIJ, or conspired with them, in connection with the October 7 attacks, so their claims also must be dismissed.

A.    **The Section 2333(d) Aiding and Abetting Standard: *Halberstam* and *Twitter***

Congress enacted § 2333(d) as an amendment to the ATA in 2016, noting that *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), "provides the proper legal framework for how [aiding-and-abetting and conspiracy] liability should function in the context of" § 2333. Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, § 2(a)(5), 130 Stat. 852 (2016). Under *Halberstam*, civil aiding and abetting includes three elements:

> (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be ***generally aware*** of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must ***knowingly and substantially assist*** the principal violation.

*Halberstam*, 705 F.2d at 477 (emphasis added). *Halberstam* also adopted a six-factor test, addressed below, for determining if the assistance is "substantial." *Id.* at 484.

In *Twitter v. Taamneh*, 598 U.S. 471 (2023), the Supreme Court provided guidance on the § 2333(d) aiding and abetting standard. The Court noted that *Halberstam*'s "precise three-element and six-factor test" for deciding a case involving a "serial burglar and his live-in partner-in-crime" "may not be entirely adequate to resolve" cases involving acts of international terrorism. *Id.* at 487–88. Ascertaining the "'basic thrust' of *Halberstam*'s elements" and "adap[ting] its framework to the facts before us today," the Court emphasized "the need to cabin aiding-and-abetting liability to cases of truly culpable conduct." *Id.* at 488–89. "At bottom, both JASTA and *Halberstam*'s elements and factors rest on the same conceptual core that has

animated aiding-and-abetting liability for centuries: that the defendant consciously and culpably participated in a wrongful act so as to help make it succeed." *Id.* at 493 (cleaned up).

In *Twitter*, the plaintiffs sued Twitter, Facebook, and Google for aiding and abetting a 2017 ISIS terrorist attack on the Reina nightclub in Turkey. They alleged that ISIS used the social media platforms "as tools for recruiting, fundraising, and spreading their propaganda," the defendants displayed advertisements "with ISIS' messages, posts, and videos based on information about the viewer and the content being viewed," ISIS used the platforms to upload videos that "fundraised for weapons of terror and that showed brutal executions of soldiers and civilians alike," and the "defendants have known that ISIS has used their platforms for years" but "failed to detect and remove a substantial number of ISIS-related accounts, posts, and videos." *Id.* at 481. The Court held these allegations were insufficient to state a § 2333(d) claim because "[n]one of those allegations suggest that defendants culpably associated themselves with the Reina attack, participated in it as something that they wished to bring about, or sought by their action to make it succeed." *Id.* at 498 (cleaned up). Because "the relationship between defendants and the Reina attack is highly attenuated," the "plaintiffs would need some other very good reason to think that defendants were consciously trying to help or otherwise participate in the Reina attack." *Id.* at 500 (internal quotation marks omitted). Here, as in *Twitter*, the relationship between Defendants and the terrorist attacks at issue is highly attenuated and the Complaint does not plausibly allege facts that Defendants encouraged or supported the attacks or otherwise culpably participated in them so as to help them succeed.

### B.  The Complaint Does Not Plausibly Allege That Defendants Were "Generally Aware" They Were Playing a Role in the Terrorist Attacks

To satisfy *Halberstam* "general awareness" requirement, Plaintiffs must plausibly allege that Defendants, at the time they provided the supposed assistance, were "generally aware of

[their] role in an overall illegal activity from which an act of international terrorism was a foreseeable risk." *Ofisi*, 77 F.4th at 673. Specifically, Plaintiffs must plausibly allege that Defendants were "generally aware" that in providing assistance, they were "thereby playing a 'role' in [the FTO's] violent or life-endangering activities." *Linde*, 882 F.3d at 329 (citing *Halberstam*, 705 F.2d at 477). Here, Plaintiffs fail to plausibly allege general awareness for the same reasons their § 2339B claims fail. *See* Part II.A.3; *Linde,* 882 F.3d at 329–30 (comparing the "general awareness" requirement under § 2333(d) with the *mens rea* required to establish material support in violation of 18 U.S.C. § 2339B).

Plaintiffs conclusorily allege that "Al Jazeera knowingly compensated operatives of Hamas and the PIJ, fully aware of their affiliations with these terrorist organizations." Compl. ¶ 258. This alleged compensation takes two forms: (1) paying salaries to Al Jazeera journalists later claimed to be Hamas operatives, and (2) paying Hamas leaders for interviews. As to the payments to employees, Plaintiffs do not plausibly allege that Defendants were generally aware that by paying salaries to their journalists they were "assuming a 'role' in terrorist activities." *Linde*, 882 F.3d at 329. As previously noted, the Complaint does not allege that Defendants had any knowledge of the journalists' supposed Hamas affiliation before the October 7, 2023 attacks. The claims of Hamas affiliation were made by the IDF in 2024, most in October 2024. Compl*.* ¶¶ 57 & n.24, 66 & n.37, 69 & n.40, 70, 73 & n.43, 79 & n.51; *see Ofisi*, 77 F.4th at 675 (finding that general awareness was not sufficiently pled, where plaintiffs alleged that the defendant provided financial assistance to Sudanese banking institutions, but the "supposed connections to al Qaeda" were "not widely reported until after" the alleged attacks). Implausible allegations that Defendants "should have" learned of these affiliations through the hiring process, Compl. ¶¶ 85–87, do not establish general awareness. Moreover, the Complaint does not even allege that any

salary payments to Al Jazeera journalists were ever transferred to Hamas or that Defendants had any awareness that Al Jazeera journalists were a funding conduit to Hamas. *See Newman*, 758 F. Supp. 3d at 1369 ("Even assuming the AP knew that [the journalist] had ties to Hamas through his social media posts and an anonymous tip from years prior, that is not enough to establish that the AP was aware of any role of their own in terrorist activities, specifically in the October 7 Attack.").

As for the allegation that Defendants pay Hamas leaders for interviews, Compl. ¶ 117, the Complaint identifies only one such leader (Hamdan) and, as noted, only speculates that such payments were "likely," *id.* ¶ 114, based on footnoted sources that do not support such an inference, *id.* ¶ 117 n.132. In any event, the Complaint does not allege that any supposed practice of paying stipends to individuals who appear on Al Jazeera programs are made with the general awareness that the payments are supporting terrorist activity. *See id.* (describing a practice of some news organizations to pay a small, token amount to *journalists* who appear on programming "when an extra commitment of time or research is required" or for "expert commentary and analysis").

With regard to the supposed inciting coverage of the attacks, the Complaint does not identify any Al Jazeera coverage on October 7 or immediately preceding October 7 that incited or otherwise played a role in the attacks. Personal Telegram posts of a few journalists at the scene of the attacks, not alleged to have been made in the scope of the journalists' employment, do not create general awareness by Defendants of any role in terrorist activity. A federal court rejected similar claims of general awareness by the AP as to the October 7 attacks: "[E]ven assuming" freelance journalists "were in close proximity to Hamas militants as they carried out the October 7 Attack, and the AP was aware of their close proximity, the Amended Complaint

still fails to suggest that they were taking part in the attack rather than simply documenting it."
*Newman*, 758 F. Supp. 3d at 1369. "With respect to claims that Hamas uses the AP's photos as a
tool of propaganda, this allegation fails to suggest how the AP would have been aware that its
publication of truthful images was in some way furthering Hamas's terrorist activities and
mission." *Id.* Similarly, here, no allegations support a plausible inference that Defendants were
aware that their coverage of October 7 as a news organization was furthering Hamas terrorist
attacks.

Moreover, the D.C. Circuit has rejected similar conclusory allegations of general
awareness in recent ATA cases. *See LeIsrael*, 66 F.4th at 1017 (dismissing aiding and abetting
claim in part for failure to plead the defendant's general awareness of its role in unlawful activity
where the allegations did not "support a finding that [the defendant] was aware that its donations
to the [alleged Hamas front] were used unlawfully, given that the [alleged Hamas front] also
engages in lawful civil resistance"); *Ofisi*, 77 F.4th at 675 ("Appellants simply do not plausibly
allege that [Appellee] BNPP was generally aware of any role it allegedly played in the U.S.
embassy bombings or that it consciously participated in any act to make the bombings succeed");
*Bernhardt*, 47 F.4th at 868 ("Bernhardt fails to plausibly allege HSBC was generally aware that
its financial dealings with intermediary banks supported al-Qaeda's terrorist acts"). The Court
should do the same here. The Complaint is nearly silent on any *mens rea* of Defendants and falls
far short of plausibly alleging that Defendants were generally aware of any role in supporting
Hamas or PIJ terrorist activity.

**C.    The Complaint Does Not Plausibly Allege Defendants "Knowingly Provided
Substantial Assistance" to Hamas and PIJ in Connection with the Terrorist
Attacks**

An ATA aiding and abetting claim requires a showing that the defendant "knowingly
provid[ed] substantial assistance" to an FTO in connection with the act of international terrorism

that injured the plaintiff. 28 U.S.C. § 2333(d). Plaintiffs fail to adequately plead either the "knowing" or "substantial assistance" elements of an aiding and abetting claim.

As to the "knowing" element, for the reasons discussed above as to the failure to plead § 2339A scienter (Part II.A.1) and the less demanding § 2333(d) "general awareness" element of aiding and abetting (Part III.B), Plaintiffs have failed to plead that Defendants "knowingly" provided substantial assistance to the attacks. "A defendant who lacks general awareness cannot be said to have knowingly assisted a foreign terrorist organization." *Bernhardt,* 47 F.4th at 870. *See also Newman*, 758 F. Supp. 3d at 1371 ("having found that the AP was not 'generally aware,' the Court similarly cannot conclude that the AP knowingly assisted Hamas in carrying out the October 7 Attack."). And, for the same reasons Plaintiffs fail to plausibly allege that Defendants provided any material support to Hamas or PIJ (Part II.A), the Complaint fails to allege facts that, if true, state a claim that Defendants provided "substantial assistance" to Hamas/PIJ. The Complaint does not plausibly allege that (1) any salary payments made to Al Jazeera journalists funded Hamas/PIJ terrorist activity, (2) any interview stipend paid to a Hamas/PIJ official funded Hamas/PIJ terrorist activity, (3) any Al Jazeera broadcast incited the October 7 attack or attacks thereafter, or (4) any Al Jazeera employee acting in the scope of his or her employment participated in terrorist acts on October 7 or thereafter. *See LeIsrael*, 66 F.4th at 1017 (dismissing ATA aiding and abetting claim where complaint failed to allege that the funds that the defendants provided "were used to finance any terrorist attacks, much less that [the defendants] was aware that it was happening"); *Newman*, 758 F. Supp. 3d at 1372 (dismissing aiding and abetting claim where the plaintiffs had not "pleaded that the AP's purchase [of photos from journalists allegedly associated with Hamas] resulted in a significant amount of money—or any amount of money—indirectly flowing to Hamas" and did not "plausibly allege that Hamas

received any financial support from the AP or that the AP knew that Hamas would likely receive any funds from the purchase of such photographs.").

Pre-*Twitter*, courts generally applied the six factors enumerated in *Halberstam* to evaluate whether the alleged assistance is knowing and substantial: (i) the nature of the act assisted, (ii) the amount and kind of assistance, (iii) the defendants' presence at the time of the tort, (iv) the defendants' relationship to the tortious actor, (v) the defendants' state of mind, and (vi) the duration of assistance. *Halberstam*, 705 F.2d at 484. The D.C. Circuit, however, has found it "unnecessary to discuss those factors" where the complaint's "factual allegations are so clearly deficient." *LeIsrael*, 66 F.4th at 1017 n.3. Similarly, here, the dearth of factual allegations regarding *any* assistance by Defendants does not lend itself to the *Halberstam* six-factor analysis of whether the assistance is knowing and substantial, and the Court therefore need not undertake the six-factor approach. But, even if it were to do so, such an exercise only serves to confirm that the Complaint fails to state an aiding and abetting claim.

In evaluating the first and second factors (nature of the act encouraged and the amount and kind of assistance), *Halberstam* asks whether the criminal activity was "heavily dependent" on the type of assistance the defendant provided and whether the defendant's own assistance was "indisputably important." 705 F.2d at 488. In *Halberstam*, the principal's "long-running burglary enterprise" was "heavily dependent on aid in transforming large quantities of stolen goods into 'legitimate' wealth," and the defendant's "assistance was indisputably important to this laundering function," because "she gave not only her time and talents but also her name to accomplish that objective, through having checks made out to her and falsifying income tax returns." *Id.* Here, Plaintiffs do not allege any facts supporting the inference that Hamas's and PIJ's terrorist attacks on October 7, or even their terrorist activity generally, was dependent on

Defendants supposedly paying Hamas officials to be interviewed or paying salaries to a handful of Al Jazeera employees alleged to be aligned with Hamas. Nor do they allege facts that Hamas or PIJ is dependent on news coverage by Al Jazeera to carry out terrorist attacks and, in any event, as noted above as to Plaintiffs' § 2339B claim (Part II.A.2), the First Amendment precludes imposing liability on Defendants for covering the news. "Absent a link between [the defendant's alleged] support and the principal violation, defendant's purported assistance is not substantial." *LeIsrael*, 530 F. Supp. 3d at 14, *aff'd*, 66 F.4th 1007. Further, the Supreme Court has held that the first and second factors weigh in favor of defendants where the FTO's "ability to benefit" from the alleged assistance was "merely incidental to defendants' services and general business models" and "not attributable to any culpable conduct of defendants directed toward" the FTO. *Twitter*, 598 U.S. at 504. Here, the Complaint does not plausibly plead that Defendants have provided any support beyond "merely incidental" assistance.

The third *Halberstam* factor considers the defendant's presence at the time of the plaintiffs' injury. As the D.C. Circuit noted in *Bernhardt*, *Halberstam* "focused on a person's physical presence in the murder and burglary context." 47 F.4th at 871 (citing *Halberstam,* 705 F.2d at 488). Here, as in *Bernhardt*, neither Defendant is alleged to have been present at the October 7 terrorist attacks or the attacks that followed. Plaintiffs do not and cannot allege that the Qatari-based AJMN or the U.S.-based AJI were in Israel at the October 7 attacks. *See Ofisi*, 77 F.4th at 675 ("Appellants do not allege, and indeed cannot plausibly allege, that BNPP was present during the bombings."). At most, the Complaint alleges that journalists Anas al-Sharif and Ismail Abu Omar were near the attacks and posted on their personal social media accounts, Compl. ¶¶ 90–98, 128–30, but the Complaint does not allege that they were employed by AJI or AJMN on October 7 and present in their capacity as AJI or AJMN employees. *See also LeIsrael*,

530 F. Supp. 3d at 14 (concluding that the third factor weighed in defendant's favor because plaintiffs do not allege that defendants were present at any of the attacks).[19]

"The fourth factor considers the closeness of any relationship between the defendant and the terrorist organization." *Bernhardt*, 47 F.4th at 872. Here, the Complaint alleges no relationship between Defendants and Hamas or PIJ, much less a close one. The Complaint instead alleges repeated instances in which Defendants have interviewed Hamas or PIJ leaders, but news coverage does not constitute a relationship that could give rise to aiding and abetting liability. Moreover, Plaintiffs cannot attribute any employee's supposed affiliation with Hamas to the Defendants because the Complaint does not allege that these affiliations were known by Defendants pre-attack or that these affiliations were authorized by Defendants or were otherwise within the scope of employment.

The fifth "state of mind" factor requires "knowledge of one's own actions and general awareness of their foreseeable results." *Id*. (cleaned up). While "this factor more powerfully supports aiding-and-abetting liability of defendants who share the same goals as the principal or specifically intend the principal's tort, . . . such intent is not required." *Id.* In *Ofisi*, the D.C. Circuit concluded that this factor weighed in defendant BNPP's favor because the Complaint failed "to plausibly allege BNPP knew of the plot to bomb the embassies or intended to support al-Qaeda in its mission." 77 F.4th at 675. Here, there are no plausible allegations that Al Jazeera knew of a plot to carry out the October 7 terrorist attacks (or the post-October 7 attacks) and intended to support Hamas or PIJ in their mission.

---

[19] Even if this Court were to adopt the Second Circuit's view that a corporation's presence may be understood "in a transactional sense," *see Bernhardt*, 47 F.4th at 871–72, the Complaint alleges no transactions with Hamas or PIJ in Israel. *Id.* at 872 ("Even from a transactional perspective, however, we are unable to infer from Bernhardt's complaint any HSBC involvement with al-Qaeda before and leading up to the Camp Chapman bombing").

Even though the defendant need not necessarily be "one in spirit" with the FTO, the complaint must nonetheless allege the defendant's general awareness that the terrorist acts were a foreseeable result of its actions. *Bernhardt*, 47 F.4th at 872. In *Halberstam*, the defendant knew, when she assisted the principal tortfeasor, that "he was involved in some type of personal property crime at night—whether as a fence, burglar, or armed robber made no difference— because violence and killing is a foreseeable risk in any of these enterprises." 705 F.2d at 488. Here, terrorist attacks were not a foreseeable risk of interviewing Hamas or PIJ leaders, providing news coverage of Israel and the Gaza Strip, or paying salaries to journalists. In any event, the "state of mind" factor has substantial overlap with the other scienter factors ("general awareness" and whether the substantial assistance was "knowingly" provided), where the Complaint is deficient for the reasons previously stated, and therefore this factor also favors Defendants. *See Bernhardt*, 47 F.4th at 872 (the state of mind "factor cuts against Bernhardt because, as already discussed, Bernhardt fails to allege that HSBC provided knowing assistance or was generally aware that acts of terrorism were the foreseeable result of its actions").

Finally, the sixth factor also weighs in favor of Defendants. This factor looks to the "duration of a defendant's assistance." *Id*. As discussed, Plaintiffs fail to plausibly allege any assistance provided by Defendants to Hamas or PIJ, much less assistance to support terrorist activities or the attacks that caused Plaintiffs' injuries. The duration of a news organization-news subject relationship or news organization-employee relationship is not relevant because it is the duration of the terrorism assistance that matters. *See id.* (even "a lengthy financial relationship does not terrorism assistance make"); *Newman*, 758 F.Supp.3d at 1373 (finding the duration factor did not weigh in the plaintiffs' favor because, "even assuming the AP had a series of transactions with the Freelance Photographers over a period of several years, Plaintiffs do not

suggest that the length of such relationship aided terrorism, outside of the conclusory allegations that the AP was a direct funding source for Hamas.").

As the Supreme Court emphasized in *Twitter*, the *Halberstam* factors, though they all weigh in favor of Defendants here, should not be taken as "a sequence of disparate, unrelated considerations without a common conceptual core." 598 U.S. at 504. "The point of those factors is to help courts capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." *Id.* Here, the Complaint does not plausibly allege that either Defendant engaged in any conduct that is both significant and culpable enough to justify attributing the Hamas/PIJ October 7 attacks to them. Accordingly, Plaintiffs' aiding and abetting claim must be dismissed.

### D.    The Complaint Does Not Allege Defendants Conspired with Hamas or PIJ to Carry Out the Terrorist Attacks

To plead a civil conspiracy claim under § 2333(d), a plaintiff must allege: "(1) an agreement between two or more persons; (2) to participate in an unlawful act"; "(3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Bernhardt*, 47 F.4th at 873 (quoting *Halberstam*, 705 F.2d at 477). Thus, at the very least, Plaintiffs must allege that AJMN and AJI were "pursuing the same object" as Hamas and PIJ. *Id.* Here, the Complaint again falls far short of the mark.

Plaintiffs allege Hamas's intent in committing the Oct. 7 attacks: "In addition to perpetrating their murderous assaults, rapes, and arsons, Hamas's chief goal was to kidnap Israeli, U.S. and other foreign civilians, and soldiers in order to utilize them as hostages and bargaining chips to compel Israel to release convicted Palestinian prisoners held in Israeli

prisons." Compl. ¶ 152. Plaintiffs have not, however, pled any facts alleging that the Defendants

were pursuing this goal and indeed any such claim would be outrageous. Here, the Defendants'

objectives are to report on the news. *See id.* ¶¶ 40–41. Plaintiffs' allegations to the contrary are

entirely conclusory. *See id.* ¶ 288 ("Defendants were and continue to be engaged in a common

pursuit with Hamas and the PIJ and share their objectives."); *id.* ¶ 289 ("Each Defendant knew

that the objective of the conspiracy was to facilitate terrorist attacks against Israelis and Israeli

Americans, including the October 7 Terrorist Attacks."). Under the Rule 8(a) pleading standard,

such conclusory allegations, devoid of any factual support, are insufficient to withstand a motion

to dismiss.

The Court of Appeals has dismissed other § 2333(d) conspiracy claims for failure to

adequately plead an agreement between the defendants and the FTO. For example, in *Bernhardt*,

defendant:

> HSBC was trying to make "substantial profits" by evading sanctions, whereas al-
> Qaeda sought to "terrorize the U.S. into retreating from the world stage"; "use long
> wars to financially bleed the U.S. while inflaming anti-American sentiment";
> "defend the rights of Muslims"; and "obtain global domination through a violent
> Islamic caliphate." These objectives are wholly orthogonal to one another.

47 F.4th at 873. In *Ofisi*, the Court of Appeals concluded: "At bottom, al-Qaeda sought to

brutally murder employees of U.S. embassies. BNPP sought to evade U.S. sanctions on Sudan by

establishing banking relations with that country. As in *Bernhardt*, these goals are simply

orthogonal to one another." 77 F.4th at 672. Similarly, here, because the Complaint does not

plausibly allege that Defendants shared Hamas's and PIJ's goals of carrying out a terrorist attack

on Israel, the Complaint fails to allege a conspiracy. Thus, Plaintiffs' § 2333(d) conspiracy

claim, like their other claims, must be dismissed.

IV.    **Some of the Plaintiffs' Lack Standing to Bring Some or All of Their Claims**

A.    **Plaintiffs Who Are Suing as Personal Representatives of Estates of Decedents Who Are Not U.S. Nationals Do Not Have an ATA Claim**

The ATA provides a civil cause of action for *"[a]ny national of the United States* injured in his or her person, property, or business by reason of an act of international terrorism, *or his or her estate, survivors, or heirs*." 18 U.S.C. § 2333(a) (emphasis added). Plaintiffs Talia Friedman, Meital Gitler, and Haim Bernstein are suing as personal representatives of estates of individuals who are not alleged to be U.S. nationals. *See* Ferguson Decl., Ex. 1, tbls.1–2. Those claims therefore must be dismissed. *Biton v. Palestinian Interim Self-Government Auth.*, 310 F. Supp. 2d 172, 181 (D.D.C. 2004) (holding that a U.S. plaintiff "cannot recover under the ATA as a representative of [the decedent's] estate or as his survivor, because he was not a U.S. national.").

B.    **Plaintiffs Shnaider and Newman-Kelmanson Have No ATA Claims for Emotional Injury Related to Harm to Non-U.S., Non-Immediate Family Members**

Plaintiff Shnaider seeks to recover emotional damages as a result of injuries inflicted by terrorists on his brother-in-law (Yosi Silverman), niece (Shiri Bibas), nephew-in-law (Yarden Bibas), and great-nephews (Ariel and Kfir Bibas). Compl. ¶¶ 162–65. Plaintiff Newman-Kelmanson brings a claim for emotional damages arising from the death of her brother-in-law Elchanan Kelmanson. *Id.* ¶¶ 19, 175. The ATA does not permit such claims because an ATA plaintiff "must be a direct family member (or functional equivalent) of a United States national who was injured by reason of an act of international terrorism to sue under the ATA based on that plaintiff's emotional damages." *Raanan v. Binance Holdings Ltd.*, No. 24-cv-697 (JGK), 2025 U.S. Dist. LEXIS 33874, at *35 (S.D.N.Y. Feb. 25, 2025); *see also In re Terrorist Attacks on Sept. 11, 2001*, No. 03 MDL 1570, 2023 U.S. Dist. LEXIS 55720, at *110 (S.D.N.Y. Mar. 30, 2023) (applying "immediate family member" standard for determining which individuals may

sue under the ATA); *Miller v. Cartel*, No. 1:20-cv-00132, 2022 U.S. Dist. LEXIS 112463, at *43 (D.N.D. June 24, 2022) (same); *cf. Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 62 (D.D.C. 2018) (holding that claims for emotional damage arising out of a death from an act of international terrorism are "traditionally limited to a victim's immediate family") (internal quotation marks omitted).

"[I]mmediate family" is "defined as one's spouse, parents, siblings, and children." *Raanan*, 2025 U.S. Dist. LEXIS 33874, at *34 (quoting *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 28 (D.D.C. 2009)). A plaintiff who is not an immediate family member must allege that they are one of "those rare cases" where they "had lived in the victim's immediate household and had been in other important respects" like a *de facto* immediate family member to the victim. *Id.* (quoting *Estate of Heiser*, 659 F. Supp. 2d at 29). Here, Plaintiffs Shnaider and Newman-Kelmanson do not allege that they are *de facto* immediate family members of the relatives directly injured on October 7. Accordingly, Mr. Shnaider's claims except as to his sister and Ms. Newman-Kelmanson's claim except as to her husband must be dismissed.

## CONCLUSION

For the foregoing reasons, all claims against AJMN should be dismissed with prejudice under Rule 12(b)(2) and 12(b)(5) for lack of personal jurisdiction and insufficient service of process, respectively. In addition, all claims should be dismissed with prejudice against both AJMN and AJI under Rule 12(b)(6) for failure to state a claim.

Dated: July 1, 2025                                    Respectfully submitted,


                                                        /s/ Laura G. Ferguson
                                                       Laura G. Ferguson (D.C. Bar No. 433648)
                                                       Andrew T. Wise (D.C. Bar No. 456865)
                                                       MILLER & CHEVALIER CHARTERED
                                                       900 16th Street, NW
                                                       Washington, D.C. 20006
                                                       Tel.: (202) 626-5800
                                                       Fax: (202) 626-5801
                                                       lferguson@milchev.com
                                                       awise@milchev.com

                                                       *Counsel for Defendants Al Jazeera Media
                                                       Network and Al Jazeera International (USA)
                                                       LLC*