**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MAURICE SHNAIDER, *et al.*,

                 *Plaintiffs*,

        v.

AL JAZEERA MEDIA NETWORK

and

AL JAZEERA INTERNATIONAL
(USA) LLC,

                *Defendants*.

Civil Action No. 1:25-cv-00538-ABJ

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION...................................................................................................... 1

PROCEDURAL BACKGROUND AND OVERVIEW OF MOTION ...................................... 5

FACTUAL ALLEGATIONS ......................................................................................... 7

    A.    The Parties ................................................................................ 7

    B.    Allegations Regarding AJMN Journalists ............................... 9

    C.    The October 7, 2023, Terrorist Attacks and Post-October 7 Attacks ................... 11

    D.    The Defendants' Alleged Role in the October 7 Attacks ...................................... 12

    E.    Plaintiffs' Use of Footnoted Sources ..................................... 13

ARGUMENT ........................................................................................................ 14

I.    CLAIMS AGAINST AL JAZEERA MEDIA NETWORK MUST BE DISMISSED FOR LACK OF PERSONAL JURISDICTION ................................... 14

    A.    The Court Lacks Specific Personal Jurisdiction over AJMN ............................. 17

        1.    The D.C. Long-Arm Statute, D.C. Code § 13-423, Does Not Provide a Basis for Specific Personal Jurisdiction over AJMN ............. 17

        2.    The Exercise of Specific Personal Jurisdiction over AJMN Under Rule 4(k)(1) Does Not Comport with Fourteenth Amendment Due Process ................... 22

    B.    The Exercise of Personal Jurisdiction Under Fed. R. Civ. P. 4(k)(2) Does Not Comport with Fifth Amendment Due Process ................................ 23

II.    PLAINTIFFS' DIRECT LIABILITY CLAIMS MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM .......................................................................... 28

    A.    The Amended Complaint Fails to Plausibly Allege That Either Defendant's Alleged Conduct Constitutes an "Act of International Terrorism" ................... 29

        1.    The Amended Complaint Does Not Plausibly Allege a Violation of § 2339A ................... 30

        2.    The Amended Complaint Does Not Plausibly Allege a Violation of § 2339B ................... 36

        3.    The Amended Complaint Does Not Even Attempt to Allege That Defendants Engaged in Any Activities That Satisfy § 2331(1)(B)'s "Appear to Be Intended" Requirement ................... 41

    B.    The Amended Complaint Fails to Plausibly Allege Proximate Causation .......... 42

i

III.    THE SECONDARY LIABILITY CLAIMS MUST BE DISMISSED FOR
        FAILURE TO STATE A CLAIM ................................................................ 46

        A.    The Section 2333(d) Aiding and Abetting Standard: *Halberstam* and
              *Twitter* ........................................................................................ 46

        B.    The Amended Complaint Does Not Plausibly Allege That Defendants
              Were "Generally Aware" They Were Playing a Role in the Terrorist
              Attacks ........................................................................................... 48

        C.    The Amended Complaint Does Not Plausibly Allege Defendants
              "Knowingly Provided Substantial Assistance" to Hamas and PIJ in
              Connection with the Terrorist Attacks ..................................................... 51

        D.    The Amended Complaint Does Not Allege Defendants Conspired with
              Hamas or PIJ to Carry Out the Terrorist Attacks .......................................... 57

IV.     PLAINTIFFS SHNAIDER AND NEWMAN-KELMANSON HAVE NO
        ATA CLAIMS FOR EMOTIONAL INJURY RELATED TO HARM TO
        NON-U.S., NON-IMMEDIATE FAMILY MEMBERS ............................... 58

CONCLUSION ................................................................................................ 60

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..............................................................................................28

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................................28

*\*Bernhardt v. Islamic Republic of Iran*,
    47 F.4th 856 (D.C. Cir. 2022)........................................................................ *passim*

*Bristol-Myers Squibb Co. v. Superior Court*,
    582 U.S. 255 (2017)..............................................................................................22

*D'Onofrio v. SFX Sports Grp.*,
    534 F. Supp. 2d 86 (D.D.C. 2008)........................................................................16

*\*Daimler AG v. Bauman*,
    571 U.S. 117 (2014)..............................................................................................18

*Dole Food Co. v. Patrickson*,
    538 U.S. 468 (2003)..............................................................................................17

*Farron v. Islamic Republic of Iran*,
    No. 1:24-cv-00358-CJN (D.D.C. filed Feb. 6, 2024) .......................................8, 45

*\*Fawzi v. Al Jazeera Media Network*,
    273 F. Supp. 3d 182 (D.D.C. 2017) ........................................................15, 17, 19

*Fields v. Twitter, Inc.*,
    217 F. Supp. 3d 1116 (N.D. Cal. 2016), *aff'd*, 881 F.3d 739 (9th Cir. 2018) ........................44

*Fritz v. Islamic Republic of Iran*,
    324 F. Supp. 3d 54 (D.D.C. 2018)........................................................................59

*Glycobiosciences, Inc. v. Vichy Lab'ys, S.A.*,
    No. CV 22-1264, 2023 U.S. Dist. LEXIS 4659 (D.D.C. Jan. 11, 2023) ................17

*GTE New Media Servs., Inc. v. Ameritech Corp.*,
    21 F. Supp. 2d 27 (D.D.C. 1998)....................................................................17, 23

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ....................................................................... *passim*

*Halley v. Blinken*,
No. 1:24-cv-00571, 2024 U.S. Dist. LEXIS 212365 (D.D.C. Nov. 21, 2024) ........................8

*Estate of Heiser v. Islamic Republic of Iran*,
659 F. Supp. 2d 20 (D.D.C. 2009) ..................................................................................59, 60

*Heping Li v. Keqiang Li*,
No. 23-7052, 2024 U.S. App. LEXIS 27508 (D.C. Cir. Oct. 29, 2024) ................................18

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) .......................................................................................................4, 38, 39

*Kaplan v. Al Jazeera*,
No. 10 Civ. 5298, 2011 U.S. Dist. LEXIS 61373 (S.D.N.Y. June 7, 2011) ...............33, 34, 44

*Kareem v. Haspel*,
986 F.3d 859 (D.C. Cir. 2021) ...........................................................................................34

*Kemper v. Deutsche Bank AG*,
911 F.3d 383 (7th Cir. 2018) .............................................................................................41

*\*Keren Kayemeth Leisrael-Jewish Nat'l Fund v. Educ. for a Just Peace in the
Middle East*,
66 F.4th 1007 (D.C. Cir. 2023) ...........................................................37, 43, 50, 52

*Keren Kayemeth Leisrael-Jewish Nat'l Fund v. Educ. for a Just Peace in the
Middle East*,
530 F. Supp. 3d 8 (D.D.C. 2021), *aff'd*, 66 F.4th 1007 (D.C. Cir. 2023) ...................42, 53, 54

*Kowal v. MCI Commc'ns Corp.*,
16 F.3d 1271 (D.C. Cir. 1994) ...........................................................................................34

*Lavi v. UNRWA USA National Committee, Inc.*,
No. 24-312-RGA, 2025 U.S. Dist. LEXIS 153757 (D. Del. Aug. 8, 2025) ..........................49

*Lewis v. Mutond*,
62 F.4th 587 (D.C. Cir. 2023) ...........................................................................................27

*Linde v. Arab Bank, PLC*,
882 F.3d 314 (2d Cir. 2018)..........................................................................................41, 48

*Livnat v. Palestinian Auth.*,
851 F.3d 45 (D.C. Cir. 2017) .............................................................................................15

*Miller v. Cartel*,
No. 1:20-cv-00132, 2022 U.S. Dist. LEXIS 112463 (D.N.D. June 24, 2022) ......................59

*Mwani v. Bin Laden*,
   417 F.3d 1 (D.C. Cir. 2005) ...................................................................................23

*NAACP v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982) ............................................................................................40

*\*Newman v. AP*,
   758 F. Supp. 3d 1357 (S.D. Fla. 2024) ........................................................ *passim*

*\*Ofisi v. BNP Paribas, S.A.*,
   77 F.4th 667 (D.C. Cir. 2023) ....................................................................... *passim*

*Owens v. BNP Paribas, S.A.*,
   235 F. Supp. 3d 85 (D.D.C. 2017), *aff'd*, 897 F.3d (D.C. Cir. 2018) ...............41, 42

*\*Owens v. BNP Paribas, S.A.*,
   897 F.3d 266 (D.C. Cir. 2018) .........................................................................29, 43

*Page v. Comey*,
   628 F. Supp. 3d 103 (D.D.C. 2022) ....................................................................29

*Raanan v. Binance Holdings Ltd.*,
   No. 24-cv-697 (JGK), 2025 U.S. Dist. LEXIS 33874 (S.D.N.Y. Feb. 25, 2025)..............59, 60

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013) ................................................................................42, 43

*Rush v. Savchuk*,
   444 U.S. 320 (1980) ...........................................................................................16

*Safex Found., Inc. v. SafeLaunch Ventures Ltd.*,
   694 F. Supp. 3d 1 (D.D.C. 2023) ......................................................................22, 23

*Shnaider v. American Muslims for Palestine*,
   No. 8:24-cv-01067-MSS-SPF (M.D. Fla. filed May 2, 2024) ...................................8

*In re Terrorist Attacks on Sept. 11, 2001*,
   No. 03 MDL 1570, 2023 U.S. Dist. LEXIS 55720 (S.D.N.Y. Mar. 30, 2023) .....................59

*Toumazou v. Turkish Republic of Northern Cyprus*,
   71 F. Supp.3d 7 (D.D.C. 2014) ...........................................................................29

*Triple Up Ltd. v. Youku Tudou Inc.*,
   235 F. Supp. 3d 15 (D.D.C. 2017), *aff'd*, No. 17-7033, 2018 U.S. App. LEXIS
   19699 (D.C. Cir. July 17, 2018).......................................................................15, 25

*Troell v. Binance Holdings Ltd.*,
   No. 1:24-cv-07136-JAV (S.D.N.Y. filed Sept. 20, 2024) ......................................8

*Twitter v. Taamneh*,
  598 U.S. 471 (2023) .................................................................... *passim*

*Walden v. Fiore*,
  571 U.S. 277 (2014) .............................................................22, 28

*In re Zinc Antitrust Litig.*,
  155 F. Supp. 3d 337 (S.D.N.Y. 2016) ....................................29

**Statutes**

18 U.S.C. § 2331 ...........................................................................30, 41

18 U.S.C. § 2333 .................................................................... *passim*

18 U.S.C. § 2339A .................................................................. *passim*

18 U.S.C. § 2339B .................................................................. *passim*

D.C. Code § 13-423 ................................................................ *passim*

Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, §
  2(a)(5), 130 Stat. 852 (2016) ...................................................46

**Other Authorities**

Fed. R. Civ. P. 4 .................................................................... *passim*

Fed. R. Civ. P. 8 .................................................................... *passim*

Fed. R. Civ. P. 11 ...........................................................................13

Fed. R. Civ. P. 12 .........................................................6, 15, 28, 60

## INTRODUCTION

This lawsuit wrongly seeks to use the U.S. Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*, to hold Qatari-based global media network Al Jazeera Media Network ("AJMN") and its U.S. subsidiary, Al Jazeera International (USA) LLC ("AJI") (collectively, "Defendants" or "Al Jazeera") responsible for Hamas and Palestinian Islamic Jihad ("PIJ") terrorist attacks in Israel on October 7, 2023, and for acts of violence against members of Israel's military forces during the ensuing Israeli siege on Gaza. It should be dismissed. Al Jazeera is not responsible for the events it covers any more than news organizations covering the attacks of September 11 were responsible for the acts of Al-Qaeda.

Al Jazeera is a major international news organization, with "extensive reach across the globe," with distribution in "over 150 countries and territories in more than 430 million homes." Am. Compl. ("AC") ¶ 57, Dkt. No. 13. Al Jazeera journalists who cover Gaza do so at great personal risk. According to the Committee for the Protection of Journalists ("CPJ"), an independent, nonprofit organization that promotes press freedom worldwide, "[j]ournalists in Gaza face extreme, often fatal, risks as they try to cover the war, including relentless Israeli airstrikes, the destruction of most of the territory's infrastructure, the forced displacement of 90% of Gaza's population, trauma, and widespread famine."[1] Al Jazeera has received awards for its courageous coverage of the Israel-Gaza conflict. Al Jazeera English's *Fault Lines*' *The Night Won't End* and Al Jazeera Digital's *One Day in Gaza: Close Up* both won prestigious Peabody

---

[1] *Journalist casualties in the Israel-Gaza war*, CPJ, https://cpj.org/2023/10/journalist-casualties-in-the-israel-gaza-conflict/ (last updated Aug. 18, 2025); *see also* Mohamed A. Hussein & Hanna Duggal, *Know their names: Palestinian journalists killed by Israel in Gaza*, Al Jazeera (Dec. 31, 2024), https://www.aljazeera.com/features/longform/2024/12/31/know-their-names-the-palestinian-journalists-killed-by-israel-in-gaza; *War in Gaza: Israel must be held accountable*, International Federation of Journalists, https://www.ifj.org/war-in-gaza (last visited Aug. 21, 2025).

Awards last year.[2] *Fault Lines'* *The Night Won't End*, *All That Remains*, and *Starving Gaza* have been nominated for 2025 Emmy awards.[3]

At bottom, this lawsuit rests on Israeli Prime Minister Benjamin Netanyahu's May 2024 statement claiming that Al Jazeera is a "mouthpiece" for Hamas, which lead to the banning of Al Jazeera broadcasts in Israel. AC ¶ 164. It also rests on related claims by the Israel Defense Forces (the "IDF") that certain Al Jazeera journalists were affiliated with Hamas, claims usually made as a precursor to, or supposed justification for, targeted killings of those journalists, including five of the journalists discussed in the Amended Complaint: Hamza Al-Dahdouh, Mustafa Thuria, Ismail Al-Ghoul, Hossam Shabat, and, most recently, Anas Al-Sharif. *Id.* ¶¶ 74– 75, 82, 95, 96.

The plausibility of these claims must, however, be assessed in the context of Israel's well-documented effort to silence any media criticism of its operations in Gaza and related human rights abuses and mass starvation. This lawsuit is part of a coordinated effort to silence Al Jazeera's coverage. Israeli counsel for the Plaintiffs, Nitsana Darshan-Leitner, *id.* at 96, runs the Shurat HaDin - Israel Law Center.[4] Shurat HaDin describes itself as a "leader in the legal war for Israel," "hard at work assisting the Israeli government," and "supporting Israel's war efforts," including with the lawsuit against Al Jazeera.[5] Ms. Darshan-Leitner has claimed that, if

---

[2] *The Night Won't End*, Peabody Awards, https://peabodyawards.com/award-profile/the-night-wont-end/ (last visited Aug. 21, 2025); *One Day in Gaza: Close Up*, Peabody Awards, https://peabodyawards.com/award-profile/one-day-in-gaza-close-up/ (last visited Aug. 21, 2025).

[3] National Academy of Television Arts & Science, *The 46th Annual News & Documentary Emmy Nominees*, https://theemmys.tv/news-46th-nominations-gallery/ (last visited Aug. 21, 2025).

[4] *Our Team*, Shurat HaDin, https://israellawcenter.org/our-team/ (last visited Aug. 21, 2025) (Ms. Darshan-Leitner is listed as the president.).

[5] *Shurat HaDin Annual Report 2024: Helping Israel Win The War* at 2, 26, Shurat HaDin (2024), https://israellawcenter.org/wp-content/uploads/2025/02/2024-Annual-Report.pdf.

successful, this lawsuit "will financially devastate Al Jazeera and shut down its operations in the United States and beyond."[6]

Following October 7, 2023, "[f]oreign journalists have not been allowed to enter Gaza to report independently from the enclave, so most of the reporting emerging from the war has come from Palestinian reporters."[7] Although Israel has blocked other major media news outlets from entering Gaza, "Al Jazeera has managed to position numerous reporters on the ground, providing a steady stream of stories about the harrowing conditions for civilians amid mass privation and hunger."[8] Those who remain in Gaza to cover the conflict have increasingly become the target of violence. According to CPJ, "192 journalists have been killed since the start of the Israeli-Gaza war on October 7, 2023. At least 184 of those journalists were Palestinians killed by Israel."[9]

On August 10, 2025, the Israeli military killed five Al Jazeera journalists by directing a drone strike at a tent in front of Al Shifa hospital in Gaza City known to house journalists.[10] The attack was targeted at prominent Al Jazeera journalist Anas Al-Sharif, who is discussed in the Amended Complaint.[11] In a statement announcing the killing, the military accused Al-Sharif of

---

[6] Adam Kredo, *How a Lawsuit From Oct. 7 Victims, Including Bibas Family Uncle, Could Cripple Al Jazeera*, The Washington Free Beacon (Apr. 9, 2025), https://freebeacon.com/israel/how-a-lawsuit-from-oct-7-victims-including-bibas-family-uncle-could-cripple-al-jazeera/.

[7] Ephrat Livni, *Israeli Strike Kills Al Jazeera Journalists, Network Says*, New York Times, (Aug. 13, 2025) https://www.nytimes.com/2025/08/10/world/middleeast/israel-gaza-journalists-killed.html.

[8] *Id.*

[9] *Israel kills Al Jazeera journalists in targeted Gaza City airstrike*, CPJ (Aug. 13, 2025), https://cpj.org/2025/08/israel-kills-al-jazeera-journalists-in-targeted-gaza-city-airstrike/.

[10] Livni, *supra* note 7.

[11] In 2024, Amnesty International awarded Anas Al-Sharif its Human Rights Defender award. *Human Rights Defender Awards*, Amnesty International (Dec. 12, 2024), https://www.amnesty.org.au/human-rights-defender-awards-2024/.

having ties to Hamas.[12] As CPJ noted following the attack, "Israel has a longstanding, documented pattern of accusing journalists of being terrorists without providing any credible proof" and the "August 10 attack raises the number of Al Jazeera staff journalists killed by Israel in Gaza during the war to 10, in addition to nine journalists who freelanced with the media organization, according to CPJ data." [13]  The IDF killed five more Palestinian journalists in a strike on Nasser Hospital on August 25, 2025, including Al Jazeera cameraman Mohammed Salama.[14]

Following October 7, 2023, Al Jazeera has been the most persistent media presence covering Israel's military operation in Gaza and the death and famine that it has caused. The IDF's ground and air campaign in Gaza has killed more than 60,000 Palestinians, nearly a third of whom are children.[15] More are dying of starvation and in bombardments every day. Images and coverage from Gaza have contributed to the growing international condemnation of Israel's treatment of civilians in Gaza. But covering events that cast Israel in a negative light does not make one a terrorist or give rise to ATA liability. The First Amendment protects the freedom of the press, and the ATA is not intended to abridge those protections. *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010); 18 U.S.C. § 2339B(i). A federal court already has dismissed a similar lawsuit seeking to hold the Associated Press ("AP") liable under the ATA for its coverage of the terrorist attacks on October 7. *Newman v. AP*, 758 F. Supp. 3d 1357 (S.D. Fla. 2024). To be sure,

---

[12] Livni, *supra* note 7.

[13] CPJ, *supra* note 9.

[14] Aritz Parra et al., *20 Killed in Gaza Hospital Strikes. Netanyahu Claims 'Tragic Mishap.'*, New York Times (Aug. 25, 2025), https://www.nytimes.com/2025/08/25/world/middleeast/gaza-hospital-journalists.html.

[15] Nidal Al-Mughrabi & Emma Farge, *How many Palestinians has Israel's Gaza offensive killed?*, Reuters (July. 30, 2025), https://www.reuters.com/world/middle-east/how-many-palestinians-has-israels-gaza-offensive-killed-2025-03-24/.

incitement is not protected by the First Amendment, but the Amended Complaint fails to identify *any* Al Jazeera coverage that would constitute incitement of the October 7 attack (or any other terrorist attack), and Plaintiffs' incitement theory is undermined by their own allegations that "Hamas spent years preparing the [October 7] attack, meticulously planning" it. AC ¶ 173. In sum, this Court should reject Plaintiffs' counsel's efforts to use the ATA to silence the only major international news organization bearing witness to the unfolding humanitarian crisis in Gaza.

## PROCEDURAL BACKGROUND AND OVERVIEW OF MOTION

Plaintiffs initiated this action in February 2025. Dkt. No. 1. In July 2025, Defendants moved to dismiss for failure to state a claim and AJMN also moved to dismiss for lack of personal jurisdiction and ineffective service of process. Dkt. No. 11. Rather than opposing the motion, Plaintiffs filed an Amended Complaint. Dkt. No. 13. Plaintiffs also moved for leave to serve AJMN through alternate means, Dkt. No. 14, which the Court granted by minute order on July 28, 2025. Although the service issue has been addressed, the Amended Complaint, like the original Complaint, fails to plead a basis for the exercise of personal jurisdiction over AJMN and fails to plausibly allege facts that would support ATA claims against either AJMN or AJI.

Plaintiffs still do not plausibly allege any basis for the exercise of personal jurisdiction over the Qatari-based AJMN because the Plaintiffs' claims do not bear a sufficient relationship to any D.C.- or even U.S.-based conduct of AJMN. Plaintiffs now allege AJMN exercises editorial control over AJI content "designed for and directed at U.S. audiences," AC ¶ 12, and operates social media accounts for AJI's Al Jazeera English channel, *id.*, ¶ 13, but the Amended Complaint does not plausibly allege that any of that content incited or otherwise aided the attacks at issue or was even viewed by those who planned or carried out the attacks. Accordingly, and as

set forth in Part I, AJMN renews its motion to dismiss pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(2).

With regard to the ATA claims, the Amended Complaint addresses certain pleading defects. Most notably, the Plaintiffs previously could not allege who carried out the post-October 7 attacks, alleging only that "terrorists" were responsible. *See* Dkt. No. 11-1 at 10. Now, they allege without explanation or citation that Hamas is responsible. Plaintiffs who previously sued as personal representatives of estates without alleging that the decedent was a U.S. national now include that allegation. Otherwise, the Amended Complaint largely tracks the original Complaint and includes the same claims, Plaintiffs, and far-fetched theories of liability.

As in the original Complaint, the Amended Complaint alleges that Plaintiffs' injuries were caused by "material support" Al Jazeera provided to Hamas or PIJ or, alternatively, that Al Jazeera "knowingly provid[ed] substantial assistance" to Hamas and PIJ, or conspired with them, in connection with the attacks at issue. AC ¶ 6. Plaintiffs continue to advance the same four theories for how this supposed material support and assistance was provided: (1) AJMN employed some journalists the IDF later claimed were affiliated with Hamas, where those journalists had no role in the attacks at issue, other than, in a few instances, posting reports on their personal social media accounts; (2) some AJMN journalists posted content on their *personal* social media accounts that Plaintiffs view as sympathetic to Hamas; (3) Defendants cover Hamas and PIJ and the Gaza War, and, by doing so, provide Hamas and PIJ a platform and incite violence, even though Plaintiffs cannot identify any AJMN or AJI inciting content; and (4) the entirely speculative claim, based "on information and belief," that Defendants compensated some Hamas or PIJ officials for interviews.

Turning to Plaintiffs' direct liability claims under 18 U.S.C. § 2333(a), as discussed in Part II, Plaintiffs fail to plausibly allege that either AJMN or AJI engaged in any "act of international terrorism," either Defendant acted with the requisite scienter, or either Defendant's conduct proximately caused their injuries. Plaintiffs' claims under 18 U.S.C. § 2333(d) for aiding and abetting and conspiracy fare no better. As discussed in Part III, the Amended Complaint does not plausibly allege that Defendants knowingly provided substantial assistance to Hamas or PIJ or conspired with them to engage in terrorist acts. In sum, the harm Plaintiffs suffered at the hands of Hamas and PIJ bears no legal connection to AJMN and AJI, whose coverage of the ongoing Israel-Gaza conflict and the attacks of October 7 does not constitute violations of the ATA under any theory.

## FACTUAL ALLEGATIONS

### A.    The Parties

**Plaintiffs.** Plaintiffs are twenty-six (26) individuals who bring this action under the ATA, seeking to impose liability on AJMN and AJI for Hamas or PIJ terrorist attacks on October 7, 2023, and for acts of violence in the Israel-Gaza war that followed. The ATA's civil liability provision creates a private cause of action for "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs." 18 U.S.C. § 2333(a).

Two of the Plaintiffs (the Roms) bring suit solely in their capacity as a personal representative of the estate of a U.S. national killed in the attacks at issue. Another ten bring suit both individually *and* as a personal representative of the estate of a U.S. national. (The Lubins, Friedman, Mizrachi, Wachs, Hexter, Saadon, Zenilman, Tatelbaum, and Bausi). Five of the Plaintiffs are U.S. nationals who allege physical injuries from terrorist attacks. (Halley, Margulies, Bollag for S.B., Merkin for I.T.M., and Kamer for N.E.K.). Another nine are U.S.

nationals who allege emotional injury from the attacks, in most cases because a relative was killed or injured. (Schnaider, Newman-Kelmanson, Nahamias, Sharabi, Wachs for J.W., Merkin, Kamer, Gitler, and Bernstein). AC ¶¶ 21–45, 178–259.

All the Plaintiffs have brought other lawsuits alleging that different defendants caused their injuries by materially supporting or aiding and abetting Hamas. Some have brought as many as four separate lawsuits, most involving multiple defendants. *See* Laura G. Ferguson Decl. ("Ferguson Decl."), Ex. 1. All but two of the Plaintiffs (Kamer and his minor son N.E.K.) sued Iran, alleging that Iran is responsible for their injuries. *Farron v. Islamic Republic of Iran*, No. 1:24-cv-00358-CJN (D.D.C. filed Feb. 6, 2024). Eleven of the Plaintiffs sued several U.S. based pro-Palestinian organizations and individuals associated with them for allegedly materially supporting Hamas and aiding and abetting the October 7 attacks by supporting pro-Palestinian activism on U.S. college campuses. *Shnaider v. American Muslims for Palestine*, No. 8:24-cv-01067-MSS-SPF (M.D. Fla. filed May 2, 2024). Twenty-one Plaintiffs have sued Binance, alleging it materially supported and aided and abetted Hamas. *Troell v. Binance Holdings Ltd.*, No. 1:24-cv-07136-JAV (S.D.N.Y. filed Sept. 20, 2024). Ten of the Plaintiffs sued the then U.S. Secretary of State, among others, for permitting U.S. funding of the United Nations Relief and Work Agency for Palestinian Refugees in the Near East, which Plaintiffs claim provided material support to Hamas in connection with the October 7 attacks. *Halley v. Blinken*, No. 1:24-cv-00571, 2024 U.S. Dist. LEXIS 212365 (D.D.C. Nov. 21, 2024). That lawsuit has been dismissed. *Id.* at *18.

**Defendants.** Plaintiffs sue two Al Jazeera entities: AJMN and AJI. The Amended Complaint alleges AJMN is a "global media conglomerate headquartered in Doha, Qatar." AC ¶ 46. "Established in 1996, the network operates multiple channels, including Al Jazeera Arabic

and Al Jazeera English, distributing content worldwide via television, online platforms, and social media." *Id.*

AJI is a "Delaware limited liability company and a subsidiary of AJMN," with its main office in Washington, D.C. *Id.* ¶ 47. According to the Amended Complaint, AJI "serves as a primary hub for the network's U.S. operations, including those of Al Jazeera English." *Id.* Al Jazeera English, in turn, "features content designed for and directed at U.S. audiences," "reaching viewers within this District and throughout the United States." *Id.* ¶ 12; *see also id.* at ¶ 11 (alleging that Al Jazeera English programs are "targeted at American audiences," including *UpFront* and *Fault Lines*). The Amended Complaint does not, however, allege that any of Al Jazeera English's programming played any role in the attacks at issue or that AJI employed any of the journalists alleged to be affiliated with Hamas or PIJ. Plaintiffs allege *UpFront* interviewed the Head of the International Relations Department of Hamas Osama Hamdan in 2017 and in 2023 and "likely compensated" him for the interviews. *Id.* ¶ 130. Aside from the Hamdan interviews, which are not alleged to contain any inciting content, *see id.*, the Amended Complaint does not allege *any connection* between AJI and Hamas or PIJ. Indeed, there are no allegations about conduct of AJI in the Amended Complaint aside from the jurisdictional allegations about its U.S. activities.

B.    **Allegations Regarding AJMN Journalists**

Plaintiffs allege that eleven AJMN journalists have been accused by the IDF of being Hamas (or, in one instance, PIJ) operatives or "working closely" with Hamas. *Id.* ¶¶ 62 (Ismail Abu Omar), 72 (Muhammad Washah), 75 (Hamza Al-Dahdouh and Mustafa Thuria), 78 (Ismail Al-Ghoul), 85 (Tamer Almisshal), 92 (Hossam Shabat), 96 (Anas Al-Sharif, Alaa Salameh, Ashraf Al-Sarraj, and Talal Al-Arrouqi). Two of the eleven (Abu Omar and Al-Sharif) are

alleged to have been present at the October 7 attacks, posting news updates on their personal Telegram accounts. *Id.* ¶¶ 62–63, 105–112, 144. Neither is alleged to have been acting as an AJMN journalist on October 7 or even to have been employed by AJMN on October 7. *Id.* ¶¶ 61 & n.28 (alleging only that AJMN referred to Abu Omar as an Al Jazeera journalist in February 2024); 144 & n.176 (alleging only that Al-Sharif "is a news reporter for Defendant AJMN").[16] Neither is alleged to have engaged in any acts of violence. Plaintiffs allege that a third journalist, Al-Ghoul, was a "member of the Hamas Nukhba terror unit involved in the October 7 Terrorist Attacks and that he instructed Hamas operatives on how to record the October 7 Terrorist Attacks." *Id.* ¶ 78 & n.49. But Plaintiffs acknowledge he was not hired by AJMN until November 2023, *id.* ¶ 76, and they allege no knowledge by AJMN of this supposed membership before the IDF killed Al-Ghoul in late July 2024, after all the attacks at issue, *id.* ¶ 78 n. 49, ¶ 79 n. 51, ¶ 82.[17] The other eight journalists are not alleged to have any involvement in any of the attacks at issue.

Moreover, the Amended Complaint does not allege that Defendants had any knowledge of the eleven journalists' supposed Hamas affiliation at the time of the October 7 attacks. The claims of Hamas affiliation were made by the IDF in 2024 (most in October), more than a year after the October 7 attacks. *Id.* ¶¶ 63 & n.30, 72 & n.42, 75 & n.46, 78 & n.49, 87 & n.60, 92 & n.70, 96 & n.78.[18] As to the post-October 7 attacks, the IDF allegations of Hamas of PIJ

---

[16] Mr. Al-Sharif was not employed by Al Jazeera until December 2023. Mostafa Salem, *Anas Al-Sharif became the face of the war in Gaza for millions. The Israel killed him*, CNN (Aug. 12, 2025), https://www.cnn.com/2025/08/11/middleeast/anas-al-sharif-al-jazeera-reporter-intl ("Al Jazeera recruited Al-Sharif in December 2023 after his social media footage of Israeli strikes in his hometown of Jabalya went viral").

[17] *See also id.* ¶ 76 n.47 (Al Jazeera refutation of "baseless" Israeli allegations against Al-Ghoul).

[18] The IDF claimed Abu Omar was a Hamas operative a few days after injuring him in an airstrike that resulted in the amputation of his right leg. *Al-Jazeera reporter, cameraman,*

affiliation post-date all the attacks, except for allegations as to Al-Dahdouh, Thuria, and Washah. *Id.* ¶¶ 72 & n.42, 74, 75 & n.46. The allegations as to Al-Dahdouh and Thuria were made shortly after the IDF killed them. *Id.* ¶¶ 74, 75 & n.46. Only one attack (Tatelbaum, *id.* ¶ 252) post-dates the IDF's February 2024 claim about Washah (*id.* ¶ 72).

### C.    The October 7, 2023, Terrorist Attacks and Post-October 7 Attacks

Thirteen of the Plaintiffs claim injury for the attacks that occurred on October 7, 2023, when "approximately 6,000 Hamas and PIJ terrorists from Gaza launched a coordinated cross-border attack into Israel by land, air, sea, and tunnels." *Id.* ¶ 167. "Though orchestrated by Hamas, other groups such as the PIJ also participated in the attacks." *Id.* ¶ 171. The United States has designated both Hamas and PIJ as foreign terrorist organizations ("FTOs"). *Id.* ¶¶ 49, 55. "Israeli intelligence reports confirm that Hamas spent years preparing the attack, meticulously planning the cross-border infiltration, mass abduction, and the documentation and publication of graphic propaganda to maximize psychological impact." *Id.* ¶ 173.

The remaining thirteen Plaintiffs allege injury from violence that occurred *after* October 7. Six of those Plaintiffs bring claims related to the injury to or killing of IDF soldiers while on duty (Margulies, Zenilman, Hexter, Gitler, Friedman, and Tatelbaum), another two Plaintiffs bring claims on behalf of an individual who was killed while on duty with the Israeli Border Police (the Lubins), and five Plaintiffs allege injury from a car attack at a bus stop (Merkin, I.T.M., Kamer, N.E.K., and Bollag for S.B.). *Id.* ¶¶ 186, 190, 194–96, 213–14, 218–19, 223, 225,

---

*critically injured by Israeli drone strike in Rafah*, CPJ (Feb. 13, 2024), https://cpj.org/2024/02/al-jazeera-reporter-cameraman-critically-injured-by-israeli-drone-strike-in-rafah/; AC ¶ 63 n.31. Similarly, the IDF claimed that Al-Dahdouh, Thuria, and Al-Ghoul were Hamas or PIJ operatives a few days after claiming credit for intentionally killing them. AC ¶ 75 & n.46; *id.* ¶¶ 82, 78 & n.49. Al Jazeera has rejected as "unfounded" the October 2024 claims by the IDF that six of its journalists are operatives for Hamas or PIJ. *Id.* ¶ 96 n.81.

243, 250, 252, 254–58. Although Plaintiffs previously did not attribute the attacks to Hamas, they now vaguely allege these attacks were carried out by Hamas terrorists. *Id.* ¶¶ 188, 190, 194, 213, 218, 223, 225, 243, 250, 252. The Amended Complaint does not allege that Defendants or their employees had any role in these attacks or even provided news coverage of the attacks other than general claims that Al Jazeera covered the Israel-Gaza war.

**D.      The Defendants' Alleged Role in the October 7 Attacks**

The Amended Complaint conclusorily alleges that Al Jazeera provided "real-time coverage, violent images, and inciting language of the October 7 Terrorist Attacks, the aftermath, and the coordinated and continuing campaign of terrorism that followed" *id.* ¶ 264, but fails to allege any facts supporting the incitement claim or even the claim that Al Jazeera broadcast "violent images." Certainly, like all major news organizations, Al Jazeera provided coverage of the October 7 attacks. As the Amended Complaint acknowledges, the "attacks and the ensuing war were widely publicized, generating global attention." *Id.* ¶ 177. Plaintiffs fail to allege any way in which Al Jazeera's coverage on October 7 differed from that of other news organizations or conceivably could constitute an "act of international terrorism."

Plaintiffs also allege that Al Jazeera provides a "platform" for Hamas and PIJ to "promote their terrorist agenda, communicate their terrorist plans, recruit terrorist members, and incite violence." *Id.* ¶ 5; *see also id.* ¶¶ 58, 136, 294. The Amended Complaint, however, provides no factual allegations that, if true, would support these claims. Instead, the Amended Complaint alleges instances in which Al Jazeera journalists, consistent with their role as members of a news organization covering the Israel-Palestinian conflict, interviewed Hamas or PIJ leaders. *See, e.g.*, *id.* ¶ 119 ("Al Jazeera has hosted, conducted, and televised interviews with high-ranking members of Hamas and the PIJ on numerous occasions, and continues to do so.").

The Amended Complaint repeatedly draws entirely baseless inferences about these interviews, such as alleging that an Al Jazeera reporter's interview of a PIJ spokesperson outside the Al Shifa Hospital in Gaza, a "sensitive location," "signif[ied] their close coordination," *id.* ¶ 127, or Plaintiffs' rank speculation that Al Jazeera "likely" paid a Hamas official for two interviews, *id.* ¶ 130.

Numerous allegations long pre-date the October 7 attacks and have no conceivable relevance to any role of Defendants in the Plaintiffs' injuries. Examples include allegations regarding Al Jazeera hosting the Head of the International Relations Department of Hamas at a 2015 panel discussion (*id.* ¶ 130), a 2017 interview with Hamas leader Khaled Meshaal (*id.* ¶ 122), a 2017 post on a journalist's X account (*id.* ¶ 99), and a 2011 Jerusalem Post story about a former Al Jazeera Afghanistan bureau chief admitting to Shin Bet during an interrogation that he was a Hamas operative from 1993–2004, as a condition of his release from prison (*id.* ¶ 98 & n.86). Many other allegations of supposed Al Jazeera affiliations with Hamas or platforming of Hamas relate to news coverage of the war in Gaza, which post-dates the attacks at issue. *See, e.g.*, *id.* ¶¶ 89, 90, 125, 133, 150, 154, 157, 158. In any event, all the "platforming" allegations, even if the content is as alleged, relate to Defendants' First Amendment-protected news coverage or protected speech of individual journalists and do not describe conduct that would constitute an act of international terrorism or knowingly providing any substantial assistance to a designated FTO, which are necessary for Plaintiffs to plead a basis for ATA liability against Al Jazeera.

### E.    Plaintiffs' Use of Footnoted Sources

Plaintiffs make extensive use of footnotes, quoting from or referencing footnoted sources throughout the Amended Complaint. The 96-page Amended Complaint includes 245 footnotes. The use of footnotes violates the spirit if not the letter of Rules 8(a) and 11(b)(3) pleading

requirements in a number of respects: (1) the sheer volume of the footnotes violates Rule 8(a)(2)'s requirement that a complaint include "a short and plain statement of the claim"; (2) some of the footnotes reference social media posts or videos that are not available at the address provided; (3) many of the footnotes reference material that is in Arabic, and no certified English translation is provided; (4) for many of the footnotes, the Amended Complaint does not provide, and it is burdensome to determine, the date and underlying source of the information; and (5) in many cases, the source material is not accurately described in the Amended Complaint, to put it mildly. This is especially troubling given the prominent role that advocacy groups played in preparing the Complaint and the English translations included in the Complaint.[19] If Plaintiffs are to rely on footnoted sources in their Amended Complaint allegations, they should provide Defendants and the Court a copy of the referenced material, with certified translations of non-English material. Otherwise, reference to any footnoted material not subject to judicial notice should be stricken.[20]

## ARGUMENT

### I.    Claims Against Al Jazeera Media Network Must Be Dismissed for Lack of Personal Jurisdiction

This Court should dismiss the Amended Complaint against AJMN for lack of personal jurisdiction because there is no statutory basis for the exercise of jurisdiction over AJMN and, in

---

[19] "Jordan Cope, Director of Policy Education for StandWithUs and a legal consultant and researcher on the lawsuit stated, 'StandWithUs has assisted Shurat HaDin to prepare this lawsuit including providing critical research, legal theory and consulting, and Arabic translations in order to help expose Al Jazeera journalists and their affiliations to terrorist groups—including Hamas and the Islamic Jihad.'" *Shurat HaDin Sues Al Jazeera on Behalf of Victims of Terrorism*, StandWithUs (Feb. 26, 2025), https://www.standwithus.com/post/shurat-hadin-sues-al-jazeera-on-behalf-of-victims-of-terrorism.

[20] Defendants raised these issues in their Motion to Dismiss the original Complaint. Dkt. No. 11-1 at 12–13. Plaintiffs' only response is to state, as to some translations, that they have used Google Translate, with the review of an individual proficient in Arabic. This is hardly sufficient.

any event, the exercise of jurisdiction over AJMN would not comport with due process. The Amended Complaint acknowledges that AJMN is not subject to general jurisdiction in this Court, now alleging only that AJMN "is subject to specific personal jurisdiction under D.C. Code § 13-423 and Federal Rule of Civil Procedure 4(k)(2)." AC ¶ 10. But, despite the addition of some unrelated, vague, and/or conclusory allegations regarding AJMN's U.S. operations, the Amended Complaint still does not allege any suit-related D.C. conduct by AJMN, barring application of the D.C. long-arm statute. *See* Part I.A. Moreover, even if the forum is treated as the United States as a whole under Rule 4(k)(2), the Amended Complaint fails to allege the requisite minimum contacts with the forum to justify the exercise of jurisdiction. *See* Part I.B.

*A Note on Plaintiffs' Burden of Proof.* Plaintiffs bear the burden of establishing that jurisdiction is proper by making "a prima facie showing of the pertinent jurisdictional facts." *Livnat v. Palestinian Auth.*, 851 F.3d 45, 56–57 (D.C. Cir. 2017). "[T]he Court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts. Mere conclusions or bare allegations do not constitute the prima facie case for jurisdiction that this standard requires." *Fawzi v. Al Jazeera Media Network*, 273 F. Supp. 3d 182, 185–86 (D.D.C. 2017) (cleaned up). In deciding a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the Court need not treat the complaint's allegations as true but may instead "weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts." *Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 20 (D.D.C. 2017), *aff'd*, No. 17-7033, 2018 U.S. App. LEXIS 19699 (D.C. Cir. July 17, 2018).

Here, Plaintiffs fail to allege facts that would establish any basis for the exercise of personal jurisdiction over AJMN. The Amended Complaint alleges that AJMN is based in Qatar, not Washington, D.C. or the United States. AC ¶ 46. Fatal to the Amended Complaint's assertion

15

of specific jurisdiction, the Amended Complaint does not allege any forum-based suit-related

conduct. In brief, the Amended Complaint alleges that AJMN "employ[ed] and compensate[ed]

journalists who are Hamas and PIJ operatives," "compensate[ed] Hamas and PIJ leaders and

operatives for interviews," and "provid[ed] a platform for Hamas and the PIJ" to promote their

agenda and incite violence. *Id.* ¶ 5. Yet it does not allege that AJMN has any employees in

Washington, D.C. or the United States that are members of Hamas or PIJ, that AJMN provided

any form of material support, including compensation, to Hamas or PIJ members from

Washington, D.C. or the United States, or that AJMN programming with some nexus to the

Washington, D.C. or the United States incited the attacks that injured Plaintiffs. Indeed, the

Amended Complaint fails to identify *any* U.S.-based nexus with the attacks that injured

Plaintiffs, other than the U.S. citizenship of many of the Plaintiffs, which is insufficient to create

jurisdiction over AJMN.

Moreover, jurisdictional facts must be pled as to *each* defendant; "plaintiff cannot

aggregate factual allegations concerning multiple defendants in order to demonstrate personal

jurisdiction over any individual defendant." *D'Onofrio v. SFX Sports Grp.*, 534 F. Supp. 2d 86,

90 (D.D.C. 2008) (citing *Rush v. Savchuk*, 444 U.S. 320, 331–32 (1980)). Plaintiffs' original

Complaint repeatedly referred to "Al Jazeera" or "Defendants" without specifying which

Defendant entity was responsible for the conduct alleged. *See, e.g.*, Compl. ¶ 10 ("Al Jazeera

explicitly targets American audiences"); *id.* ¶ 12 ("Defendants are compensating designated

terrorists out of Washington, D.C."). The Amended Complaint attempts to address the group

pleading problem by replacing "Al Jazeera" with "AJMN and AJI." *See* AC ¶ 14 ("[B]y

producing, editing, and broadcasting content from Washington, D.C. that supported and

legitimized the messaging of Hamas and the PIJ, Defendant AJMN and AJI engaged in tortious

conduct . . ."); *id.* ("Defendant AJMN and Defendant AJI both compensated individuals affiliated with Hamas and the PIJ for interviews . . ."). This rhetorical tweak does not alter the fact that none of the substantive allegations of material support or aiding and abetting in the Amended Complaint bears any connection to AJMN operations in the District of Columbia or United States. Instead, the Amended Complaint's jurisdictional allegations are the sort of "bare allegations or conclusory statements" that fail to "allege specific facts connecting *each defendant* with the forum." *GTE New Media Servs., Inc. v. Ameritech Corp.*, 21 F. Supp. 2d 27, 36 (D.D.C. 1998) (emphasis added).

The Amended Complaint claims that it refers to AJMN and AJI collectively because they "operate as part of a unified global media enterprise." AC at 4 n.1. But personal jurisdiction over AJMN may not be based on AJI's or any other subsidiary's jurisdictional contacts. AJMN and AJI are separate legal entities, and the Amended Complaint alleges no basis for disregarding corporate form. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 474–75 (2003) ("A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities."); *see also Glycobiosciences, Inc. v. Vichy Lab'ys, S.A.*, No. CV 22-1264, 2023 U.S. Dist. LEXIS 4659, at *10 (D.D.C. Jan. 11, 2023) ("a defendant corporation's contacts with a forum may not be attributed to affiliated corporations" unless "there such unity of interest and ownership that the separate personalities . . . no longer exist"); *Fawzi*, 273 F. Supp. 3d at 187 (holding that AJMN's U.S. subsidiary's jurisdictional contacts could not be imputed to AJMN).

### A. The Court Lacks Specific Personal Jurisdiction over AJMN

#### 1. *The D.C. Long-Arm Statute, D.C. Code § 13-423, Does Not Provide a Basis for Specific Personal Jurisdiction over AJMN*

Under Rule 4(k)(1)(A), "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant" who is "subject to the jurisdiction of a court of general

jurisdiction in the state where the district court is located." Fed. R. Civ. P. 4(k)(1). Thus, "[f]ederal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (citing Rule 4(k)(1)). The District of Columbia's jurisdictional statutes, however, do not provide a basis for the exercise of jurisdiction. The Amended Complaint alleges, AC ¶ 10, that specific jurisdiction exists under Section 13-423 of the D.C. Code, D.C.'s long-arm statute, which provides for jurisdiction over persons for claims "arising from" certain acts. D.C. Code § 13-423(a)(1)–(7). Plaintiffs fail to allege which specific provision of the D.C. long-arm statute applies.

Plaintiffs conclusorily assert that AJMN "engaged in tortious *conduct* within this District and throughout the United States," AC ¶¶ 13, 14 (emphasis added), but the long-arm statute requires that the plaintiff's claim arises from the defendant's "causing tortious *injury* in the District of Columbia." D.C. Code § 13-423(a)(3), (4) (emphasis added). None of the Plaintiffs allege injury in the District of Columbia.

Plaintiffs include several allegations about AJMN's supposed business operations in the District of Columbia. Section 13-423(a)(1) provides for jurisdiction "arising from" the defendant's "transacting any business in the District of Columbia." D.C. Code § 13-423(a)(1). This provision also does not provide a basis for jurisdiction over AJMN. The Amended Complaint simply does not allege how Plaintiffs' claims "arise from [AJMN's] particular transaction of business in the District." *Heping Li v. Keqiang Li*, No. 23-7052, 2024 U.S. App. LEXIS 27508, at *5 (D.C. Cir. Oct. 29, 2024) (cleaned up). All the attacks are alleged to have occurred in Israel and Gaza, and the Amended Complaint draws no connection between those attacks and AJMN's alleged D.C. contacts. These alleged contacts are addressed in turn.

18

First, the Amended Complaint alleges that AJMN's subsidiary Al Jazeera Plus (AJ+) "operates primarily in this District." AC ¶ 10. As a general matter, a subsidiary's contacts with the forum cannot be imputed to the parent. *See Fawzi*, 273 F. Supp. 3d at 187. Regardless, the conduct of AJ+ is not at issue or ever even referenced in the Amended Complaint.

Second, Plaintiffs allege that AJI's Washington, D.C. office is a "primary hub for AJMN's U.S. operations," AC ¶ 11, and further allege that AJMN "oversees the editorial direction and international content strategy" for the U.S. market, *id.* ¶ 10. The Amended Complaint, however, never alleges how AJMN's supposed editorial direction and international content strategy for D.C.-based AJI has any relevance to their ATA claims. There are no non-conclusory allegations that D.C.-based AJI content incited the attacks at issue.[21]

Third, Plaintiffs allege that Al Jazeera English, "which is editorially controlled by AJMN and distributed in the United States by AJI," produces and broadcasts programs, including *UpFront* and *Fault Lines*, "from Washington, D.C." *Id.* ¶¶ 11–12. Even assuming that Al Jazeera English programming may be attributed to AJMN, the programming referenced in the Amended Complaint lacks connection to Plaintiffs' claims. The Amended Complaint alleges that Al Jazeera English's "D.C.-based productions have included interviews and features involving individuals affiliated with Hamas and the PIJ," *id.* ¶ 12, but throughout the entire Amended Complaint it references only one Hamas-affiliated interviewee on a D.C.-based show. Plaintiffs note an October 13, 2023, interview of Hamas spokesperson Osama Hamdan on *UpFront*. *Id.*

---

[21] The Amended Complaint also alleges, that AJI's "Washington, D.C. office . . . has included over 100 staff credentialed for Congressional press galleries." AC ¶ 11 & n.4 (citing staffing from 2017–2018). But even assuming this allegation relates to AJMN staff and is accurate as of the filing of the lawsuit, Plaintiffs' claims do not relate to Al Jazeera's coverage of the U.S. Congress.

¶ 130. The Amended Complaint speculates without basis that it is "likely" Hamdan was compensated "from the Washington, D.C.-based show" for the interview. *Id.* Significantly, the Amended Complaint does not allege that this interview is one in which Al Jazeera supposedly gave Hamas a platform to "promote their terrorist agenda, communicate their terrorist plans, recruit terrorist members, and incite violence." *See id.* ¶ 5. Indeed, the cited video, posted on the interviewer's YouTube channel, is captioned: "Marc Lamont Hill CONFRONTS Hamas Spokesperson About Targeting Israeli Civilians!!!" *Id.* ¶ 130 n.158 (emphasis in original). And the exchanges between Hamdan and the interviewer are indeed heated, with the interviewer pressing Hamdan to acknowledge civilian casualties and Hamdan claiming that the interviewer was repeating Israeli talking points. So even if it were plausible that AJMN paid this interview subject from the District of Columbia—and it is not—any inference of support or "platforming" is undercut by the interview itself. Moreover, Hamdan is not alleged to have any role in the attacks at issue.[22]

      Further, the Amended Complaint asserts that "[t]hese broadcasts" platforming Hamas and the PIJ—without identifying any such broadcasts—"contributed to the radicalization and escalation of violent rhetoric and conduct on *U.S. college campuses*." *Id.* ¶ 12 (emphasis added). This allegation is on its face wholly unrelated to Plaintiffs' claims arising out of injuries sustained in terrorist attacks *in Israel and Gaza* perpetrated by individuals not alleged to have been "radicalized" by rhetoric on U.S. college campuses. Indeed, in support of this claim the Amended Complaint references a *Fault Lines* documentary from March 2024 exploring the

---

[22] Plaintiffs also reference a 2017 *UpFront* interview with Hamdan about moving the U.S. Embassy to Jerusalem. AC ¶ 130 & n.157. The Amended Complaint does not allege how this interview is even remotely related to their claims arising from the October 7 attacks, over six years later.

impact of allegations of support of terrorism on academic freedom in the United States. *Id.* ¶ 12 n.9. It is not clear how this documentary or the U.S.-based issues it covers could have played any role in the attacks at issue, all but one of which occurred before the segment aired.

Fourth, the Amended Complaint alleges that AJMN "maintains and operates social media accounts for Al Jazeera English and its programming, which are specifically targeted at U.S.-based users." *Id.* ¶ 13. The Amended Complaint, however, does not include any allegations linking social media posts for Al Jazeera English to the Hamas/PIJ October 7 attacks or to any of the other attacks at issue.

Fifth, the Amended Complaint suggests that AJMN "direct[ed] incitement and calls to action into this District," the only example alleged being a November 2024 personal social media post of a deceased AJMN journalist, Hossam Shabat, calling for Israeli embassies to be, in the words of the Amended Complaint, "besiege[d]." *Id.* ¶ 15. The post, which issues a call to "shut down these embassies immediately," is dated after every one of Plaintiffs' injuries, none of which have anything to do with Israeli embassies in the District of Columbia or otherwise. *See id.* ¶ 15 n.13. Like other allegations related to the social media posts of AJMN journalists, the Amended Complaint does not allege that this post was made within Shabat's scope of employment, nor that Shabat, who reported from Gaza, had any connection whatsoever to the District of Columbia.

In sum, Section 13-423(a)(1) does not provide a basis for the exercise of personal jurisdiction over AJMN because Plaintiffs' claims do not relate to any business AJMN conducted in Washington, D.C.

2.    *The Exercise of Specific Personal Jurisdiction over AJMN Under Rule
4(k)(1) Does Not Comport with Fourteenth Amendment Due Process*

Plaintiffs' jurisdictional allegations also cannot survive the Fourteenth Amendment due

process inquiry. "For a State to exercise jurisdiction consistent with due process, the defendant's

suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*,

571 U.S. 277, 284 (2014). For specific jurisdiction, "a defendant's general connections with the

forum are not enough." *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255, 264 (2017).

The defendant must "purposefully avail[] itself of the privilege of conducting activities" in the

forum, and the plaintiff's claims must "arise out of or relate to any such activities." *Safex Found.,*

*Inc. v. SafeLaunch Ventures Ltd.*, 694 F. Supp. 3d 1, 9 (D.D.C. 2023).

For all the reasons stated in Part I.A.1 above that the Amended Complaint's jurisdictional

allegations fail to meet the requirements of the D.C. long-arm statute, they also fail to satisfy due

process. *See id.* at 8 (citing cases for the proposition that Section 13-423(a)(1) of D.C. Code is

"coextensive with the due process clause"). The Amended Complaint fails to allege any AJMN

activities in the District of Columbia that are related to Plaintiffs' claims or injuries. Stated

another way, all the alleged "suit-related conduct"—employing journalists alleged to be affiliated

with Hamas or PIJ, compensating interviewees, and providing a platform for Hamas and PIJ to

incite violence—occurred in Israel, Gaza, or, arguably, Qatar, not in the District of Columbia (or

even the United States, as discussed in Part I.B below). With no link between AJMN's alleged

D.C. conduct and Plaintiffs' injuries, due process does not permit the exercise of specific

jurisdiction over AJMN.

Beyond the allegations regarding AJMN's conduct *in* the District of Columbia, the

Amended Complaint generally asserts that AJMN "purposefully directs content into the United

States—including the District of Columbia." AC ¶ 10; *see also id.* ¶ 12 (alleging that unspecified

Al Jazeera English "broadcasts were distributed across multiple channels accessible in the District of Columbia."). Such general allegations, which amount to a statement that Al Jazeera content is accessible in Washington D.C., just as it is accessible in every other U.S. jurisdiction and around the world, cannot establish specific jurisdiction consistent with due process. *See Safex*, 694 F. Supp. 3d at 10 ("[T]he D.C. Circuit has established that the 'mere accessibility to an Internet site in the District' is not 'enough of a foundation upon which to base personal jurisdiction.'") (citing *GTE*, 199 F.3d at 1346); *id.* at 13–14 (holding that plaintiffs failed to establish purposeful availment where complaint did not allege that residents in the forum "actually engage[d]" with defendant's content or that defendant targeted the forum "as a market" any differently than other markets). Therefore, even if the AJMN programming with which the Amended Complaint takes issue were related to Plaintiffs' suit—and it is not, as further discussed below in Part I.B—that same programming does not establish the requisite "purposeful availment" of Washington D.C.

### B. The Exercise of Personal Jurisdiction Under Fed. R. Civ. P. 4(k)(2) Does Not Comport with Fifth Amendment Due Process

In the alternative, Plaintiffs assert that this Court may assert personal jurisdiction under Rule 4(k)(2). AC ¶ 10. Rule 4(k)(2) permits the exercise of personal jurisdiction for a claim arising under federal law where a summons has been served, and "(A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2). Under Rule 4(k)(2), the proper forum for assessing whether jurisdiction satisfies Fifth Amendment due process is "the United States as a whole." *Mwani v. Bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005). Rule 4(k)(2) was added to the Federal Rules of Civil Procedure in 1993. As the Advisory Committee Notes to the 1993 amendments explain: "There remain constitutional limitations on

the exercise of territorial jurisdiction by federal courts over persons outside the United States. . . . The Fifth Amendment requires that any defendant have affiliating contacts with the United States sufficient to justify the exercise of personal jurisdiction over that party." Fed. R. Civ. P. 4(k)(2) advisory committee's notes to 1993 amendment.

The Amended Complaint claims that jurisdiction under Rule 4(k)(2) is proper because AJMN "broadcasts content into the United States, maintains a significant media presence through its Washington, D.C. operations, and targets American audiences as part of its strategic media campaign." AC ¶ 16. The Amended Complaint's jurisdictional allegations regarding AJMN's "Washington, D.C. operations" are insufficient under Rule 4(k)(2) for the same reason they are insufficient under Rule 4(k)(1), leaving only vague, general claims of targeting and broadcasting content to U.S. audiences. The problem for Plaintiffs is that their substantive allegations—such as they are—that AJMN provided material support to Hamas or PIJ or knowingly provided substantial assistance to Hamas or PIJ in connection with the October 7 attacks and their aftermath have no connection to any of AJMN's U.S.-focused content. Plaintiffs pepper the Amended Complaint with examples of Al Jazeera content that is either—and often both—not directed at the United States at all or bears no relation to Plaintiffs' claims. That is not sufficient to meet the requirements of Fifth Amendment due process.

"Pleading specific personal jurisdiction under Rule 4(k)(2) requires demonstrating a close nexus between the United States, the foreign defendant's conduct, and the plaintiff's claim. The plaintiff must show that the foreign defendant has purposefully directed his activities at residents of the forum, and that the alleged injuries arise out of or relate to those activities." *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 864 (D.C. Cir. 2022) (internal quotation marks omitted). First, the Amended Complaint fails to plausibly allege that AJMN's content is, as a general

matter, purposefully directed at the United States. To the contrary, the Amended Complaint alleges that AJMN is a "global media conglomerate" that operates channels, including Al Jazeera English, that distribute content "*worldwide* via television, online platforms, and social media." AC ¶ 46 (emphasis added); *id.* ¶ 57 (alleging that Al Jazeera English was launched with the aim of "reaching a global audience"); *id.* ("Al Jazeera has extensive reach across the globe and is distributed in over 150 countries"); *id.* ¶ 10 (describing AJMN's role as overseeing "international content strategy"); *id.* ¶ 17 (describing AJMN's "vast international presence" that "underscores AJMN's capacity and intent to shape public discourse on a global scale").

In the face of AJMN's acknowledged global footprint, the Amended Complaint's allegation that AJMN targets its content at U.S. audiences amounts to repeated assertions that U.S. audiences can access Al Jazeera programming in a variety of ways. *See id.* ¶ 47 (noting Al Jazeera programming is "distributed to U.S. viewers through platforms like Sling TV, YouTube, and streaming services such as Roku, Amazon Fire TV, and Apple TV"); *id.* ¶ 13 ("AJMN also makes its Arabic language channels accessible to U.S. users, including through the use of virtual private networks (VPNs)"). And Plaintiffs reference various broadcasts they claim evidence AJMN's support of Hamas and PIJ that were "made accessible" or which "streamed in the U.S." *Id.* ¶¶ 90, 114, 116, 154. However, "it is clear that the mere accessibility" of content over the internet "cannot by itself establish the necessary minimum contacts" to satisfy Fifth Amendment due process; otherwise, defendants would lack the "minimum assurance as to where [their] conduct will and will not render them liable to suit." *Triple Up Ltd.*, 235 F. Supp. 3d at 23 (cleaned up) (collecting cases).

The Amended Complaint attempts to distinguish AJMN's conduct on the grounds that "AJMN and AJI" enabled Facebook to target AJMN videos to U.S. users who had previously

engaged with "AJMN-produced content." AC ¶ 13. The Amended Complaint's source for this allegation relates only to AJI's activities, not AJMN's. *Id.* ¶ 13 n. 12. Worse, the source itself is an advertisement by a private plaintiff's attorney investigating *possible* AJI conduct.

In any event, Plaintiffs' allegation that AJMN uses Facebook to target U.S. users, like all the Amended Complaint's allegations regarding AJMN's alleged U.S. contacts, comes nowhere close to satisfying the due process *relatedness* requirement. There simply is no allegation in the Amended Complaint that Plaintiffs' "alleged injuries 'arise out of or relate to'" any activities of AJMN deliberately targeted at the United States. *Bernhardt*, 47 F.4th at 864. As discussed in Part I.A, none of AJMN's alleged Washington, D.C. operations (its only alleged U.S. operations) relate to Plaintiffs' claims. Further, Plaintiffs do not allege that AJMN's "strategic media campaign" to "target[] American audiences" via Facebook or otherwise is linked or contributed to Plaintiffs' injuries in any way. AC ¶ 16. Plaintiffs do not allege, for instance, that the perpetrators of the attacks that injured Plaintiffs were informed, recruited, or incited by content associated with an AJMN U.S. media campaign. The Amended Complaint alleges that some of Al Jazeera English's programming—namely, *Upfront*, *Fault Lines*, and other unspecified "regularly feature[d] content"—is "designed for and directed at U.S. audiences." *Id.* ¶¶ 11, 12. But its only examples of that content—the interviews with Hamdan and the segment about U.S. campus speech—are not related to Plaintiffs' claims.

Even the AJMN broadcasts that the Amended Complaint alleges were "accessible" in the United States do not meet the relatedness requirement. Two of the four segments alleged to be accessible to U.S. audiences are not provided as examples of AJMN "providing a platform" to incite violence or otherwise promote Hamas's or PIJ's agenda. *See id.* ¶ 90 (describing an episode of an Al Jazeera Arabic-language docuseries published in January 2025 as evidence of

producer's Hamas affiliation); *id.* ¶ 154 (describing an Al Jazeera Arabic-language sketch that "trivialized" the October 7 attacks, which streamed online in October 2024, after all the attacks that injured Plaintiffs). The Amended Complaint alleges that two other segments were "made accessible" or "streamed" in the U.S. that promoted Hamas and incited further violence. The first is a broadcast on the morning of October 7 on Al Jazeera English reporting on the message of a Hamas military commander, *id.* ¶ 114, and the second is a March 2024 English-language documentary investigating the events of October 7, *id.* ¶ 116. But Plaintiffs provide no support whatsoever for these bare allegations, which require the Court to accept, in one instance, that AJMN's English-language reporting of newsworthy information already "widely disseminated" in Arabic by multiple news sources and Hamas itself played some role in the attacks that injured Plaintiffs, *id.* ¶¶ 114, 116; and in the other, that an English-language documentary critical of Hamas's actions on October 7 and published after all but one of the relevant attacks "contributed to the ongoing incitement" that relates to Plaintiffs' injuries, *id.* ¶ 116.

As Plaintiffs allege, "Hamas spent years preparing the attack, meticulously planning the cross-border infiltration . . . ." *Id.* ¶ 173. It strains credulity that, given this context, the perpetrators of the attacks that injured Plaintiffs were incited to act by any of the U.S.-directed, or even U.S.-accessible, English language content on Al Jazeera networks noted in the Amended Complaint. Moreover, it is not enough to draw a "possible connection" between Defendants and "terrorism generally"; rather, Plaintiffs must draw the necessary U.S. suit-related connection to the individuals or organizations that carried out the attacks at issue. *Bernhardt,* 47 F.4th at 865.

Further, the fact that U.S. citizens were killed or injured in the attacks is insufficient. *See Lewis v. Mutond,* 62 F.4th 587, 593 (D.C. Cir. 2023) (holding that the torture of an American abroad is insufficient to demonstrate minimum contacts with the United

27

States); *Walden*, 571 U.S. at 285 ("[T]he plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him.").

## II.    Plaintiffs' Direct Liability Claims Must Be Dismissed for Failure to State a Claim

Plaintiffs' first two causes of action seek to impose direct liability on AJI and AJMN under 18 U.S.C. § 2333(a), which creates a civil cause of action when a U.S. national is "injured in his or her person, property, or business by reason of an act of international terrorism." Thus, to maintain a direct liability claim under the ATA, plaintiffs must plausibly allege (1) an injury to a U.S. national, (2) by act of international terrorism, and (3) proximate causation. *Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667, 677 (D.C. Cir. 2023). Here, Plaintiffs fail to plausibly allege that either AJI or AJMN engaged an act of international terrorism or that any conduct alleged to be an act of international terrorism proximately caused Plaintiffs' injuries. The Amended Complaint is silent on any role of AJI, the only defendant over whom the Court has personal jurisdiction.

***Rule 12(b)(6) Standard of Review.*** "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A complaint alleges a facially plausible claim only if it sets forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint cannot state a claim through mere "labels and conclusions[,] a formulaic recitation of the elements of a cause of action . . . , [or] naked assertions devoid of further factual enhancement," *id.* (cleaned up), and a plaintiff's claim must rise "above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

In reviewing a complaint, the Court "need not accept inferences unsupported by facts or legal conclusions cast in the form of factual allegations" nor must it "accept as true the

complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice." *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 272–73 (D.C. Cir. 2018).

Moreover, Plaintiffs cannot satisfy the Rule 8(a) pleading standard by "lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct." *Toumazou v. Turkish Republic of Northern Cyprus*, 71 F. Supp.3d 7, 21 (D.D.C. 2014); *accord Page v. Comey*, 628 F. Supp. 3d 103, 128 (D.D.C. 2022). Plaintiffs sue AJMN and AJI, two separate legal entities, and the Amended Complaint alleges no basis for disregarding their separate legal status. Whereas the original Complaint made almost no allegations about AJMN specifically, the Amended Complaint now alleges that most journalists and content are associated with AJMN, not AJI. Plaintiffs make no effort to plead *any* ATA-related conduct of AJI. AJI appears to be included only in a mistaken attempt to use its U.S. presence as a basis for asserting jurisdiction over AJMN. In the 96-page Amended Complaint, AJI is referenced only seventeen (17) times, all in the sections captioned "Jurisdiction and Venue" and "Parties." Elsewhere, the Amended Complaint refers to AJMN and AJI collectively as "Al Jazeera" or "Defendants." This type of group pleading is insufficient, even for affiliated corporate entities. *See In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016). The Amended Complaint thus entirely fails to satisfy the Rule 8(a) pleading standard as to AJI.

### A.    The Amended Complaint Fails to Plausibly Allege That Either Defendant's Alleged Conduct Constitutes an "Act of International Terrorism"

For an act to qualify as "international terrorism," it must (A) "involve violent acts or acts dangerous to human life that are . . . or that would be a criminal violation if committed within the jurisdiction of the United States or of any State"; (B) "appear to be intended" "to intimidate or coerce a civilian population" or "to influence the policy of a government by intimidation or coercion"; and (C) "occur primarily outside the territorial jurisdiction of the United States, or

transcend national boundaries." 18 U.S.C. § 2331(1)(A)–(C). With respect to the first

requirement—the predicate criminal act requirement—Plaintiffs allege that AJI and AJMN

violated 18 U.S.C. § 2339A and § 2339B. The Amended Complaint, however, fails to plausibly

allege a violation of either statute. It also fails to allege any conduct that appears to have the

requisite intent to intimidate or coerce.

1.    *The Amended Complaint Does Not Plausibly Allege a Violation of
      § 2339A*

Plaintiffs' first cause of action seeks to impose liability on AJI and AJMN for providing

material support to terrorists in violation of 18 U.S.C. § 2339A. Section 2339A prohibits the

provisions of "material support or resources . . . knowing or intending that they are to be used in

preparation for, or in carrying out, a violation of" one or more of the crimes enumerated in the

statute.[23] 18 U.S.C. § 2339A(a). The Amended Complaint alleges three forms of material

support: (1) "providing real-time coverage, violent images, and inciting language of the October

7 Terrorist Attacks, their aftermath, and the coordinated and continuing campaign of terrorism

that followed"; (2) making "financial payments to leaders of Hamas and the PIJ for interviews

and to their own employees who were known Hamas and PIJ operatives"; and (3) employing

AJMN correspondents who "trained members of [Hamas and PIJ] in the use of weapons and

drones." AC ¶¶ 264–66. Plaintiffs' theories fail on multiple independent grounds.

---

[23] "Material support or resources" is defined as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials." 18.U.S.C. § 2339A(b)(1). 18 U.S.C. § 2339A(b)(3) defines "expert advice or assistance" as "advice or assistance derived from scientific, technical or other specialized knowledge."

*Al Jazeera's "Real Time" Coverage of October 7*

The original Complaint was silent about *any* specific Al Jazeera coverage on October 7 or in the period immediately leading up to October 7, other than alleging that Al Jazeera aired video of hostages "being paraded through the streets of Gazan cities." Compl. ¶ 151. Now, Plaintiffs acknowledge that such videos were "globally broadcast" and "widely shared on social media," by a range of sources. AC ¶ 169. Plaintiffs now also allege that AJMN aired a statement on October 7 from Hamas military commander Mohammed Deif, in which he "announced the launch of 'Operation Al-Aqsa Flood' and framed the attacks as the opening move in a larger war urging all Palestinians to rise up." *Id.* ¶ 114. Plaintiffs allege that, by "airing Deif's message in real time to global and U.S. audiences, AJMN did not merely report the news—it acted as a willing conduit for Hamas propaganda." *Id.* Yet, Plaintiffs' source for this allegation is MEMRI TV, a propaganda organization with close ties to the Israeli military, *id.* ¶ 114 n.112, which itself translated into English and disseminated the Deif announcement on October 7.[24] Deif's announcement was highly newsworthy, originally aired on Hamas's TV channel, not Al Jazeera,[25] and was extensively reported by other news organizations, including The Jerusalem Post and CNN.[26] Plaintiffs do not plausibly allege how airing the announcement subjects Al

---

[24] *Middle East Media Research Institute*, Wikipedia, https://www.sourcewatch.org/index.php/Middle_East_Media_Research_Institute (last visited Aug. 26, 2025).

[25] Samia Nakhoul & Laila Bassam, *Secretive Hamas military chief masterminded Oct 7 strike on Israel*, Reuters (May 20, 2024), https://www.reuters.com/world/middle-east/secretive-hamas-military-chief-masterminded-oct-7-strike-israel-2024-05-20/.

[26] Seth J. Frantzman, *Hamas terror commander Deif calls for all out war on Israel*, The Jerusalem Post (Oct. 7, 2023), https://www.jpost.com/middle-east/article-762052 (quoting Deif as calling on all Palestinians to "organize their operations against the settlements and sweep away the occupier"); Ibrahim Dahman et al., *Netanyahu says Israel is 'at war' after Hamas launches surprise air and ground attack from Gaza*, CNN (Oct. 7, 2023), https://www.cnn.com/2023/10/07/middleeast/sirens-israel-rocket-attack-gaza-intl-hnk (quoting

Jazeera to ATA liability. News coverage is protected by the First Amendment, and airing the announcement cannot plausibly be construed as inciting the October 7 attacks, which Plaintiffs elsewhere alleged were "meticulously" planned by Hamas over several "years." AC ¶ 173. Other than the alleged airing of video of hostages and the Deif statement, Plaintiffs do not identify any supposedly inciting or "platforming" content from Al Jazeera on October 7 or the weeks or months leading up to October 7.

Most of the allegations regarding contemporaneous coverage of October 7 relate to posts on *personal* social media accounts of alleged Al Jazeera journalists, not to any Al Jazeera content. *Id.* ¶¶ 62–63, 105–12 (Abu Omar), 144 (Al-Sharif); *see also id.* ¶ 263 ("AJMN employees . . . shared real-time updates" of the October 7 attacks). The Amended Complaint does not allege that either Abu Omar or Al-Sharif were employed by AJMN on October 7 or that either made the posts in the scope of his employment with AJMN or that AJMN was aware of or approved of the posts.[27] *See id.* ¶ 61 & n.28 (alleging only that Al Jazeera referred to Abu Omar as an Al Jazeera journalist in February 2024); *id.* ¶ 144 (alleging only that Al-Sharif currently is

---

Deif as saying "If you have a gun, get it out. This is the time to use it – get out with trucks, cars, axes, today the best and most honorable history starts."); *see also Hamas commander calls to 'set the Earth on fire'*, JNS (Oct. 7, 2023), https://www.jns.org/hamas-commander-calls-to-set-the-earth-on-fire/ (Jewish News Syndicate October 7, 2023, story stating that Deif "called on Saturday for Arabs and Muslims across the Middle East to 'set the Earth on fire under the feet of the occupiers [Israel]'").

[27] Personal social media posts of other alleged Al Jazeera journalists from years before or well after the October 7 attacks also are not plausibly related to any alleged material support *by Defendants*, nor are they plausibly causally related to the October 7 attacks. *See, e.g.*, AC ¶¶ 99, 147 (July 2019 X post and a July 2017 Instagram post of Hisham Zaqout); 149 (2015 and 2017 Instagram posts of Ashraf Amra, when Amra is not even alleged to have been employed by Al Jazeera); 150 (Hind Al Khoudary May 2023 social media post "liking" another post and predating employment with "Al Jazeera English"); 153 (October 7, 2024 X post of Jamal Rayyan, according to the Times of Israel, which post-dates all the attacks at issue).

an Al Jazeera journalist, not that he was employed by any Al Jazeera entity on October 7).[28] The posts themselves do not indicate that either Abu Omar or Al-Sharif were reporting for AJMN on October 7, and, despite Plaintiffs' extensive research, they are unable to identify *any* Abu Omar or Al-Sharif coverage for AJMN on October 7. Along the same lines, Plaintiffs highlight a photograph taken by Ashraf Amra on October 7 for *another news organization. Id.* ¶ 149 ("Photo: Ashraf Amra/Anadolu Agency via Getty Images"). Defendants are not responsible for non-Al Jazeera content posted by journalists or photographers, many of whom work freelance, on their personal social media accounts or created for or sold to other media outlets.

In any event, the theory that Defendants or individual journalists provided material support to Hamas or PIJ in the form of "expert assistance, communications equipment, and personnel," *id.* ¶ 264, simply by covering the October 7 attacks and Israel's subsequent operations in Gaza defies common sense and, more importantly, First Amendment protections for the press. If covering a terrorist attack constitutes providing material support to the terrorist organization, then every news organization that covered 9/11 equally would have been liable for providing material support to Al-Qaeda. "Unlike a financial donation to a terrorist organization, news coverage of the activities of a terrorist organization can serve an entirely different and acceptable purpose, namely, delivering important information to the public." *Kaplan v. Al Jazeera*, 10 Civ. 5298, 2011 U.S. Dist. LEXIS 61373, at *21 (S.D.N.Y. June 7, 2011).

Even leaving aside that Plaintiffs cannot identify any material support provided by AJI or AJMN, the Amended Complaint does not allege that either AJI or AJMN provided coverage (which Plaintiffs falsely assert constitutes "expert assistance," "communications equipment," and

---

[28] As CNN reported, Al-Sharif was not hired by Al Jazeera until December 2023. Salem, *supra* note 16 ("Al Jazeera recruited Al-Sharif in December 2023 after his social media footage of Israeli strikes in his hometown of Jabalya went viral").

"personnel") with the requisite scienter. The Amended Complaint does not allege that either Defendant provided coverage of the October 7 attacks "knowing or intending" that this coverage would be "used in preparation for, or in carrying out" the October 7 attacks. *See Id.* at *17–18 (dismissing a § 2339A material support claim alleging that Al Jazeera's coverage of Hezbollah rocket attacks provided material support to Hezbollah because the complaint "failed to allege any facts suggesting that Defendant broadcast news of the Hezbollah Rocket Barrage with the intention of assisting Hezbollah"); *cf. Newman*, 758 F. Supp. 3d at 1377 ("the AP's actions, working with photographers and reporters during the course of breaking news, cannot plausibly suggest that the AP intended to carry out the goals of Hamas").

### *Financial Payments*

The Amended Complaint alleges, "[o]n information and belief," that "Defendant AJMN and Defendant AJI both compensated individuals affiliated with Hamas and the PIJ for interviews and employed personnel who were Hamas and PIJ operatives." AC ¶ 14.[29] As to the claim that AJMN and AJI both paid individuals affiliated with Hamas and PIJ for interviews, most of the Amended Complaint's allegations are purely conclusory. *Id.* ¶¶ 5, 14, 58. 265, 278. The only potential recipient Plaintiffs identify is Osama Hamdan. *Id.* ¶ 130 (alleging, without elaboration, it was "likely" that "Al Jazeera's Washington, D.C.-based show *Upfront*" compensated Hamdan for interviews in 2017 and 2023). Elsewhere, the Amended Complaint alleges that "Al Jazeera reportedly customarily pays interviewees a fee for appearing on its channels and even provides transportation for in-studio interviews." *Id.* ¶ 134. The reference to

---

[29] The DC Circuit requires "allegations based on information and belief 'be accompanied by a statement of the facts upon which the allegations are based.'" *Kareem v. Haspel*, 986 F.3d 859, 866 (D.C. Cir. 2021) (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994)). In other words, the complaint must allege supporting facts sufficient to "create a plausible inference" that the allegation based on information and belief is true. *Id.*

"reportedly" is sourced to a 2019 story posted on Medium by someone with no connection to Al Jazeera who described "[s]ome large media outlets" paying *journalists* appearing on their shows to talk about their work or weigh in on current events amounts ranging from $50–$150. *Id.* ¶ 134 n.166. Despite their exhaustive research into sources hostile to Al Jazeera, Plaintiffs can cite no source to support their claim that Al Jazeera pays Hamas or PIJ leaders for interviews. This claim is made up out of whole cloth. In addition, the Amended Complaint does not, as § 2339A requires, allege that Hamdan or any other member of Hamas was compensated for an interview "knowing or intending" that this payment would be "used in preparation for, or in carrying out" the October 7 attacks or even any terrorist attacks. 18 U.S.C. § 2339A(a).

Similarly, the Amended Complaint fails to adequately plead the requisite scienter as to allegations that AJI or AJMN paid salaries to journalists that the IDF later claimed were Hamas or PIJ operatives. Nowhere does the Amended Complaint plausibly allege that the Defendants paid salaries to journalists knowing they were Hamas or PIJ operatives and "knowing or intending" that the salary payments would be "used in preparation for, or in carrying out" the attacks at issue. Implausible allegations that Defendants "should have known" certain journalists supposedly are Hamas or PIJ operatives because AJMN interviews applicants and conducts background checks before hiring them, AC ¶ 103, are insufficient to establish scienter under Section 2339A. Moreover, the Hamas/PIJ affiliation allegations were made by the IDF well after the October 7 attacks, usually immediately following the IDF's killing or injury of the journalist.[30]

---

[30] AC ¶¶ 63 & n.30, 72, 74–75 & n.46, 87 & n.60, 92 & n.70, 95 & n.76, 96.

*Training*

Even more far-fetched, Plaintiffs allege that "AJMN correspondents, acting as Hamas and PIJ operatives, trained members of these terrorist organizations in the use of weapons and drones." *Id.* ¶ 266; *see also id.* ¶ 279. These conclusory allegations rest solely on the IDF's claims in October 2024 that Ismail Abu Omar served as a Hamas "training company commander." *Id.* ¶ 63 & n.30. Plaintiffs fail to connect these allegations to AJMN, as Section 2339A requires. They do not allege that Abu Omar provided training to Hamas in his capacity as an AJMN journalist or while employed by AJMN or that, before the attacks at issue, AJMN had knowledge of any supposed role of Abu Omar in providing training to Hamas.

In sum, Plaintiffs' direct liability claim based on Section 2339A must be dismissed because the Amended Complaint fails to plausibly allege that either AJI or AJMN provided any material support to Hamas or PIJ or that they did so knowing or intending it would be used in preparation for or in carrying out the October 7 attacks or any post-October 7 attacks.

> **2.**     *The Amended Complaint Does Not Plausibly Allege a Violation of § 2339B*

Plaintiffs' second cause of action seeks to impose liability on AJI and AJMN for violating 18 U.S.C. § 2339B, which criminalizes "knowingly provid[ing] material support or resources to a foreign terrorist organization." Plaintiffs allege that Defendants provided material support to designated foreign terrorist organizations Hamas and PIJ. AC ¶¶ 274–75. In their § 2339B claim, Plaintiffs allege the same categories of material support as for their § 2339A claim: (1) Al Jazeera employees broadcast and "glorified" the October 7 attacks "in real time" and this live coverage provided expert assistance, communications equipment, and personnel to Hamas and PIJ; (2) Defendants provided financial support by paying Hamas and PIJ leaders for interviews and by paying employees they allege were Hamas or PIJ "operatives"; and (3) Al

36

Jazeera employees trained Hamas and members in the use of weapons and drones. *Id*. ¶¶ 277–80. These allegations fail to state a claim that the Defendants provided "material support" for the reasons stated in the preceding section.

In addition, recent cases interpreting Section 2339B foreclose Plaintiffs' theory that making salary payments to journalists later alleged to be affiliated with Hamas constitutes knowingly providing material support to Hamas. For example, a federal district court recently dismissed a Section 2339B claim alleging that AP is liable for the October 7 attacks by paying photographers alleged to be Hamas affiliates for photographs providing "real time" coverage of the conduct of Hamas militants. *Newman*, 758 F. Supp. 3d 1357. As here, the *Newman* complaint failed to adequately plead the extent of the news organization's knowledge that the journalists were conduits to Hamas or engaged in terrorism. *Id.* at 1380. And, in *Keren Kayemeth LeIsrael-Jewish National Fund v. Education for a Just Peace in the Middle East*, the Court of Appeals dismissed a Section 2339B claim based on the premise that the U.S. Campaign for Palestinian Rights ("USCPR") provided material support to Hamas when it made financial contributions to the Boycott National Committee, an alleged "direct front" for Hamas. 66 F.4th 1007, 1014–15 (D.C. Cir. 2023). The Court of Appeals explained that the complaint's "conclusory allegations amount to nothing more than guilt by association: The web of connections alleged in the Complaint falls far short of establishing that the Boycott National Committee is an extension of Hamas or has been taken over by Hamas." *Id.* at 1015. Here, Plaintiffs allege no pre-October 7 knowledge that any journalists employed by AJI or AJMN were conduits to Hamas or engaged in terrorism.

In addition, Section 2339B(h) forecloses any argument that either Defendant provided "personnel" to Hamas by employing journalists later alleged to be Hamas "operatives." *See* AC

¶ 280 (conclusorily alleging that Defendants provided "personnel" to Hamas and PIJ by employing Hamas and PIJ "operatives"). That section provides:

> No person may be prosecuted under this section in connection with the term "personnel" *unless that person has knowingly provided*, attempted to provide, or conspired to provide a foreign terrorist organization with *1 or more individuals* (who may be or include himself) *to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization*. Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control.

18 U.S.C. § 2339B(h) (emphasis added). The Amended Complaint does not allege that either Defendant provided journalists to Hamas or PIJ so that the journalists could work under the direction or control of those organizations. Thus, Plaintiffs may not proceed under a "personnel" theory.

Further, Section 2339B(i) provides: "Nothing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States." 18 U.S.C. § 2339B(i). As the Supreme Court explained, with Section 2339B(i), "most importantly, Congress has avoided any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups" *Holder*, 561 U.S. at 36; s*ee also id.* at 23–24 (holding that provision of material support in the form of "service" or "personnel" does not include independent advocacy); *id.* at 26 ("the statute is carefully drawn to cover only a narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations"). Accordingly, Plaintiffs may not base a Section 2339B claim on news coverage of the October 7 attacks or on journalists' personal social media posts, both of which are protected under the First Amendment. *See Newman*, 758 F. Supp. 3d at 1379 ("The Court agrees with the AP that any publication of factual, newsworthy photographs would not satisfy the scienter requirement under

§ 2339B and would be rendered 'independent advocacy.'") (quoting *Holder*, 561 U.S. at 36); *Holder*, 561 U.S. at 26 (holding that § 2339B does not even prevent individuals from becoming members of a foreign terrorist organizations or from independently advocating on the organization's behalf).

Many allegations in the Amended Complaint regarding Defendants' alleged actions bear no relationship to any recognized category of material support. Rather, Plaintiffs make numerous allegations related to First Amendment protected activity, including: (1) news coverage of Hamas and PIJ, including interviews with Hamas and PIJ leaders (AC ¶¶ 120–26, 129, 130); (2) coverage of October 7 and the Israel-Gaza war (*id.* ¶¶ 114, 116, 133, 156–59); (3) Al Jazeera references to Palestinians killed by Israeli forces as "martyrs" (*id.* ¶¶ 137–41); and (4) Palestinian reporters' criticism of Israeli leaders, the IDF, and the Occupation or support for "resistance" in their personal social media posts (*id.* ¶¶ 145–50, 153). None of these allegations, even if true, constitutes "material support" for purposes of the Anti-Terrorism Act because they do not constitute providing "expert assistance," "communications equipment," or "personnel," *see id.* ¶ 277 (alleging forms of material support provided by alleged broadcasting and "glorification" related to October 7), and, in any event, under *Holder* and Section 2339B(i), they may not give rise to a Section 2339B claim.

Relatedly, Plaintiffs repeatedly conclusorily allege that Defendants offer Hamas or PIJ a "platform" to incite violence. *See* AC ¶¶ 5, 14, 58, 136, 151, 177, 263, 277, 294, 296, 307. Aside from these conclusory claims, which do not meet the Rule 8(a) standard, the Amended Complaint identifies four Al Jazeera broadcasts Plaintiffs claim incited violence or "contributed to the ongoing incitement and radicalization" (*id.* ¶ 116): (1) the October 7, 2023 coverage of Deif's announcement of the attacks (*id.* ¶ 114); (2) a March 2024 Al Jazeera documentary on

October 7, which "claimed[] 'many of the worst stories that came out in the days following the attack were false'" (*id.* ¶ 116),[31] (3) a March 23, 2024 posting on YouTube of a video including an interview with a woman who purported to have witnessed IDF soldiers raping Palestinian women at Al Shifa Hospital, which Al Jazeera retracted the following day when it learned the woman's claims were fabricated (*id.* ¶ 117); and (4) an August 2024 interview with Khalil al-Hayya, a member of the Palestinian Legislative Council and official in the Hamas Political Bureau, in which the politician allegedly demanded "a serious Arab and Islamic response to punish the Israeli occupation" (*id.* ¶ 125).[32]

There are numerous flaws in Plaintiffs' incitement theory. Incitement must be directed at promoting "imminent lawless action" and likely to produce such action. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 927–28 (1982). Plaintiffs do not identify any statements *by Al Jazeera* that even arguably constitute incitement. In all but one instance (the March 2024 October 7 documentary), Plaintiffs allege that Al Jazeera provided coverage of a third party supposedly making an inciting statement. Plaintiffs do not identify any inciting statements in the March 2024 documentary. AC ¶ 116. Of the other three instances, as to two of the three (the March 2024 YouTube clip and the August 2024 interview with al-Hayya), the Amended

---

[31] Although the Amended Complaint alleges that the documentary denied Hamas's crimes on October 7 (AC ¶ 116), the *October 7* documentary referenced in footnote 115 in fact revealed "widespread human rights abuses by Hamas fighters and others, including the killing of 782 Israelis and foreign nationals." Press Release, Al Jazeera, "October 7" (Mar. 18, 2024), https://network.aljazeera.net/en/press-releases/%E2%80%9Coctober-7%E2%80%9D.

[32] The full quote from the Amended Complaint's source, which purports to summarize the interview, is: "Hayya demanded that the United Nations Security Council hold an emergency meeting to stop the massacres and Israeli aggression, emphasizing that there is no justification for targeting civilians, including women and children, in the Palestinian territories. Furthermore, Hayya called for 'a serious Arab and Islamic response to punish the Israeli occupation,' *suggesting measures such as closing embassies and recalling ambassadors* in protest of the continued violence and oppression faced by the Palestinian people." AC ¶ 125 n.144 (emphasis added). The full context makes clear Hayya was not inciting violence.

Complaint does not identify any statements that meet the definition of incitement. *Id.* ¶¶ 117, 125. Moreover, the al-Hayya interview post-dates all the attacks, and Plaintiffs do not allege that the quickly-retracted March 2024 YouTube clip incited the single attack that post-dated the airing of that clip. *See id.* ¶ 252 (discussing June 28, 2024 shooting of IDF soldier Yakir Tatelbaum "at the hands of a Hamas terrorist sniper"). The October 7 Deif statement, as previously noted, was widely covered and highly newsworthy, and the airing of newsworthy content by an international news organization does not constitute material support. Further, the Amended Complaint's own allegations counter any theory the October 7 attacks were the result of incitement, because the Amended Complaint alleges that "Hamas spent years preparing the attack," which it "meticulously plann[ed]." *Id.* ¶ 173.

> 3. *The Amended Complaint Does Not Even Attempt to Allege That Defendants Engaged in Any Activities That Satisfy § 2331(1)(B)'s "Appear to Be Intended" Requirement*

To plead a direct liability claim, it is not enough for Plaintiffs to allege a violation of one of the material support statutes. To qualify as an act of international terrorism, a defendant's act must also involve violence or endanger human life, 18 U.S.C. § 2331(1)(A), and must appear to be intended to intimidate or coerce a civilian population or to influence or affect a government, *id.* § 2331(1)(B). *Owens v. BNP Paribas, S.A.*, 235 F. Supp. 3d 85, 90 (D.D.C. 2017), *aff'd*, 897 F.3d at 270 n.1; *see also Linde v. Arab Bank, PLC*, 882 F.3d 314, 326 (2d Cir. 2018) (holding that the district court erred in charging the jury that proof of a bank's material support to an FTO was sufficient to prove the bank's own commission of an act of international terrorism, because "the provision of material support to a terrorist organization does not invariably equate to an act of international terrorism."); *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 390 (7th Cir. 2018) (holding that a bank's alleged material support of a terrorist organization did not constitute an act of international terrorism because its actions "do not appear intended to intimidate or coerce any

civilian population or government," but instead, "[t]o the objective observer, its interactions with Iranian entities were motivated by economics, not by a desire to 'intimidate or coerce.'").

Here, the Amended Complaint fails to allege—even conclusorily—that either AJI or AJMN engaged in any actions that "appear intended to intimidate or coerce" a civilian population or influence a government. The Amended Complaint alleges that *PIJ* used violence to intimidate and coerce the Israeli government. AC ¶ 54. And, in their aiding and abetting and conspiracy claims, Plaintiffs allege that *the actions of PIJ and Hamas* were intended to intimidate and coerce the civilian populations of Israel and the United States and to influence the Governments of Israel and the United States through intimidation and coercion. *Id.* ¶¶ 289, 303. The Plaintiffs make no such allegations as to AJI or AJMN, which is fatal to their direct liability claim.

In any event, it is not plausible that the actions Plaintiffs attribute to AJI or AJMN (covering the October 7 attacks, interviewing Hamas leaders, paying salaries to journalists it employs) would be viewed by an objective observer as intended to intimidate or coerce a civilian population, as opposed to simply carrying out Defendants' function as a global news organization covering events unfolding in Israel and Gaza.

### B.    The Amended Complaint Fails to Plausibly Allege Proximate Causation

Plaintiffs' direct liability claims fail for the independent reason that they fail to plead the element of proximate cause. To state a claim under § 2333(a), Plaintiffs must plausibly allege that they were injured "by reason of" an act of international terrorism. 18 U.S.C. § 2333(a). Courts have repeatedly held that the "by reason of" language requires a showing of proximate cause. *See, e.g.*, *Ofisi*, 77 F.4th at 677; *Keren Kayemeth Leisrael-Jewish Nat'l Fund v. Educ. for a Just Peace in the Middle East*, 530 F. Supp. 3d 8, 12 (D.D.C. 2021), *aff'd*, 66 F.4th 1007 (D.C. Cir. 2023); *Owens*, 235 F. Supp. at 97, *aff'd*, 897 F.3d at 273; *Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir.

2013) ("The 'by reason of' language had a well-understood meaning, as Congress had used it in creating private rights of action under RICO and the antitrust laws, and it had historically been interpreted as requiring proof of proximate cause.").

Further, the proximate cause standard includes two elements: (1) that defendant's acts must be a "substantial factor in the sequence of events that led to [the plaintiff's] injury," and (2) the plaintiff's injuries must have been "reasonably foreseeable or anticipated as a natural consequence of [the defendant's] conduct." *Owens*, 897 F.3d at 273 (cleaned up); *accord LeIsrael*, 66 F.4th at 1015; *Rothstein*, 708 F.3d at 91. Applying this standard, the Court of Appeals has affirmed dismissals of ATA cases for failure to adequately allege proximate causation. In two related cases, plaintiffs sought to impose liability on international bank BNP Paribas ("BNPP") for Al-Qaeda's 1998 attacks on U.S. embassies in Kenya and Tanzania on the theory that BNPP materially supported Al-Qaeda by assisting Sudanese banks, including one used by Al-Qaeda, evade U.S. sanctions and by processing currency for Sudan, which Sudan allegedly provided to Al-Qaeda. In both cases, the D.C. Circuit held that causation was not adequately pled because the complaints failed "to plausibly allege that any currency processed by BNPP for Sudan was either in fact sent to al Qaeda or necessary for Sudan to fund the embassy bombings." *Owens*, 897 F.3d at 276; *Ofisi*, 77 F.4th at 679 (same). Similarly, in *LeIsrael*, the Court of Appeals affirmed the dismissal of ATA claims where the plaintiffs had sought to impose liability on USCPR for emotional harm and property damage from incendiary devices launched from Gaza into Israel on the theory that USCPR provided material support to an alleged Hamas front (Boycott National Committee), because the plaintiffs did not "allege that the money provided to the Boycott National Committee by USCPR funded incendiary attacks." 66 F.4th at 1015. Similarly, here, the Amended Complaint does not allege that any money provided to Hamas

officials for interviews or to Al Jazeera journalists alleged to be affiliated with Hamas or PIJ funded the attacks at issue.

Courts have consistently dismissed cases against news organizations, including Al Jazeera, for failure to plausibly allege that the actions of the news organizations were the proximate cause of terrorist attacks. *Kaplan*, 2011 U.S. Dist. LEXIS 61373, at *22–23 ("Plaintiffs have not alleged any facts suggesting that Defendant's broadcasts were used by Hezbollah to better target their rockets."); *Newman*, 758 F. Supp. 3d at 1381 ("Applying the 'substantial factor' standard, Plaintiffs have not alleged any facts suggesting that the AP's factual reporting was used by Hamas to advance the October 7 Attack, thereby causing Plaintiffs' injuries."). Direct liability claims against social media companies have failed for similar reasons. *See, e.g.*, *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1127 (N.D. Cal. 2016) (dismissing ATA direct liability claim because plaintiffs failed to plausibly allege the necessary causal connection between Twitter's provision of accounts to ISIS and the particular attack that injured them), *aff'd*, 881 F.3d 739 (9th Cir. 2018).

Here, the Amended Complaint alleges that Hamas spent "years" preparing and "meticulously planning" the October 7 attacks. AC ¶ 173. The attack involved "approximately 6,000 Hamas and PIJ terrorists from Gaza" who "launched a coordinated cross-border attack into Israel by land, air, sea, and tunnels." *Id.* ¶ 167. Given Plaintiffs' own allegations that the attack was planned for "years," and was fully underway in "the early morning hours of October 7," *id.* ¶ 228, it is not plausible that contemporaneous coverage by Defendants on or around October 7 was a substantial factor in the attacks. Coverage of the attacks obviously cannot be a causal factor in attacks that were long planned and already in process. And, as Plaintiffs concede, the October 7 attacks and ensuing war were "widely publicized, generating global attention." *Id.* ¶ 177. Thus, Al Jazeera was just one of countless news organizations covering the October 7 attacks and the

44

continuing conflict in Gaza. Moreover, even if Abu Omar and Al-Sharif's personal Telegram posts on October 7 could be imputed to Defendants—and they cannot—those Telegram posts similarly were not a substantial factor in the attacks leading to Plaintiffs' injuries on October 7.

Plaintiffs' own sources and allegations in a related lawsuit also refute any claim that material support from Defendants was a substantial factor in the attacks that injured them. In announcing terrorism charges against several senior Hamas leaders for their role in October 7, the U.S. Department of Justice stated that Hamas's ability to carry out terrorist attacks, including October 7, "has been fueled in part by the Government of Iran" and that Hamas also has raised "tens of millions of dollars in cryptocurrency payments" through soliciting supporters abroad on social media accounts and other platforms. *Id*. ¶ 51 n.19. Moreover, all but two of the Plaintiffs (Allen Kamer and N.E.K.) have filed a separate suit against the Republic of Iran for the same injuries. *Farron v. Islamic Republic of Iran*, No. 1:24-cv-00358-CJN (D.D.C. filed Feb. 6, 2024). In that suit, they allege "Iran provided Hamas and PIJ with massive financial support with the specific intention of causing and facilitating the commission of acts of extrajudicial killing and international terrorism including the terrorist attacks at issue herein." Am. Compl. ¶ 89, *Farron*, Dkt. No. 7. It strains credulity that a stipend that Plaintiffs speculate was paid to a Hamas spokesperson for an interview or salaries paid to a handful of journalists—with no claim those salary payments went to Hamas—were a substantial contributing factor to the attacks at issue in contrast to the "massive financial support" Plaintiffs elsewhere allege Iran provided or the "tens of millions of dollars in cryptocurrency payments" raised from Hamas supporters.

In sum, Plaintiffs fail to plausibly allege that Defendants engaged in an act of international terrorism and that they were injured by reason of acts of international terrorism by Defendants. Accordingly, their direct liability claims must be dismissed.

**III.    The Secondary Liability Claims Must Be Dismissed for Failure to State a Claim**

Plaintiffs' third and fourth causes of action seek to impose secondary, indirect liability on AJI and AJMN under 18 U.S.C. § 2333(d) for aiding and abetting and conspiracy. Section 2333(d) provides that, in an action under § 2333(a), liability may be imposed on "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism," if the act of international terrorism was "committed, planned, or authorized by an organization that had been designated as a[n] [FTO]" by the U.S. Department of State. 18 U.S.C. § 2333(d). Plaintiffs fail to plausibly allege that either Defendant knowingly provided substantial assistance to Hamas or PIJ, or conspired with them, in connection with any of the attacks at issue, so these claims also must be dismissed.

**A.    The Section 2333(d) Aiding and Abetting Standard: *Halberstam* and *Twitter***

Congress enacted § 2333(d) as an amendment to the ATA in 2016, noting that *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), "provides the proper legal framework for how [aiding-and-abetting and conspiracy] liability should function in the context of" § 2333. Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, § 2(a)(5), 130 Stat. 852 (2016). Under *Halberstam*, civil aiding and abetting includes three elements:

> (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be ***generally aware*** of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must ***knowingly and substantially assist*** the principal violation.

*Halberstam*, 705 F.2d at 477 (emphasis added). *Halberstam* also adopted a six-factor test, addressed below, for determining if the assistance is "substantial." *Id.* at 484.

In *Twitter v. Taamneh*, 598 U.S. 471 (2023), the Supreme Court provided guidance on the § 2333(d) aiding and abetting standard. The Court noted that *Halberstam*'s "precise three-element and six-factor test" for deciding a case involving a "serial burglar and his live-in partner-

46

in-crime" "may not be entirely adequate to resolve" cases involving acts of international terrorism. *Id.* at 487–88. Ascertaining the "'basic thrust' of *Halberstam*'s elements" and "adap[ting] its framework to the facts before us today," the Court emphasized "the need to cabin aiding-and-abetting liability to cases of truly culpable conduct." *Id.* at 488–89. "At bottom, both JASTA and *Halberstam*'s elements and factors rest on the same conceptual core that has animated aiding-and-abetting liability for centuries: that the defendant consciously and culpably participated in a wrongful act so as to help make it succeed." *Id.* at 493 (cleaned up).

In *Twitter*, the plaintiffs sued Twitter, Facebook, and Google for aiding and abetting a 2017 ISIS terrorist attack on the Reina nightclub in Turkey. They alleged that ISIS used the social media platforms "as tools for recruiting, fundraising, and spreading their propaganda," the defendants displayed advertisements "with ISIS' messages, posts, and videos based on information about the viewer and the content being viewed," ISIS used the platforms to upload videos that "fundraised for weapons of terror and that showed brutal executions of soldiers and civilians alike," and the "defendants have known that ISIS has used their platforms for years" but "failed to detect and remove a substantial number of ISIS-related accounts, posts, and videos." *Id.* at 481. The Court held these allegations were insufficient to state a § 2333(d) claim because "[n]one of those allegations suggest that defendants culpably associated themselves with the Reina attack, participated in it as something that they wished to bring about, or sought by their action to make it succeed." *Id.* at 498 (cleaned up). Because "the relationship between defendants and the Reina attack is highly attenuated," the "plaintiffs would need some other very good reason to think that defendants were consciously trying to help or otherwise participate in the Reina attack." *Id.* at 500 (internal quotation marks omitted). Here, as in *Twitter*, the relationship between Defendants and the terrorist attacks at issue is highly attenuated and the Amended

Complaint does not plausibly allege facts that Defendants encouraged or supported the attacks or otherwise culpably participated in them so as to help them succeed.

**B.    The Amended Complaint Does Not Plausibly Allege That Defendants Were "Generally Aware" They Were Playing a Role in the Terrorist Attacks**

To satisfy *Halberstam* "general awareness" requirement, Plaintiffs must plausibly allege that Defendants, at the time they provided the supposed assistance, were "generally aware of [their] role in an overall illegal activity from which an act of international terrorism was a foreseeable risk." *Ofisi*, 77 F.4th at 673. Specifically, Plaintiffs must plausibly allege that Defendants were "generally aware" that in providing assistance, they were "thereby playing a 'role' in [the FTO's] violent or life-endangering activities." *Linde*, 882 F.3d at 329 (citing *Halberstam*, 705 F.2d at 477). Here, Plaintiffs fail to plausibly allege general awareness for the same reasons their § 2339B claims fail. *See* Part II.A.2; *Linde,* 882 F.3d at 329–30 (comparing the "general awareness" requirement under § 2333(d) with the *mens rea* required to establish material support in violation of 18 U.S.C. § 2339B).

Plaintiffs allege that Defendants knowingly employed and compensated individuals known to serve with Hamas and PIJ, compensated Hamas and PIJ leaders for interviews, and provided Hamas and PIJ a platform to "organize, communicate, recruit, and incite violence." AC ¶ 294. As to the payments to employees, Plaintiffs do not plausibly allege that Defendants were generally aware that by paying salaries to their journalists they were "assuming a 'role' in terrorist activities." *Linde*, 882 F.3d at 329. As previously noted, Factual Statement, Part B, the claims of Hamas or PIJ affiliation were made by the IDF in 2024, after most of the attacks at issue. Leaving aside the numerous other flaws with this theory, including whether the IDF claims are credible, Al Jazeera could not have general awareness of any role in terrorist activity as to attacks that pre-date Al Jazeera's supposed notice of Hamas or PIJ affiliation, or, in the case of

Al-Dahdouh and Thuria, where the journalist is no longer employed by Al Jazeera after the claim of affiliation is made. *Ofisi*, 77 F.4th at 675 (finding that general awareness was not sufficiently pled, where plaintiffs alleged that the defendant provided financial assistance to Sudanese banking institutions, but the "supposed connections to al Qaeda" were "not widely reported until after" the alleged attacks). Implausible allegations that Defendants "should have" learned of these affiliations through the hiring process, AC ¶¶ 100–04, do not establish general awareness.

Moreover, the Amended Complaint does not even allege that any salary payments to Al Jazeera journalists were ever transferred to Hamas or PIJ or that Defendants had any awareness that Al Jazeera journalists were a funding conduit to Hamas or PIJ. *See Newman*, 758 F. Supp. 3d at 1369 ("Even assuming the AP knew that [the journalist] had ties to Hamas through his social media posts and an anonymous tip from years prior, that is not enough to establish that the AP was aware of any role of their own in terrorist activities, specifically in the October 7 Attack."); *see also, Lavi v. UNRWA USA National Committee, Inc.*, No. 24-312-RGA, 2025 U.S. Dist. LEXIS 153757, at * 11–12 (D. Del. Aug. 8, 2025) (dismissing ATA aiding and abetting claims for failure to meet the general awareness requirement, where the complaint "provides no basis from which to conclude plausibly" that UNRWA hired "members of Hamas and people who were sympathetic to Hamas's terrorist efforts" with "knowledge of their connection to Hamas, or that these individuals' employment with UNRWA facilitated Hamas's terrorist activities.")

As for the allegation that Defendants paid Hamas leaders for interviews, AC. ¶¶ 294–95, the Amended Complaint identifies only one such leader (Hamdan) and, as noted, only speculates that such payments were "likely," *id.* ¶ 130, based on "information and belief," *id.* ¶ 14, and footnoted sources that do not support such an inference, *id.* ¶ 134 n.166. In any event, the

Amended Complaint does not allege that any supposed practice of paying stipends to individuals who appear on Al Jazeera programs are made with the general awareness that the payments are supporting terrorist activity. *See id.* (describing a practice of some news organizations to pay a small, token amount to *journalists* who appear on programming "when an extra commitment of time or research is required" or for "expert commentary and analysis").

With regard to the allegation that Defendants provide a platform for Hamas to incite violence, the Amended Complaint does not identify any *Al Jazeera* coverage during or immediately preceding any of the attacks at issue, that incited or otherwise played a role in the attacks. *See* Part II.A.2. Further, *personal* Telegram posts of a few journalists at the scene of the October 7 attacks, not alleged to have been made in the scope of the journalists' employment, do not create general awareness by Defendants of any role in terrorist activity. A federal court rejected similar claims of general awareness by the AP as to the October 7 attacks: "[E]ven assuming" freelance journalists "were in close proximity to Hamas militants as they carried out the October 7 Attack, and the AP was aware of their close proximity, the Amended Complaint still fails to suggest that they were taking part in the attack rather than simply documenting it." *Newman*, 758 F. Supp. 3d at 1369. "With respect to claims that Hamas uses the AP's photos as a tool of propaganda, this allegation fails to suggest how the AP would have been aware that its publication of truthful images was in some way furthering Hamas's terrorist activities and mission." *Id.* Similarly, here, no allegations support a plausible inference that Defendants were aware that their coverage of October 7 as a news organization was furthering Hamas terrorist attacks.

Moreover, the D.C. Circuit has rejected similar conclusory allegations of general awareness in recent ATA cases. *See LeIsrael*, 66 F.4th at 1017 (dismissing aiding and abetting

claim in part for failure to plead the defendant's general awareness of its role in unlawful activity where the allegations did not "support a finding that [the defendant] was aware that its donations to the [alleged Hamas front] were used unlawfully, given that the [alleged Hamas front] also engages in lawful civil resistance"); *Ofisi*, 77 F.4th at 675 ("Appellants simply do not plausibly allege that [Appellee] BNPP was generally aware of any role it allegedly played in the U.S. embassy bombings or that it consciously participated in any act to make the bombings succeed"); *Bernhardt*, 47 F.4th at 868 ("Bernhardt fails to plausibly allege HSBC was generally aware that its financial dealings with intermediary banks supported al-Qaeda's terrorist acts"). The Court should do the same here. The Amended Complaint is nearly silent on any *mens rea* of Defendants and falls far short of plausibly alleging that Defendants were generally aware of any role in supporting Hamas or PIJ terrorist activity.

### C.    The Amended Complaint Does Not Plausibly Allege Defendants "Knowingly Provided Substantial Assistance" to Hamas and PIJ in Connection with the Terrorist Attacks

An ATA aiding and abetting claim requires a showing that the defendant "knowingly provid[ed] substantial assistance" to an FTO in connection with the act of international terrorism that injured the plaintiff. 28 U.S.C. § 2333(d). Plaintiffs fail to adequately plead either the "knowing" or "substantial assistance" elements of an aiding and abetting claim.

As to the "knowing" element, for the reasons discussed above as to the failure to plead § 2339A scienter (Part II.A.1) and the less demanding § 2333(d) "general awareness" element of aiding and abetting (Part III.B), Plaintiffs have failed to plead that Defendants "knowingly" provided substantial assistance to the attacks. "A defendant who lacks general awareness cannot be said to have knowingly assisted a foreign terrorist organization." *Bernhardt,* 47 F.4th at 870. *See also Newman*, 758 F. Supp. 3d at 1371 ("having found that the AP was not 'generally aware,' the Court similarly cannot conclude that the AP knowingly assisted Hamas in carrying

out the October 7 Attack."). And, for the same reasons Plaintiffs fail to plausibly allege that Defendants provided any material support to Hamas or PIJ (Part II.A), the Amended Complaint fails to allege facts that, if true, state a claim that Defendants provided "substantial assistance" to Hamas/PIJ. The Amended Complaint does not plausibly allege that (1) any salary payments made to Al Jazeera journalists funded Hamas/PIJ terrorist activity, (2) any interview stipend paid to a Hamas/PIJ official funded Hamas/PIJ terrorist activity, (3) any Al Jazeera broadcast incited the October 7 attacks or attacks thereafter, or (4) any Al Jazeera employee acting in the scope of his or her employment participated in terrorist acts on October 7 or thereafter. *See LeIsrael*, 66 F.4th at 1017 (dismissing ATA aiding and abetting claim where complaint failed to allege that the funds that the defendants provided "were used to finance any terrorist attacks, much less that [the defendants] was aware that it was happening"); *Newman*, 758 F. Supp. 3d at 1372 (dismissing aiding and abetting claim where the plaintiffs had not "pleaded that the AP's purchase [of photos from journalists allegedly associated with Hamas] resulted in a significant amount of money—or any amount of money—indirectly flowing to Hamas" and did not "plausibly allege that Hamas received any financial support from the AP or that the AP knew that Hamas would likely receive any funds from the purchase of such photographs.").

Pre-*Twitter*, courts generally applied the six factors enumerated in *Halberstam* to evaluate whether the alleged assistance is knowing and substantial: (i) the nature of the act assisted, (ii) the amount and kind of assistance, (iii) the defendants' presence at the time of the tort, (iv) the defendants' relationship to the tortious actor, (v) the defendants' state of mind, and (vi) the duration of assistance. *Halberstam*, 705 F.2d at 484. The D.C. Circuit, however, has found it "unnecessary to discuss those factors" where the complaint's "factual allegations are so clearly deficient." *LeIsrael*, 66 F.4th at 1017 n.3. Similarly, here, the dearth of factual allegations

regarding *any* assistance by Defendants does not lend itself to the *Halberstam* six-factor analysis of whether the assistance is knowing and substantial, and the Court therefore need not undertake the six-factor approach. But, even if it were to do so, such an exercise only serves to confirm that the Amended Complaint fails to state an aiding and abetting claim.

In evaluating the first and second factors (nature of the act encouraged and the amount and kind of assistance), *Halberstam* asks whether the criminal activity was "heavily dependent" on the type of assistance the defendant provided and whether the defendant's own assistance was "indisputably important." 705 F.2d at 488. In *Halberstam*, the principal's "long-running burglary enterprise" was "heavily dependent on aid in transforming large quantities of stolen goods into 'legitimate' wealth," and the defendant's "assistance was indisputably important to this laundering function," because "she gave not only her time and talents but also her name to accomplish that objective, through having checks made out to her and falsifying income tax returns." *Id.* Here, Plaintiffs do not allege any facts supporting the inference that the attacks at issue, or even Hamas and PIJ's terrorist activity generally, was dependent on Defendants supposedly paying Hamas or PIJ officials to be interviewed or paying salaries to a handful of Al Jazeera employees alleged to be aligned with Hamas or PIJ. Nor do they allege facts that Hamas or PIJ is dependent on news coverage by Al Jazeera to carry out terrorist attacks and, in any event, as noted above as to Plaintiffs' § 2339B claim (Part II.A.2), the First Amendment precludes imposing liability on Defendants for covering the news. "Absent a link between [the defendant's alleged] support and the principal violation, defendant's purported assistance is not substantial." *LeIsrael*, 530 F. Supp. 3d at 14, *aff'd*, 66 F.4th 1007. Further, the Supreme Court has held that the first and second factors weigh in favor of defendants where the FTO's "ability to benefit" from the alleged assistance was "merely incidental to defendants' services and

general business models" and "not attributable to any culpable conduct of defendants directed toward" the FTO. *Twitter*, 598 U.S. at 504. Here, the Amended Complaint does not plausibly plead that Defendants have provided any support beyond "merely incidental" assistance.

The third *Halberstam* factor considers the defendant's presence at the time of the plaintiffs' injury. As the D.C. Circuit noted in *Bernhardt*, *Halberstam* "focused on a person's physical presence in the murder and burglary context." 47 F.4th at 871 (citing *Halberstam,* 705 F.2d at 488). Here, as in *Bernhardt*, neither Defendant is alleged to have been present at the October 7 attacks or the attacks that followed. Plaintiffs do not and cannot allege that the Qatari-based AJMN or the U.S.-based AJI were in Israel during any of the attacks. *See Ofisi*, 77 F.4th at 675 ("Appellants do not allege, and indeed cannot plausibly allege, that BNPP was present during the bombings."). At most, the Amended Complaint alleges that journalists Anas Al-Sharif and Ismail Abu Omar were near the October 7 attacks and posted on their personal social media accounts, AC ¶¶ 106–12, 144, but the Amended Complaint does not allege that they were employed by AJI or AJMN on October 7 and present in their capacity as AJI or AJMN employees. The Amended Complaint also does not allege that Defendants or even any of Defendants' employees were present at, or participated in, any of the post-October 7 attacks. *See LeIsrael*, 530 F. Supp. 3d at 14 (concluding that the third factor weighed in defendant's favor because plaintiffs do not allege that defendants were present at any of the attacks).[33]

"The fourth factor considers the closeness of any relationship between the defendant and the terrorist organization." *Bernhardt*, 47 F.4th at 872. Here, the Amended Complaint does not

---

[33] Even if this Court were to adopt the Second Circuit's view that a corporation's presence may be understood "in a transactional sense," *see Bernhardt*, 47 F.4th at 871–72, the Amended Complaint alleges no transactions with Hamas or PIJ in Israel. *Id.* at 872 ("Even from a transactional perspective, however, we are unable to infer from Bernhardt's complaint any HSBC involvement with al-Qaeda before and leading up to the Camp Chapman bombing").

plausibly allege facts establishing a relationship between Defendants and Hamas or PIJ, much less a close one. The Amended Complaint instead alleges repeated instances in which Defendants have interviewed Hamas or PIJ leaders, but news coverage does not constitute a relationship that could give rise to aiding and abetting liability. Moreover, Plaintiffs cannot attribute any employee's supposed affiliation with Hamas or PIJ to the Defendants because the Amended Complaint does not allege that these affiliations were known by Defendants pre-attack or that these affiliations were authorized by Defendants or were otherwise within the scope of employment.

The fifth "state of mind" factor requires "knowledge of one's own actions and general awareness of their foreseeable results." *Id.* (cleaned up). While "this factor more powerfully supports aiding-and-abetting liability of defendants who share the same goals as the principal or specifically intend the principal's tort, . . . such intent is not required." *Id.* In *Ofisi*, the D.C. Circuit concluded that this factor weighed in defendant BNPP's favor because the Complaint failed "to plausibly allege BNPP knew of the plot to bomb the embassies or intended to support al-Qaeda in its mission." 77 F.4th at 675. Here, there are no plausible allegations that Al Jazeera knew of a plot to carry out the October 7 attacks (or the post-October 7 attacks) and intended to support Hamas or PIJ in their mission.

Even though the defendant need not necessarily be "one in spirit" with the FTO, the complaint must nonetheless allege the defendant's general awareness that the terrorist acts were a foreseeable result of its actions. *Bernhardt*, 47 F.4th at 872. In *Halberstam*, the defendant knew, when she assisted the principal tortfeasor, that "he was involved in some type of personal property crime at night—whether as a fence, burglar, or armed robber made no difference— because violence and killing is a foreseeable risk in any of these enterprises." 705 F.2d at 488.

Here, terrorist attacks were not a foreseeable risk of interviewing Hamas or PIJ leaders, providing news coverage of Israel and the Gaza Strip, or paying salaries to journalists. In any event, the "state of mind" factor has substantial overlap with the other scienter factors ("general awareness" and whether the substantial assistance was "knowingly" provided), where the Amended Complaint is deficient for the reasons previously stated, and therefore this factor also favors Defendants. *See Bernhardt*, 47 F.4th at 872 (the state of mind "factor cuts against Bernhardt because, as already discussed, Bernhardt fails to allege that HSBC provided knowing assistance or was generally aware that acts of terrorism were the foreseeable result of its actions").

Finally, the sixth factor also weighs in favor of Defendants. This factor looks to the "duration of a defendant's assistance." *Id*. As discussed, Plaintiffs fail to plausibly allege any assistance provided by Defendants to Hamas or PIJ, much less assistance to support terrorist activities or the attacks that caused Plaintiffs' injuries. The duration of a news organization-news subject relationship or news organization-employee relationship is not relevant because it is the duration of the terrorism assistance that matters. *See id.* (even "a lengthy financial relationship does not terrorism assistance make"); *Newman*, 758 F. Supp. 3d at 1373 (finding the duration factor did not weigh in the plaintiffs' favor because, "even assuming the AP had a series of transactions with the Freelance Photographers over a period of several years, Plaintiffs do not suggest that the length of such relationship aided terrorism, outside of the conclusory allegations that the AP was a direct funding source for Hamas.").

As the Supreme Court emphasized in *Twitter*, the *Halberstam* factors, though they all weigh in favor of Defendants here, should not be taken as "a sequence of disparate, unrelated considerations without a common conceptual core." 598 U.S. at 504. "The point of those factors

is to help courts capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." *Id.* Here, the Amended Complaint does not plausibly allege that either Defendant engaged in any conduct that is both significant and culpable enough to justify attributing the attacks at issue to them. Accordingly, Plaintiffs' aiding and abetting claim must be dismissed.

### D.    The Amended Complaint Does Not Allege Defendants Conspired with Hamas or PIJ to Carry Out the Terrorist Attacks

To plead a civil conspiracy claim under § 2333(d), a plaintiff must allege: "(1) an agreement between two or more persons; (2) to participate in an unlawful act"; "(3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Bernhardt*, 47 F.4th at 873 (quoting *Halberstam*, 705 F.2d at 477). Thus, at the very least, Plaintiffs must allege that AJMN and AJI were "pursuing the same object" as Hamas and PIJ. *Id.* Here, the Amended Complaint again falls far short of the mark.

Plaintiffs allege that "Hamas's primary objectives" in committing the October 7 attacks included "mass murder, sexual violence, and the abduction of civilians and soldiers in order to utilize them as hostages and bargaining chips to compel Israel to release convicted Palestinian prisoners held in Israeli prisons." AC ¶ 170. Elsewhere, Plaintiffs describe Hamas's and PIJ's overarching goal of "destroying Israel and establishing an Islamic state through terrorism." *Id.* ¶ 54. Plaintiffs have not, however, pled any facts alleging that the Defendants shared these goals and indeed any such claim would be outrageous. Here, the Defendants' objectives are to report on the news. *See id.* ¶¶ 17, 46. Plaintiffs' allegations to the contrary are entirely conclusory. *See id.* ¶ 308 ("Defendants were engaged in a common pursuit with Hamas and the PIJ and shared

their objectives."); *id.* ¶ 309 ("Each Defendant knew that the objective of the conspiracy was to facilitate terrorist attacks against Israelis and Israeli Americans, including the October 7 Terrorist Attacks and subsequent acts of violence."). Under the Rule 8(a) pleading standard, such conclusory allegations, devoid of any factual support, are insufficient to withstand a motion to dismiss.

The Court of Appeals has dismissed other § 2333(d) conspiracy claims for failure to adequately plead an agreement between the defendants and the FTO. For example, in *Bernhardt*, defendant:

> HSBC was trying to make "substantial profits" by evading sanctions, whereas al-Qaeda sought to "terrorize the U.S. into retreating from the world stage"; "use long wars to financially bleed the U.S. while inflaming anti-American sentiment"; "defend the rights of Muslims"; and "obtain global domination through a violent Islamic caliphate." These objectives are wholly orthogonal to one another.

47 F.4th at 873. In *Ofisi*, the Court of Appeals concluded: "At bottom, al-Qaeda sought to brutally murder employees of U.S. embassies. BNPP sought to evade U.S. sanctions on Sudan by establishing banking relations with that country. As in *Bernhardt*, these goals are simply orthogonal to one another." 77 F.4th at 672. Similarly, here, because the Amended Complaint does not plausibly allege that Defendants shared Hamas's and PIJ's goals of carrying out a terrorist attack on Israel, the Amended Complaint fails to allege a conspiracy. Thus, Plaintiffs' § 2333(d) conspiracy claim, like their other claims, must be dismissed.

## IV. Plaintiffs Shnaider and Newman-Kelmanson Have No ATA Claims for Emotional Injury Related to Harm to Non-U.S., Non-Immediate Family Members

The ATA provides a civil cause of action for "*[a]ny national of the United States* injured in his or her person, property, or business by reason of an act of international terrorism, *or his or her estate, survivors, or heirs*." 18 U.S.C. § 2333(a) (emphasis added). Plaintiff Shnaider seeks to recover emotional damages as a result of injuries inflicted by terrorists on his brother-in-law

(Yosi Silverman), niece (Shiri Bibas), nephew-in-law (Yarden Bibas), and great-nephews (Ariel and Kfir Bibas), none of whom are U.S. nationals. AC ¶¶ 21, 180–84. Plaintiff Newman-Kelmanson brings a claim for emotional damages arising from the death of her brother-in-law Elchanan Kelmanson, who also is not alleged to be a U.S. national. *Id.* ¶¶ 25, 192–93. Even assuming, for argument's sake, that the ATA is intended to provide a remedy for a U.S. national whose only injury is emotional injury from the death of a non-U.S. national family member killed in a terrorist attack, these emotional injury claims do not extend to non-immediate family members.

An ATA plaintiff "must be a direct family member (or functional equivalent) of a United States national who was injured by reason of an act of international terrorism to sue under the ATA based on that plaintiff's emotional damages." *Raanan v. Binance Holdings Ltd.*, No. 24-cv-697 (JGK), 2025 U.S. Dist. LEXIS 33874, at *35 (S.D.N.Y. Feb. 25, 2025); *see also In re Terrorist Attacks on Sept. 11, 2001*, No. 03 MDL 1570, 2023 U.S. Dist. LEXIS 55720, at *110 (S.D.N.Y. Mar. 30, 2023) (applying "immediate family member" standard for determining which individuals may sue under the ATA); *Miller v. Cartel*, No. 1:20-cv-00132, 2022 U.S. Dist. LEXIS 112463, at *43 (D.N.D. June 24, 2022) (same); *cf. Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 62 (D.D.C. 2018) (holding that claims for emotional damage arising out of a death from an act of international terrorism are "traditionally limited to a victim's immediate family") (internal quotation marks omitted).

"[I]mmediate family" is "defined as one's spouse, parents, siblings, and children." *Raanan*, 2025 U.S. Dist. LEXIS 33874, at *34 (quoting *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 28 (D.D.C. 2009)). A plaintiff who is not an immediate family member must allege that they are one of "those rare cases" where they "had lived in the victim's

immediate household and had been in other important respects" like a *de facto* immediate family member to the victim. *Id.* (quoting *Estate of Heiser*, 659 F. Supp. 2d at 29). Here, Plaintiffs Shnaider and Newman-Kelmanson do not allege that they are *de facto* immediate family members of the relatives directly injured on October 7. AC ¶¶ 21, 25, 180–84, 192–93. Accordingly, Mr. Shnaider's claims except as to his sister and Ms. Newman-Kelmanson's claim except as to her husband must be dismissed.

## CONCLUSION

For the foregoing reasons, all claims against AJMN should be dismissed with prejudice under Rule 12(b)(2) for lack of personal jurisdiction. In addition, all claims should be dismissed with prejudice against both AJMN and AJI under Rule 12(b)(6) for failure to state a claim.

Dated: September 2, 2025                    Respectfully submitted,


                                              /s/ Laura G. Ferguson
                                            Laura G. Ferguson (D.C. Bar No. 433648)
                                            Andrew T. Wise (D.C. Bar No. 456865)
                                            MILLER & CHEVALIER CHARTERED
                                            900 16th Street, NW
                                            Washington, D.C. 20006
                                            Tel.: (202) 626-5800
                                            Fax: (202) 626-5801
                                            lferguson@milchev.com
                                            awise@milchev.com

                                            *Counsel for Defendants Al Jazeera Media Network and Al Jazeera International (USA) LLC*