UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-------------------------------------------------------------------- X

**MAURICE SHNAIDER**, *et al.,*

　　　　　　　　　　　　Plaintiffs,

　　　　　v.

**AL-JAZEERA MEDIA NETWORK,**

　　　　　　　　　　　Civil Action No.
　　　　　　　　　　　1:25-cv-00538

　　　　　and

**AL-JAZEERA INTERNATIONAL (USA) LLC,**

　　　　　　　　　　　　Defendants.

-------------------------------------------------------------------------- X

## <u>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>

The Court should deny the Motion to Dismiss filed by Defendants al-Jazeera Media Network ("AJMN") and al-Jazeera International (USA) LLC ("AJI") (collectively, "Defendants" or "al-Jazeera"). Defendants' motion mischaracterizes Plaintiffs' claims as an attack on journalism while ignoring the First Amended Complaint's ("FAC") detailed allegations of egregious conduct that goes well beyond news coverage.

The FAC pleads concrete, defendant-specific conduct: employing Hamas and Palestinian Islamic Jihad ("PIJ") operatives as salaried journalists; retaining those operatives even as they actively participated in terrorist operations, including the October 7, 2023 terrorist attacks; integrating those operatives into coverage that staged propaganda and orchestrated humiliating hostage-release ceremonies portraying Hamas and the PIJ in a favorable light; broadcasting content that provided Hamas and the PIJ with a global platform to recruit and coordinate violence; transmitting user data and targeted content into the United States to maximize those terrorist

groups' reach; and compensating Hamas and PIJ leaders for appearances that amplified their terrorist messaging. These allegations describe material support and substantial assistance to and conspiracy with terrorist organizations, not abstract reporting or commentary.

The FAC further alleges that this overlap of al-Jazeera and terrorists was not incidental. For years before October 7, 2023, al-Jazeera knowingly employed individuals who simultaneously served in Hamas's and the PIJ's military and propaganda wings. On October 7, 2023, al-Jazeera journalists themselves took part in the terrorist campaign. In the aftermath, al-Jazeera continued to coordinate with Hamas and the PIJ, staging ceremonies and producing content that magnified the groups' coercive effect on civilians and governments worldwide.

International terrorism is never just the violence itself. It is the violence plus the projection that magnifies its impact. A massacre in Israel becomes international terrorism only when its message is amplified to intimidate civilians and influence governments far beyond the battlefield. The FAC alleges that Defendants not only amplified that message but knowingly employed and retained operatives who actively participated in the terrorist campaign itself. For these reasons, and as set forth below, Defendants' Motion to Dismiss should be denied.

## **INTRODUCTION**

Plaintiffs, survivors and family members of victims of the October 7, 2023 Hamas terrorist attacks, their aftermath, and the coordinated and continuing campaign of terrorism (the "October 7 Terrorist Attacks"), bring this action under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a) and (d), to hold Defendants civilly liable for knowingly aiding and abetting Hamas and the PIJ, providing them with material support and resources, and conspiring in furtherance of acts of international terrorism.

This case does not target Defendants for their viewpoints or for covering a war. It seeks to hold al-Jazeera accountable for knowingly employing operatives of Hamas and the PIJ, coordinating with Hamas and the PIJ for years before the October 7 Terrorist Attacks, helping them to prepare for the attacks, and continuing to coordinate with Hamas and the PIJ afterward to magnify Hamas's and the PIJ's campaign of terror. The FAC further alleges that al-Jazeera has long been aligned with Hamas's and the PIJ's operations by employing high-level Hamas and PIJ operatives as journalists, maintaining direct communication channels with Hamas leadership, obtaining privileged access to terrorist cells and materials unavailable to other outlets, staging interviews that glorify terrorists as "martyrs," and broadcasting propaganda supplied by Hamas and the PIJ themselves. This alignment is not speculative. For over a decade, governments across the Middle East, including Israel, Egypt, Saudi Arabia, the United Arab Emirates, and Jordan, have banned or restricted al-Jazeera for inciting violence and serving as a platform for terrorist organizations. More recently, following the October 7 Terrorist Attacks, U.S. and Israeli officials have identified al-Jazeera as functioning as Hamas's propaganda and intelligence arm, and the Israeli Cabinet and courts moved to close its operations as a direct threat to civilian and national security. These international sanctions and official findings corroborate the FAC's allegations that al-Jazeera is not an ordinary media outlet but a central component of Hamas's and the PIJ's campaign of terror.

Terrorism depends on both violence and communication. A bomb that explodes in the forest but is never heard is not terrorism. The October 7 Terrorist Attacks became terrorism because al-Jazeera's employees not only helped carry them out but broadcast their message worldwide. al-Jazeera supplied Hamas and the PIJ with the personnel, infrastructure, and propaganda machinery that transformed a local massacre into international terrorism intended to

intimidate civilians and influence governments. For that conduct, Defendants must be held accountable under the ATA.

Defendants open their Motion with sweeping claims that this case is no different from suing a news outlet for covering September 11. That framing is false. The FAC alleges years of overlap and coordination between al-Jazeera and Hamas and the PIJ, culminating in al-Jazeera journalists' direct participation in the October 7 Terrorist Attacks and their continued work with Hamas and the PIJ in the weeks and months that followed. Unlike the reporters who covered 9/11 from the outside, al-Jazeera was inside the attacks itself. Its operatives coordinated with Hamas and the PIJ to help prepare for the October 7 Terrorist Attacks, and its institutional practices remained aligned with Hamas's and the PIJ's objectives by promoting, protecting, and glorifying their operatives for years prior to, on, and following October 7. If al-Jazeera's role were merely that of neutral news coverage, one would expect balanced reporting, including equal attention to the plight of the Israeli and American hostages held in Gaza following October 7. Instead, its coverage amplified Hamas's narrative while sidelining the suffering of those victims. Plaintiffs, survivors and family members of victims of those attacks, allege far more than coverage.

Defendants next point to al-Jazeera's global reach, journalism awards, and Committee to Protect Journalists ("CPJ") commentary about "journalists in Gaza working at great personal risk." But the FAC alleges that the "risk" arose not from neutral reporting but from the fact that many of these individuals were and are Hamas and PIJ operatives embedded in combat. Their risk was that of combatants, not journalists. And journalism awards prove nothing. Defendants hide behind Peabody and Emmy nominations the way a cartel hides behind a charitable front—prestige on the surface, criminality underneath. Awards do not erase years of coordination with terrorists or immunize al-Jazeera for retaining terrorist operatives even after the October 7 Terrorist Attacks.

Defendants also argue that Plaintiffs' claims rest on Israeli government statements. Not so. The FAC is a 96-page pleading, not a political press release. It documents years of coordination between al-Jazeera and Hamas and the PIJ: the employment of terrorist operatives; the employment of Hamas and PIJ members in al-Jazeera's ranks long before the October 7 Terrorist Attacks; and their continued employment and retention long afterward. These allegations stand on their own, and Israeli government statements further bolster them and will be substantiated through discovery.

Defendants attempt to recast this lawsuit as part of an Israeli campaign to "silence" criticism of its operations Gaza, sprinkling their Motion with inflammatory rhetoric about "human rights abuses" and "mass starvation." Plaintiffs are survivors and family members of victims of the October 7 Terrorist Attacks. This lawsuit is not about silencing a point of view; it is about dismantling a network of coordination with terrorist groups. Shurat HaDin, which represents Plaintiffs, litigates against terrorism under lawful authority. That is not a campaign against the press; it is a campaign against terrorism. Defendants' attempt to dress up Hamas coordination as "bearing witness" to human suffering is sophistry, and their reliance on inflammatory political rhetoric only underscores the weakness of their legal position.

Defendants suggest that most reporting from Gaza came from Palestinian journalists and that al-Jazeera uniquely maintained access. The FAC alleges why: al-Jazeera's access came through its deep coordination with Hamas and the PIJ, not neutrality. And its reporting told only one side—stories of destruction (often fabricated) without meaningful coverage of the hostages tortured in Gaza. That omission was no accident; it was propaganda, part of al-Jazeera's long-standing alignment with Hamas and the PIJ.

Defendants cite the CPJ for the claim that Israel "accuses journalists of being terrorists without providing any credible proof." But CPJ is an advocacy group, not an intelligence service, law enforcement agency, or counterterrorism authority. What does CPJ know about Hamas's military infrastructure or Israel's intelligence assessments? Nothing. Their pronouncements are advocacy, not evidence. Plaintiffs' allegations rest not on CPJ's opinions but on detailed, well-pleaded facts: al-Jazeera's years-long overlap with Hamas and the PIJ, its journalists' participation in the October 7 Terrorist Attacks, and its continued collaboration afterward. At this stage, the Court must accept those allegations as true. Whether al-Jazeera's employees doubled as terrorists is a factual question for discovery, not for dismissal based on CPJ's partisan statements.

Defendants also lean heavily on casualty figures and imagery of Gaza's suffering, citing a Reuters article to claim more than 60,000 Palestinians have been killed, nearly a third of them children, and that famine is widespread. These numbers and claims are unverified, disputed, and irrelevant to the issues before this Court. More importantly, al-Jazeera's coverage of Gaza is not balanced reporting; it is propaganda coordinated alongside Hamas. al-Jazeera omitted meaningful reporting on the hostages tortured and killed in Gaza while relentlessly amplifying Hamas's narrative of victimhood. That omission was deliberate. It is what transforms violence into terrorism.

Defendants invoke *Newman v. AP,* 758 F. Supp. 3d 1357 (S.D. Fla. 2024*).* That case involved photographs purchased from freelancers and published after the fact. The FAC alleges far more: that al-Jazeera knowingly coordinated with Hamas and the PIJ for years, that its salaried employees were themselves operatives who directly participated in the October 7 Terrorist Attacks, and that al-Jazeera continued to collaborate with Hamas and the PIJ afterward through staged propaganda events and coverage designed to magnify and whitewash their campaign of

terror. In *Newman*, the Associated Press was never accused of putting terrorists on its payroll, of employing snipers and PIJ operatives as journalists, of maintaining direct phone lines into Hamas leadership, of staging propaganda events alongside hostage ceremonies, or of broadcasting materials supplied by terrorist organizations. al-Jazeera is.

At bottom, al-Jazeera's Motion to Dismiss seeks to reframe a terrorism case as a press-freedom case. The FAC alleges a pattern of knowing coordination with Hamas and the PIJ before, during, and after the October 7. For that conduct, not for their viewpoints, Defendants must be held accountable under the ATA.[1]

## **DEFENDANTS' FACTUAL ALLEGATIONS IN THEIR MOTION TO DISMISS**

### **The Parties**

Defendants emphasize that some Plaintiffs have filed other ATA actions against different defendants alleged to have supported Hamas in connection with the October 7 Terrorist Attacks. See Mot. at 8. That is irrelevant. Each case turns on the defendant-specific allegations pleaded. The FAC here sets out detailed facts of al-Jazeera's years-long employment of Hamas and PIJ operatives, their direct participation in the October 7 Terrorist Attacks, and al-Jazeera's continued coordination with Hamas and the PIJ for years before, during, and after October 7. Moreover, the fact that Plaintiffs have sued other actors only underscores the breadth of Hamas's support network. Terrorist organizations like Hamas and the PIJ cannot operate in isolation; they depend

---

[1] Defendants' "Overview of Motion" mischaracterizes the FAC as if it alleged only four narrow theories. See Defs.' Mem. in Supp. of Mot. to Dismiss, Case No. 1:25-cv-00538-ABJ, ECF No. 24-1 (D.D.C. Sept. 2, 2025) ("Mot.") at page 6. That framing selectively extracts a few paragraphs while ignoring the 96-page pleading as a whole. The FAC in fact alleges multiple, detailed avenues of material support.

on a worldwide web of facilitators, financial sponsors, covert logisticians, infrastructure, propagandists, and media platforms whose reach extends into U.S. college campuses to mobilize sympathizers, and—through al-Jazeera—into U.S. households by delivering Hamas's messaging, propaganda, and influence operations directly to American audiences, and into the District of Columbia through its extensive press galleries designed to influence policy. Without that global network—without the money, the messaging, the recruitment, and the machinery—massacres like the October 7 Terrorist Attacks could not be planned, executed, or magnified to achieve their coercive effect. The ATA expressly provides for joint and several liability against all who aid and abet by knowingly providing substantial assistance. 18 U.S.C. § 2333(d)(2).

Defendants argue that AJI is merely a passive U.S. hub with no direct role in Hamas's or the PIJ's activities. See Mot. at 8-9. But that argument ignores the nature of the claims and how terrorism operates. Terrorism does not exist in isolation; it becomes terrorism through the global web of amplification and influence that projects violence as coercive intimidation. The FAC pleads that AJI functions as al-Jazeera's U.S. hub distributing programming targeted at American audiences and broadcasting interviews with Hamas and PIJ leadership. These activities were not incidental. They were part of the same unified enterprise that knowingly employed Hamas and the PIJ operatives and coordinated with their leadership, including in the period leading up to the October 7 Terrorist Attacks and in their aftermath. That AJI's role was centered in Washington, D.C. does not insulate it; it underscores how Defendants leveraged a global network, including U.S. operations, to magnify Hamas's and the PIJ's campaign of terror before, during, and after October 7.

**Employment and Retention of Terrorist Operatives**

Defendants argue that Plaintiffs' allegations about AJMN's journalists are insufficient because Plaintiffs do not allege that these individuals were acting "as al-Jazeera employees" on October 7, that they personally engaged in acts of violence, or that al-Jazeera had knowledge of their affiliations at the time. These arguments misstate both the law and the FAC. The ATA does not require that liability attach only to individuals who themselves committed violence; it extends to those who knowingly provide material support, resources, or legitimacy to terrorist actors. Nor does liability turn on whether an operative's conduct occurred in a narrow "scope of employment" sense, so long as the defendant's institutional conduct gave terrorists the platform and credibility to advance their aims. And knowledge need not be pled as contemporaneous awareness of each attack, but rather as general awareness of the defendant's role in an unlawful enterprise from which terrorist violence was a foreseeable risk.

The FAC pleads that eleven AJMN journalists have been identified by the IDF as Hamas or PIJ operatives, or as "working closely" with Hamas or the PIJ (FAC ¶¶ 62, 72, 75, 78, 85, 92, 96). Two of these individuals, Ismail Abu Omar and Anas Al-Sharif, were present on October 7, not as neutral observers but as participants who had advance awareness and positioned themselves inside the attacks before they began. From their personal Telegram channels, they broadcast the massacre in real time, shouting "*Allahu Akbar*" and exalting the violence (FAC ¶¶ 62-63, 106-12, 144). Their celebratory presence was not incidental; it glorified and amplified Hamas's atrocities as they unfolded. While public reports suggest Abu Omar and Al-Sharif were formally recognized as al-Jazeera correspondents shortly after October 7, that timing is beside the point. Terrorism is not limited to those who pull a trigger or detonate a bomb. It also depends on those who record, amplify, and glorify violence to ensure its coercive impact on civilians and governments. On

October 7, both men embedded themselves inside the attacks, broadcasting the massacre in real time and exalting the violence. Their conduct lent legitimacy to Hamas's and the PIJ's atrocities and ensured their dissemination and incitement. AJMN's subsequent decision to employ them, with knowledge of their role and public declarations, ratified that conduct and provided them with salaries, credentials, and a global platform. Moreover, AJMN's decision to hire Abu Omar and Al-Sharif after October 7 had an additional effect. Viewers who later saw their October 7 Telegram footage could reasonably assume that these broadcasts reflected al-Jazeera's own coverage and stance, since the men were now presented to the world as al-Jazeera correspondents. That association legitimized Hamas's and the PIJ's atrocities, making them appear as sanctioned news content rather than raw terrorist propaganda. By giving these individuals salaries, credentials, and the credibility of its global brand, al-Jazeera amplified the coercive impact of the attacks. That institutional backing itself constitutes material support under the ATA.

Defendants also attempt to minimize the significance of AJMN's decision to hire Ismail al-Ghoul after October 7. The FAC pleads that Al-Ghoul was a member of Hamas's Nukhba unit, instructed operatives on how to record the attacks, and had publicly declared his commitment to Hamas years earlier (FAC ¶¶ 76, 78 & n. 49). Al-Ghoul's social media statements in May 2021 left no ambiguity: he pledged loyalty to Hamas leader Mohammed Deif and promised to "preserve [the resistance] with all our blood." (FAC ¶ 77). Despite this record, AJMN hired him in November 2023. This post-October 7 hiring decision is not exculpatory; it is inculpatory. It demonstrates al-Jazeera's knowing willingness to embed Hamas and PIJ operatives within its ranks even after the attacks, underscoring Plaintiffs' allegation that al-Jazeera has long functioned as a Hamas-aligned network.

This pattern is not new. The FAC pleads that al-Jazeera's employment of Hamas and PIJ operatives dates back years. Its former Director General, Wadah Khanfar, was publicly described as a Hamas political leader in Sudan and Africa (FAC ¶ 97). In 2011, Samer Allawi, AJMN's Afghanistan bureau chief, admitted to serving as a Hamas operative for more than a decade and to offering to leverage his position at al-Jazeera to advance Hamas's interests (FAC ¶ 98). And AJMN continued to employ Hisham Zaqout, who publicly posted a photo of himself in 2017 in IDF uniform holding an illegally obtained weapon during a Hamas-affiliated event in Gaza (FAC ¶ 99). These examples confirm that al-Jazeera's employment of Hamas and PIJ operatives is not accidental but a recurring feature of its organizational structure.

Defendants further argue that eight of the identified journalists are not alleged to have personally participated in the October 7 Terrorist Attacks. But that argument misses the point. The FAC alleges that they were Hamas or PIJ operatives, and that al-Jazeera knowingly employed them. Providing designated terrorist operatives with salaries, credentials, and the institutional backing of a global media enterprise is itself material support under the ATA. Terrorism depends not only on those who carry out physical attacks, but also on those who sustain the organizational infrastructure that enables such attacks to achieve their coercive impact. By employing Hamas and PIJ operatives as "journalists," al-Jazeera provided resources and legitimacy to individuals embedded in terrorist organizations, thereby furthering Hamas's campaign of terror.

Finally, Defendants assert that al-Jazeera could not have known of its journalists' Hamas or PIJ ties at the time. That is implausible. The FAC sets out a record of the journalists' public social media posts, which were accessible to any reasonable employer, openly declaring loyalty to Hamas or the PIJ, celebrating "martyrs," and praising the "resistance." (FAC ¶¶ 15, 62, 68-71, 73, 77, 81, 86-90, 94, 147-49). al-Jazeera is not an ordinary employer; it is a major international news

organization as Defendants concede (see Mot. at 1) with sophisticated editorial structures. It also advertises an extensive pre-employment screening process, including criminal checks, reference verifications, public domain searches, and due diligence checks (FAC ¶¶ 100-102). To suggest that al-Jazeera remained unaware of its employees' affiliations, despite both their public declarations and the Network's own screening process, is not credible. And even after Israel publicly released evidence that al-Jazeera knowingly employed Hamas and PIJ operatives, al-Jazeera failed to terminate their employment and continued to compensate them (FAC ¶¶ 103-04). At a minimum, Plaintiffs are entitled to discovery to determine what al-Jazeera knew and when.

Defendants also stress that many of the IDF's public identifications came in 2024. But the timing of Israel's public announcements does not define the plausibility of Plaintiffs' claims. Plaintiffs allege a longstanding pattern of AJMN employing Hamas and PIJ operatives before, during, and after October 7. The fact that official identifications were later published only underscores what discovery is likely to confirm: that al-Jazeera knew, or recklessly disregarded, that its employees were embedded operatives, and chose to employ and retain them nonetheless.

In short, the FAC alleges that al-Jazeera did not merely cover Hamas and the PIJ. It knowingly employed Hamas and the PIJ. And in the context of the ATA, providing Hamas and PIJ operatives with employment, salaries, credentials, and platforms constitutes material support and substantial assistance. See *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 698-99 (7th Cir. 2008) (en banc) (holding that ATA liability extends to those who provide material resources that enable Hamas's terrorist operations); see also *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 860 (2d Cir. 2021) (support directed to an FTO's operational apparatus can be a "substantial factor" in its terrorist activities).

**Defendants' Liability Extends to All Plaintiffs' Injuries Arising From the October 7 Attacks and the Continuing Campaign of Terrorism**

Defendants contend that the FAC improperly "vaguely alleges" that Hamas was responsible for several post-October 7 attacks, and that Plaintiffs fail to connect Defendants to those incidents (See Mot. at 12). This argument mischaracterizes the pleadings and misstates the scope of liability under the ATA.

First, Plaintiffs allege with specificity that each of the post-October 7 attacks, including the killings of IDF soldiers, the murder of a Border Police officer, and the Ra'anana car-ramming, was carried out by terrorists from, or supported by, Hamas in the aftermath of the October 7 Terrorist Attacks and as part of Hamas's coordinated campaign of violence (FAC ¶¶ 185-91, 194-98, 213-26, 243, 245, 250-53). There is nothing "vague" about these allegations. Defendants' assertion to the contrary is belied by the pleadings themselves.

Second, the ATA imposes liability for injuries suffered "by reason of" acts of international terrorism "committed, planned, or authorized" by the foreign terrorist organization the defendant aided, abetted, or conspired with. 18 U.S.C. § 2333(a), (d). Courts have repeatedly recognized that ATA liability extends beyond the single discrete attack to the subsequent acts of terrorism carried out by the supported organization. In *Boim*, the court explained that those who provide resources to Hamas necessarily enable it to continue its murder and injury. See also *In re Terrorist Attacks on September 11, 2001,* 740 F Supp 2d 494 (SDNY 2010) (Court states that it is wholly foreseeable that a terrorist organization could use any material support provided to it as part of a broader strategy to promote terrorism). Hamas's violence did not end on October 7, 2023; it began then and continued through subsequent terrorist acts, including those that injured the remaining Plaintiffs here. Just as kidnapping constitutes a discrete terrorist attack that endures so long as the hostage is held for coercive purposes, Hamas's October 7 Terrorist Attacks did not terminate on

October 7 itself but continued through subsequent assaults, terrorist attacks, rocket barrages, and armed engagements aimed at furthering the same terrorist objective. *United States v Garcia*, 854 F2d 340 (9th Cir 1988) (court held that kidnapping is a continuing offense); *In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284 (SD Fla 2018) (court held that a defendant could be held liable under the ATA for damages caused by subsequent terrorist acts if it knowingly provided material support to a terrorist organization). The IDF's combat operations against Hamas after October 7 confirm that Hamas remained engaged in ongoing acts of international terrorism. Every time Hamas launched an attack against IDF soldiers or civilians, it was furthering the act of terrorism initiated on October 7. Although Hamas's terrorist attacks began on October 7, they continued for two years thereafter, all stemming from the October 7 Terrorist Attacks.

Defendants err in suggesting Plaintiffs must allege that al-Jazeera employees personally participated in or covered these attacks. ATA liability does not require that Defendants themselves wield the weapons. Liability attaches where, as alleged here, Defendants knowingly provided substantial assistance to Hamas and the PIJ, and Plaintiffs' injuries were a foreseeable consequence of Hamas's and the PIJ's ongoing terrorist campaign. See 18 U.S.C. § 2333(d)(2).

## Defendants' Direct Role In Propagating And Amplifying The October 7 Terrorist Attacks

Defendants dismiss the FAC as "conclusory," insisting that Plaintiffs merely allege al-Jazeera provided "real-time coverage, violent images, and inciting language" of the October 7 Terrorist Attacks, no different from other news organizations. That contention ignores the detailed allegations of the FAC. Far from being neutral observers, Defendants' employees were active Hamas and PIJ operatives and propagandists whose conduct went far beyond routine reporting.

The FAC alleges that AJMN identified Ismail Abu Omar as one of its journalists, even as he simultaneously served as a Hamas commander (FAC ¶61). On October 7, Omar entered Israel with armed terrorists, filmed himself inside Kibbutz Nir Oz while the massacre unfolded, and watermarked graphic videos of murdered IDF soldiers with his personal credit (FAC ¶¶62-63, 106-11). These were not the actions of a journalist reporting from a distance, but of a Hamas operative glorifying and inciting violence in real time. Defendants now suggest that Omar was only hired after October 7 and that his Telegram reporting cannot be attributed to al-Jazeera. But the FAC makes clear that AJMN itself publicly embraced Omar as a correspondent notwithstanding his role as a Hamas commander. By bringing him onto its roster, AJMN ratified and legitimized his October 7 reporting as part of its own coverage, thereby amplifying Hamas's propaganda. Whether Omar was formally on AJMN's payroll, his conduct and AJMN's adoption of him as its "journalist" fall squarely within the FAC's allegations of knowing material support.

The FAC further alleges that longtime AJMN presenter Tamer Almisshal acted as a producer for Hamas propaganda, celebrated the October 7 atrocities on social media, and later staged humiliating hostage parades in Gaza portraying kidnapped Israeli women as honored guests. On January 24, 2025, AJMN aired his docuseries episode framing October 7 as a victory, featuring exclusive footage of Yahya Sinwar and Mohammed Deif planning the attacks (FAC ¶¶84-90). That broadcast was coordinated propaganda, not journalism.

Other AJMN employees also provided direct and substantial assistance. The FAC alleges that Hossam Shabat, identified by the IDF as a Hamas sniper, used his platform as an al-Jazeera journalist to call for global embassy attacks, while Anas al-Sharif praised the killings on October 7, glorified Hamas "martyrs," and encouraged further violence in the days following the attacks. Prominent AJMN presenters, including Ghada Oueiss, Rawaa Augé, and Ahmad Mansour, echoed

Hamas's narrative on their social media accounts, demeaning Israeli victims and celebrating Hamas's actions. (FAC ¶¶91-94, 144-75). The FAC alleges these individuals are prominent al-Jazeera journalists whose public identities are inseparable from their roles at al-Jazeera. By retaining them despite their glorification of terrorism, Defendants ratified and amplified their messaging, making it part of al-Jazeera's overall propagation of Hamas's agenda. This is conduct qualitatively different from the coverage of "other news organizations."

The FAC also details al-Jazeera's direct coordination with Hamas and the PIJ leadership. Documents seized by the IDF revealed the existence of an "al-Jazeera Phone" for confidential communication with Hamas (FAC ¶ 113). On the morning of October 7, AJMN gave exclusive airtime to Mohammed Deif, who announced "Operation Al-Aqsa Flood" as the attacks were underway, broadcasting his operational message in real time to global and U.S. audiences and thereby amplifying Hamas's incitement (FAC ¶ 114). Defendants continued to provide Hamas with a platform after the attacks: airing a documentary minimizing the October 7 atrocities and featuring Hamas official Bassem Naim (FAC ¶ 116); publishing fabricated rape allegations in the Shifa Hospital operation that spread globally before being withdrawn (FAC ¶ 117); and being publicly thanked by PIJ's spokesman as a "resistance" collaborator (FAC ¶ 118). al-Jazeera went on to broadcast al-Qassam Brigades spokesperson Abu Obaida's[2] statements, incorporate Hamas's "Al-Aqsa Flood" logo on al-Jazeera videos, trivialize the attacks through comedic sketches, and silence Gazans who criticized Hamas, further reinforcing Hamas's narrative (FAC ¶¶ 133, 143, 154-58).

---

[2] Abu Obaida was allegedly killed by the IDF on August 30, 2025.

Nor is it correct to suggest, as Defendants do, that Plaintiffs rely on speculation about interviews. The FAC alleges that AJMN repeatedly hosted senior Hamas and PIJ leaders, including Ismail Haniyeh, Khaled Meshaal, Ziyad al-Nakhalah, Yahya Sinwar, Khalil al-Hayya, and Hassan Yousef, sometimes in sensitive locations such as tunnels, bases, and hospitals that doubled as Hamas and PIJ command centers (FAC ¶¶119-127). These were not incidental encounters. al-Jazeera provided terrorist leaders with a global platform to intimidate the public, encourage violence, threaten kidnappings, and glorify attacks, referred to Haniyeh as a "martyr" after his death, and was praised by al-Nakhalah from the PIJ for its uniquely supportive coverage (FAC ¶¶120, 121, 123). The FAC further alleges that al-Jazeera paid leaders for appearances and hosted conferences with designated Hamas officials, constituting direct material support (FAC ¶¶130-136). Defendants' suggestion that these allegations are speculative ignores that the FAC pleads them as facts, which must be taken as true at this stage, and the precise details will be confirmed in discovery.

Defendants' attempt to discount pre-October 7 allegations fares no better. The FAC describes how, for years, al-Jazeera legitimized Hamas ideologues of the Muslim Brotherhood (the forbear of Hamas) such as Yusuf al-Qaradawi, whose prime-time al-Jazeera show promoted jihad, praised the Holocaust, and encouraged suicide bombings (FAC ¶128). That history shows al-Jazeera's long-standing alignment with Hamas and the PIJ, its awareness of their terrorist objectives, and its willingness to employ and platform Hamas and PIJ operatives. Such allegations go directly to scienter and general awareness, while post-October 7 conduct demonstrates Defendants' ongoing role in Hamas's and the PIJ's continuing terrorist campaign.

Liability under the ATA does not require Defendants to wield weapons; it requires knowingly providing substantial assistance to a designated FTO. *Halberstam v. Welch*, 705 F.2d

472, 488 (D.C. Cir. 1983); *Twitter v. Taamneh*, 598 U.S. 471, 484-86 (2023). The FAC pleads precisely that. And while the press is free to report the news, it is not free to provide material support to terrorists. As the Supreme Court held, "the First Amendment does not protect the provision of material support to terrorist organizations, even if the support consists of speech." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 25-28 (2010).

**Plaintiffs' Use of Footnotes is Proper**

Defendants argue that Plaintiffs' use of 245 footnotes renders the FAC improper and violative of Rules 8(a) and 11(b)(3). But neither Rule 8 nor Rule 11 restricts the use of footnotes in pleadings. What Rule 8 requires is "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has emphasized that Rule 8's standard is satisfied so long as the complaint provides fair notice of the claims and the grounds upon which they rest. *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) (per curiam). Courts have emphasized that complaints that obscure who did what to whom risk dismissal. *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1322 (11th Cir. 2015). Footnotes that supply citations or explanatory context do not obscure claims or render a complaint unintelligible. Defendants' claim that footnotes are "burdensome" misses the mark. The FAC is detailed, but it is not obscure. Its use of footnotes to cite public reports, videos, and translations only enhances clarity and demonstrates evidentiary support and plausibility.

Nor is there merit to Defendants' attack on the availability or accuracy of cited sources. Plaintiffs checked every link at the time of filing. If a URL has since gone inactive, Plaintiffs have preserved screenshots and archives to cure any concern. The duty to preserve evidence applies to all forms of evidence, including inactive URLs. *Innis Arden Golf Club v Pitney Bowes, Inc.*, 257 FRD 334 (D Conn 2009). The accuracy of cited material is not adjudicated on a Rule 12(b)(6)

motion; at this stage, Plaintiffs' allegations are accepted as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Defendants also fault Plaintiffs for citing Arabic-language sources without certified translations. That objection is premature. Plaintiffs have provided English translations for each Arabic footnote, reviewed by an individual proficient in Arabic. Courts routinely accept translated sources at the pleading stage; certification becomes an evidentiary matter for summary judgment or trial, not Rule 12. See *Bazarian Intl. Fin. Assoc., LLC v Desarrollos Aerohotelco, C.A.*, 315 F Supp 3d 101 (DDC 2018) (noting that objections to the adequacy of expert opinions generally go to the weight of the evidence rather than its admissibility); *United States v. Cruz*, 765 F.2d 1020, 1023 (11th Cir. 1985) (translation issues go to weight, not admissibility, absent a material dispute). Nor have Defendants marshalled the goods by showing that there was something substantively inaccurate about any particular translation.

Equally misplaced is Defendants' demand that Plaintiffs attach copies of every footnoted source to the FAC. Fed. R. Civ. P. 10(c) allows, but does not require, the attachment of exhibits to a pleading. Plaintiffs may cite public materials without annexing them. See *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) (allegations must be read collectively and reasonably). If Defendants want the underlying sources, they can request them in discovery.

Defendants go so far as to claim it is "especially troubling" that advocacy groups assisted in preparing the Complaint and reviewing translations. That assertion is wholly irrelevant. There is nothing improper about Plaintiffs relying on organizations with subject-matter expertise to help compile public materials and provide translations. What matters under the Federal Rules is that Plaintiffs' counsel signed the FAC and stand behind its contents. Courts evaluate pleadings on their allegations, not on who helped gather the supporting research. The attempt to discredit the

FAC by attacking StandWithUs is an ad hominem distraction, not a legal argument, and it does nothing to undermine the sufficiency of the allegations.

Defendants' request to strike the footnotes under Rule 12(f) is extraordinary and unwarranted. Rule 12(f) permits striking only "redundant, immaterial, impertinent, or scandalous matter." Courts generally disfavor motions to strike, viewing them as a drastic remedy that should only be granted when the material has no possible relation to the controversy and may cause prejudice to one of the parties. *Nugent v Unum Life Ins. Co. of Am.*, 752 F Supp 2d 46 (DDC 2010); *Hall v Carnival Corp.*, 536 F Supp 3d 1306 (SD Fla 2021). The footnotes at issue are none of these; they are integral to Plaintiffs' allegations that Defendants knowingly collaborated with Hamas and the PIJ.

Defendants' fixation on footnotes is nothing more than a sideshow and a bid to distract from the detailed factual allegations in the FAC that demonstrate their collaboration with Hamas's and the PIJ's terror campaign.

## **JURISDICTION**

Defendants begin with the unremarkable proposition that Plaintiffs bear the burden of making a prima facie showing of jurisdictional facts. *Livnat v. Palestinian Auth.*, 851 F.3d 45, 56-57 (D.C. Cir. 2017). That much is true, but they misstate how that standard operates. At this stage, Plaintiffs need not prove jurisdiction; they must allege facts that, if true, establish jurisdiction. Courts do not credit conclusory assertions or unsupported inferences, *Fawzi v. al-Jazeera Media Network*, 273 F. Supp. 3d 182, 185-86 (D.D.C. 2017), but well-pleaded jurisdictional facts are taken as true and construed in Plaintiffs' favor. *Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 20 (D.D.C. 2017), aff'd, No. 17-7033, 2018 U.S. App. LEXIS 19699 (D.C. Cir. July 17,

2018). The FAC does just that, alleging defendant-specific jurisdictional facts, with citations and public sources, showing AJMN's purposeful contacts with the United States and this District.

Defendants' premise, that the FAC alleges no forum-based, suit-related conduct by AJMN, is wrong. The FAC pleads AJMN's purposeful U.S. direction through its Washington, D.C. production/editorial operation, U.S. distribution to American audiences, use of VPNs, and U.S. data-targeting practices, all used to platform, legitimize, and amplify Hamas/PIJ messaging before, on, and after October 7 (FAC ¶¶ 10-13). Terrorism under the ATA turns on the coercive effects of intimidating civilians and influencing governments, not merely where the trigger is pulled. 18 U.S.C. § 2331(1)(B). As *Mwani v. Osama Bin Laden* holds, specific jurisdiction lies where a foreign defendant intentionally aims conduct at the United States and the resulting injuries are foreseeably felt here; the D.C. Circuit sustained jurisdiction over al Qaeda for the Nairobi embassy bombing because its effects were "unabashedly" directed at the U.S., 417 F.3d 1, 12-13 (D.C. Cir. 2005). So too here: the FAC alleges AJMN used its D.C. pipeline and U.S. distribution to broadcast operational messaging (including the real-time Deif announcement), stream Hamas/PIJ-sourced propaganda for years to U.S. viewers, and algorithmically target U.S. users, all contributing to coercive impact on American campuses, throughout the United States, and in this District (FAC ¶¶ 11-14, 113-17, 119-26, 151-55). Those are AJMN's contacts, not "group pleadings."

Nor does *D'Onofrio* help. We do not aggregate across entities; the FAC alleges (i) AJMN's editorial control over English-language content created in D.C.; (ii) D.C. programs and U.S. distribution that repeatedly platformed Hamas/PIJ figures; (iii) AJMN's making its Arabic-language channels accessible to U.S. users, including through the use of virtual private networks (VPNs); (iv) targeted social-media/pixel amplification steering AJMN videos to U.S. users; and (v) use of U.S. operations to legitimize and operationalize terrorist propaganda—the conduct from

which these ATA claims arise (FAC ¶¶ 10-14, 119-26, 130, 151-55). *Fawzi* is likewise inapposite, which lacked these D.C.-anchored editorial, production, distribution, and targeting facts.

Al-Jazeera's "no Hamas/PIJ employees in D.C." rejoinder misses the point. Specific jurisdiction turns on whether the defendant intentionally aimed suit-related conduct at the forum such that the claim "arises out of or relates to" those contacts. *Mwani*, 417 F.3d at 12-13. The FAC alleges AJMN used its U.S. apparatus to give the October 7 atrocities terroristic effect here by publicizing, legitimizing, and mobilizing the violence so intimidation and coercion were felt in the United States (FAC ¶¶ 11-14, 151-55).

The corporate-form point also fails. First, our theory does not depend on imputing AJI's contacts; the FAC pleads AJMN's own U.S. conduct and control (FAC ¶¶ 10-14, 17). Second, even if the AJMN-AJI relationship is considered, the complaint alleges an integrated operation, overlapping personnel, coordinated editorial direction, common branding/technical infrastructure, and D.C. production/distribution executed to reach U.S. audiences, which are all adequate at this stage to plead agency/alter-ego for jurisdictional purposes. See *In re Tenaris S.A. Sec. Litig.*, 493 F. Supp. 3d 143 (E.D.N.Y. 2020); *Hoffman v. United Telecom., Inc.*, 575 F. Supp. 1463 (D. Kan. 1983); *Taishan Gypsum Co. v. Gross (In re Chinese-Manufactured Drywall Prods. Liab. Litig.)*, 753 F.3d 521 (5th Cir. 2014).

**The D.C. Long-Arm Reaches AJMN**

Defendants say the FAC pleads no forum-based, suit-related conduct. The record says otherwise. Plaintiffs allege AJMN used its Washington, D.C. operation to create and control al-Jazeera English programming and distribute it to U.S. audiences (FAC ¶¶ 10-12). *UpFront* and *Fault Lines* are produced in D.C., aimed at U.S. viewers, and carried on U.S. platforms including Sling, Roku, Apple TV, and Amazon Fire TV—"transacting business" under § 13-423(a)(1); the

claims "arise from or relate to" those contacts because the same pipeline platformed Hamas/PIJ leaders and broadcast operational/propaganda content before, on, and after October 7 (FAC ¶¶ 11-12, 119-26, 130, 151-55). The FAC also alleges AJMN and AJI compensated Hamas/PIJ-affiliated individuals; on information and belief, appearance-fee payments for D.C.-produced programming were budgeted, approved, or routed through U.S./D.C. operations (FAC ¶¶ 14, 130, 134-36). Using U.S. channels to pay designated FTO officials is "material support" under 18 U.S.C. §§ 2339B and constitutes tortious conduct in and directed to this forum, satisfying § 13-423(a)(1) and, alternatively, (a)(3)/(4). See *Ford Motor Co. v. Montana*, 592 U.S. 351, 364-66 (2021); *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 329-34 (D.C. 2000) (en banc). AJMN's Washington operation has included more than 100 staff credentialed for the Congressional press galleries, a sustained D.C. media presence directly relevant to the ATA's focus on coercing government policy; those credentials and the D.C. bureau are part of the same U.S. apparatus used to amplify Hamas/PIJ messaging to policymakers and the public (FAC ¶ 11 & n.4; 18 U.S.C. § 2331(1)(B)(ii)). The FAC also pleads D.C.-anchored effects: AJMN produced, edited, and broadcast from D.C. content that amplified designated FTO messaging and contributed to radicalization and escalated violent rhetoric on U.S. campuses, including in this District, satisfying the "effects test" recognized in *Calder v. Jones*, 465 U.S. 783, 789-90 (1984) (abrogated in part on other grounds) and the "express aiming" requirement applied in *Mwani v. bin Laden*, 417 F.3d 1, 12-13 (D.C. Cir. 2005) (FAC ¶¶ 12-14, 151-55).

Defendants' "no subsection" quibble ignores that the FAC pleads facts satisfying (a)(1) and, alternatively, (a)(3), (4) (FAC ¶¶ 10-17). Forum injury is not required under (a)(1); and even under (a)(3), (4), the FAC alleges District-felt coercive effects from D.C.-created, U.S.-targeted propaganda (FAC ¶¶ 12-14, 151-55). Plaintiffs do not rely on AJ+ imputation; they allege AJMN's

editorial control, D.C. production, and U.S. targeting through al-Jazeera English and related channels (FAC ¶¶ 10-13). Claims that "editorial direction" in D.C. has "no nexus" are refuted by detailed allegations of D.C. use to platform senior Hamas/PIJ figures, grant real-time October 7 airtime to Deif, and stream denialist/incendiary segments to U.S. audiences following October 7, including the Shifa Hospital incident fabrication and a March 2024 documentary featuring Hamas official Bassem Naim (FAC ¶¶ 12-14, 113-17, 116-17, 119-26, 151-55). Whether one *UpFront* exchange with Osama Hamdan was "confrontational" is beside the point; the question is AJMN's use of a D.C. platform to elevate a Hamas spokesperson to U.S. audiences (FAC ¶¶ 11-12, 130). And campus radicalization is not "unrelated" under the ATA; terrorism is defined by coercive effects on civilians and governments, which the FAC alleges AJMN operationalized here (FAC ¶¶ 12-14, 151-55; 18 U.S.C. § 2331(1)(B)).

The social-media/data-targeting allegations are suit-related forum contacts. From 2022-2025 AJMN embedded Meta/Facebook pixels on AJMN sites that transmitted U.S. viewers' video-viewing data to U.S. servers, enabling algorithmic recommendations of additional AJMN videos to U.S. users—deliberate domestic data flows and targeted amplification (FAC ¶ 13). At the pleading stage, the Court takes as true the FAC's allegation that AJMN "maintains and operates" the U.S.-facing sites/accounts; whether the embedded pixels were technically implemented through AJMN or AJI is a merits question for jurisdictional discovery, and Plaintiffs plead on information and belief that AJMN's integrated U.S. operation encompassed those data flows (FAC ¶¶ 10-13). AJMN also makes its Arabic-language channels accessible to U.S. users, including through the use of VPNs; U.S. users employing a domestic VPN (i.e., routing traffic through U.S. servers) can access AJMN's Arabic-language live streams and archived footage without restriction via AJMN's official websites and mobile applications (FAC ¶ 13). This accessibility further

underscores AJMN's purposeful targeting of U.S. audiences. On information and belief, those pushes elevated Hamas/PIJ-aligned content, including real-time operational messaging, denialist programming, and "martyr" glorification, immediately before October 7 and in the months after, to intimidate and coerce civilian audiences and influence U.S. policy (FAC ¶¶ 13, 113-17, 119-26, 137-43, 151-55). And because the same D.C. production budgets and U.S. distribution plausibly encompassed appearance-fee payments to Hamas/PIJ leaders and operatives for U.S.-aimed interviews, those financial transfers are themselves suit-related forum conduct under the ATA's material-support prohibitions (FAC ¶¶ 14, 130, 134-36). This nexus satisfies § 13-423(a) and fits the *Calder/Mwani* effects paradigm. See also *Ford Motor*, 592 U.S. at 364-66; *Calder*, 465 U.S. at 789-90 (abrogated in part on other grounds); *Mwani*, 417 F.3d at 12-13; *Spanski Enters., Inc. v. Telewizja Polska S.A.*, 883 F.3d 904, 915-16 (D.C. Cir. 2018).

Plaintiffs do not need to impute AJI's contacts to AJMN (FAC ¶¶ 10-14). If the relationship is considered, the FAC adequately pleads agency/alter-ego for jurisdictional purposes; merits proof can follow in discovery. See *Boland v. Fortis Constr. Co., LLC*, 796 F. Supp. 2d 80 (D.D.C. 2011). And even if the long-arm were not satisfied, Rule 4(k)(2) independently applies: AJMN's nationwide contacts—broadcasting al-Jazeera English into the United States before, during, and after October 7; operating U.S.-facing digital channels; using U.S. platforms and data flows; granting real-time October 7 airtime to Deif and later disseminating Hamas-aligned content accessible here; and targeting U.S. users via VPNs, social media, and pixels—together with these federal ATA claims, satisfy due process. *Mwani*, 417 F.3d at 11-13.

## The Fourteenth Amendment Due Process Standard Is Satisfied

Defendants' *Walden/Bristol-Myers/Safex/GTE* refrain fails because the FAC alleges suit-related purposeful forum conduct, not mere web accessibility. AJMN used Washington, D.C. as

an editorial/production hub for al-Jazeera English, with overlapping personnel, branding, and technical infrastructure to create and distribute U.S.-facing programs (including *UpFront* and *Fault Lines*) on U.S. platforms (Sling, Roku, Apple TV, Amazon Fire TV), maintained more than 100 Congressional press-gallery credentials evidencing sustained D.C. presence, and embedded pixels that transmitted U.S. viewers' data to U.S. servers to trigger algorithmic recommendations—targeted engagement, not passivity (FAC ¶¶ 10-13, 11 & n.4). Those are AJMN's own choices that create a substantial connection with the forum, satisfying *Walden*. *Safex* is inapposite: unlike the bare "mere accessibility" rejected there, Plaintiffs allege targeted U.S. production/distribution plus U.S.-server data flows that algorithmically recommended additional AJMN videos to U.S. user constituting concrete forum engagement (FAC ¶¶ 10-13). See *Walden v. Fiore*, 571 U.S. 277, 284-85 (2014); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-76 (1985); *Spanski*, 883 F.3d at 915-16; *Ford Motor*, 592 U.S. at 364-66; *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984); *Calder*, 465 U.S. at 789-90 (abrogated in part on other grounds); *Mwani*, 417 F.3d at 12-13.

## Rule 4(k)(2): Exercising Nationwide Jurisdiction Comports with Fifth Amendment Due Process

Rule 4(k)(2) independently supports jurisdiction. Viewing the United States as the forum, the same U.S.-aimed conduct—D.C. production/editorial control, U.S. distribution on American platforms, U.S.-facing social channels, and pixel-enabled recommendation loops—was expressly aimed at American audiences and alleged to have operationalized Hamas/PIJ messaging into coercive effects here (FAC ¶¶ 10-14, 90, 113-17, 119-26, 137-43, 151-55). Although headquartered in Doha with 70-plus bureaus worldwide, AJMN highlights Washington, D.C. as its sole listed U.S. location and has credentialed 100+ staff for congressional press galleries—

engagement far beyond "mere accessibility" (FAC ¶ 11 & n.4, ¶ 17). Plaintiffs also allege AJMN and AJI paid Hamas/PIJ figures for interviews that, on information and belief, were planned, authorized, or executed through U.S./D.C. operations for D.C.-produced programming, bringing those transfers within § 2339B's ban on "material support," and further tying U.S. conduct to these ATA claims (FAC ¶¶ 14, 130, 134-36). *Ford* confirms strict but-for causation is unnecessary; the pleaded nexus is sufficient. See *Mwani*, 417 F.3d at 11-13; *Ford Motor*, 592 U.S. at 364-66; *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 864-65 (D.C. Cir. 2022).

Defendants' piece-by-piece rejoinders miss the cumulative point. One "confrontational" *UpFront* exchange does not negate AJMN's use of a D.C. platform to elevate a Hamas spokesperson; the October 7 Deif broadcast was made accessible here in real time; the March 2024 documentary and other segments furthered the continuing campaign of intimidation; and AJMN's channels repeatedly glorified "martyrs" and disseminated Hamas-sourced battle videos, all available to U.S. viewers and pushed through U.S. algorithms (FAC ¶¶ 11-14, 90, 113-17, 119-26, 137-43, 151-55). The FAC also alleges compensation of Hamas/PIJ figures and employment of operatives; if discovery confirms U.S. payment flows or D.C. budgets facilitating those appearances, that will further anchor nationwide contacts and relatedness (FAC ¶¶ 14, 119-26, 130, 134-36). At this stage, Plaintiffs' detailed, defendant-specific allegations are accepted as true and construed in their favor.

Finally, Fifth Amendment "fair play and substantial justice" factors reinforce nationwide jurisdiction. The United States has a paramount interest in a federal forum for ATA claims and in deterring use of U.S. media infrastructure to operationalize terrorist propaganda; Plaintiffs, U.S. nationals, have a compelling interest in convenient and effective relief; and adjudication in this District, where AJMN concentrated its U.S. apparatus, is efficient and fair (FAC ¶¶ 11-13, 11 &

n.4). See *Mwani*, 417 F.3d at 13. The Supreme Court recently reaffirmed that Congress may constitutionally ensure a federal forum for U.S. victims of terrorism, emphasizing the Federal Government's compelling interest in providing such a forum for American victims to hold accountable those responsible for acts of international terrorism against U.S. citizens, and recognizing American plaintiffs' strong interest in pursuing ATA damages actions in U.S. courts. *Fuld v. Palestine Liberation Org.*, 606 U.S. 1 (2025). In the interests of justice, this case should be adjudicated in the United States and specifically in this District, where AJMN's U.S. operations are centered. Hamas and the PIJ are not designated as terrorist organizations in Qatar and receive support there; forcing U.S. citizens to pursue ATA claims in a forum that does not recognize those designations would effectively deny a suitable forum for redress.

## ARGUMENT

### I.    Plaintiff's Direct Liability Claim

#### A.    The FAC Plausibly Alleges That Defendants Themselves Committed Acts of International Terrorism

Section 2333(a) provides a civil remedy to any U.S. national "injured…by reason of an act of international terrorism." 18 U.S.C. § 2333(a). "International terrorism" includes conduct that "involves violent acts or acts dangerous to human life," appears intended "to intimidate or coerce a civilian population" or "influence the policy of a government by intimidation or coercion," and occurs primarily abroad. 18 U.S.C. § 2331(1). Defendants contend that Plaintiffs have not plausibly alleged that AJMN or AJI committed an "act of international terrorism" or proximately caused Plaintiffs' injuries, and that the FAC impermissibly "lumps" the two entities. The text of § 2331(1), Supreme Court precedent, and binding D.C. Circuit authority all defeat these arguments.

Congress deliberately defined "international terrorism" to encompass conduct that "*involves* violent acts or acts dangerous to human life" and is intended to intimidate or coerce. 18 U.S.C. § 2331(1) (emphasis added). The Supreme Court has held that even seemingly non-violent activities, when coordinated with a designated foreign terrorist organization ("FTO"), cannot be separated from that group's violent ends because such coordination legitimizes and furthers terrorism. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 29-33 (2010). Non-violent "support" activities qualify as international terrorism when they satisfy § 2331(1)'s coercion and intimidation elements. See *Boim*, 549 F.3d at 690-91 (Court held that providing financial aid to terrorists could constitute international terrorism if it endangered human life under § 2331(1)(A)).

The FAC more than satisfies this standard. Historically, al-Jazeera aligned itself with Hamas and the PIJ by paying terrorist leaders for interviews, providing a platform for them to organize, and glorifying perpetrators as "martyrs" (FAC ¶¶ 58-59, 118-125, 137-143). During the October 7, 2023 massacre, Hamas relied on an "al-Jazeera Phone" to coordinate with AJMN, and AJMN broadcast Mohammed Deif's announcement of "Operation Al-Aqsa Flood" as the attacks were carried out—real-time operational propaganda that amplified and legitimized the violence (FAC ¶¶ 113-14).

The FAC further alleges that AJMN knowingly employed and compensated Hamas commander Ismail Abu Omar. On October 7, Abu Omar posted on his personal Telegram account as he entered Kibbutz Nir Oz with armed men, watermarked gruesome footage of murdered Israelis, and celebrated the massacres (FAC ¶¶ 61-66, 106-12). Rather than disavow him once his role as a Hamas commander was exposed, AJMN ratified his conduct by continuing to describe him as one of its "journalists" and retaining him on staff (FAC ¶¶ 63-66). That ratification lent his propaganda the imprimatur of professional reporting, making it appear to global audiences as the

work of a correspondent for a major international news network, and thereby magnifying its terroristic effect.

The FAC also details how other al-Jazeera presenters glorified the October 7 atrocities. Presenter Ghada Oueiss mocked President Biden's condemnation of Hamas and shared antisemitic imagery comparing Israel's Prime Minister to Hitler. Presenter Rawaa Augé justified the massacres as an understandable response to Israeli actions. Presenter Ahmad Mansour posted videos celebrating Hamas operatives dragging Israeli soldiers' bodies, boasting that such images were worth "hundreds of billions of dollars that the world's Zionists have invested in Israel," and glorifying Hamas's breach of the border fence (FAC ¶ 145). Likewise, al-Jazeera reporter Anas al-Sharif published a series of Telegram posts on and after October 7 praising and urging continued jihad, exalting Hamas "heroes" for killing and capturing Israelis, glorifying the "jihad of victory and martyrdom," mourning slain Hamas leaders, and praying for "our mujahideen," describing them as "Servants of Ours, endowed with great might" (FAC ¶ 144). Similarly, correspondent Rami Saleim openly celebrated Hamas and the PIJ on his social-media accounts, declaring "Together we sacrifice. Together we win," and later referring to Hamas leader Ismail Haniyeh as "Master of Martyrs" while employed by al-Jazeera (FAC ¶ 148). These were not fringe freelancers; they were branded al-Jazeera presenters. By tolerating and amplifying their conduct, AJMN employees institutionalized their messaging, aligning the network's global platform with Hamas's campaign of intimidation and coercion.

Nor did al-Jazeera's conduct begin or stop on October 7. Its presenters and correspondents historically glorified Hamas leaders as martyrs and aligned themselves with Hamas on social media (FAC ¶¶ 137-43, 145-48). The FAC alleges that AJMN broadcast a documentary denying Hamas atrocities and featuring Hamas official Bassem Naim, published fabricated atrocity stories

against Israel later admitted being false, and produced "comedy" sketches trivializing the massacres (FAC ¶¶ 116-17, 154). And al-Jazeera repeatedly censored Gazan civilians who criticized Hamas, cutting interviews to preserve Hamas's narrative (FAC ¶¶ 155-57). Al-Jazeera also gave wall-to-wall coverage to Gaza's narrative while downplaying the plight of tortured Israeli and American hostages, thereby reinforcing Hamas's propaganda strategy (FAC ¶ 159). These allegations show that Defendants' conduct was not neutral reporting but direct participation in the intimidation and coercion that defines terrorism.

Defendants' "group pleading" argument distorts the FAC. Rule 8 requires factual specificity, not rigid separation of allegations where two entities operate as a unified enterprise. *New York v. Debt Resolve, Inc.,* 387 F. Supp. 3d 358 (SDNY 2019*)* (court noted that when multiple corporate entities operate as a common enterprise, they may be held liable for each other's actions without requiring the complaint to specify which defendant committed each act). *Toumazou v. Turkish Republic of N. Cyprus*, 71 F. Supp. 3d 7 (D.D.C. 2014), and *Page v. Comey*, 628 F. Supp. 3d 103 (D.D.C. 2022), are inapposite. In *Toumazou*, plaintiffs failed to provide factual allegations that distinguished between different government actors or entities. In *Page*, the complaint impermissibly lumped numerous federal officials together with no basis for collective treatment. Here, by contrast, the FAC alleges that AJMN and AJI are not strangers but parts of the same global media enterprise, with "coordinated operations, shared branding, integrated editorial content, and overlapping personnel and resources" (FAC Ft. Nt. 1).

Defendants suggest it is dispositive that AJI appears primarily in the "Jurisdiction and Venue" section of the FAC. That is irrelevant. Rule 8 does not require that allegations be placed under a particular heading, only that the complaint contain "a short and plain statement of the claim

showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Court must read the complaint as a whole. See *Tellabs,* 551 U.S. at 322.

The FAC alleges that AJI functions as AJMN's U.S. arm, implementing and distributing AJMN's editorial strategy through its Washington, D.C. bureau, producing flagship programs like *UpFront* and *Fault Lines*, maintaining congressional press credentials, and disseminating content nationwide through U.S. streaming platforms (FAC ¶¶ 10-13). Those are concrete, defendant-specific allegations that plausibly tie AJI to the conduct at issue. AJI is not pled merely as a jurisdictional hook; it is pled as an active participant in disseminating Hamas and the PIJ propaganda to U.S. audiences.

For example, *UpFront* and *Fault Lines*, filmed and broadcast from Washington, D.C. under AJI's production, featured interviews and segments with Hamas and PIJ figures that amplified those groups' messaging and elevated their legitimacy (FAC ¶ 12). These programs were packaged and distributed through AJI into U.S. households via Sling, Roku, Apple TV, and Amazon Fire. AJI also enabled targeted dissemination of this content to American users by embedding tracking pixels on its websites that transmitted U.S. viewer data to Facebook, which in turn promoted additional AJMN content to those users (FAC ¶ 13). Separately, AJMN itself made its Arabic-language channels directly accessible to U.S. users through the use of VPNs, allowing American viewers routing traffic through U.S. servers to access AJMN's Arabic broadcasts and archives without restriction—no involvement by AJI was required (FAC ¶ 13). By producing, editing, and distributing programs that platformed Hamas and PIJ operatives and disseminated their propaganda to American audiences, AJI committed actionable conduct under § 2333(a).

Moreover, the FAC expressly defines "al-Jazeera" to include both AJMN and AJI and then uses "al-Jazeera" throughout the complaint to describe the coordinated enterprise's conduct (FAC

Ft. Nt. 1). The suggestion that AJI is absent from the body of the complaint ignores this defined usage. When the FAC details al-Jazeera's employment of Hamas operatives like Abu Omar (FAC ¶¶ 61-66), glorification of October 7 atrocities by its reporters (FAC ¶¶ 144-47), and systematic broadcasting of Hamas leaders' propaganda (FAC ¶¶ 119-26, 137-43), those allegations are directed at "al-Jazeera" as defined to include AJI. Reading the complaint as a whole, as Rule 8 requires, these allegations clearly encompass AJI's role in producing and disseminating terrorist propaganda to U.S. audiences.

Just as financial institutions can be directly liable under the ATA for serving as conduits of terrorist financing, see *In Wultz v. Islamic Republic of Iran,* 864 F. Supp. 2d 24 (DDC 2012) (court emphasized financial services could constitute valuable assistance under the ATA, even if bank acted as a conduit, as long as services facilitated terrorist activities), AJI is directly liable as the conduit through which AJMN's terrorist propaganda was produced and delivered into the United States. Its conduct gave Hamas's terrorism the coercive and intimidating reach Congress intended to capture in 18 U.S.C. § 2333(a). That is why the FAC defines "al-Jazeera" to include both AJI and AJMN, making clear that AJI's U.S.-based role in distributing AJMN's propaganda is part of the same actionable conduct.

### B.  Plaintiffs Plausibly Allege a Violation of § 2339A

Defendants contend that Plaintiffs' § 2339A claim fails because al-Jazeera merely engaged in "news coverage," but that mischaracterizes the FAC. The FAC does not allege passive reporting; it pleads that Defendants knowingly provided material support to Hamas and the PIJ in the form of platforms, personnel, financial compensation, and global distribution of propaganda that amplified and furthered terrorist operations (FAC ¶¶ 61-66, 106-14, 119-26, 137-47, 144-49, 155-58, 264-66).

Defendants' focus on the October 7 airing of Hamas commander Mohammed Deif's message exemplifies their distortion. They claim al-Jazeera simply reported a "newsworthy" announcement. But the FAC pleads that Hamas and al-Jazeera coordinated through a dedicated "al-Jazeera phone" to ensure that Deif's message would be broadcast in real time at the very moment terrorists were massacring civilians (FAC ¶ 113-14). That broadcast was not after-the-fact reporting; it was operational messaging delivered through al-Jazeera's platforms to global and U.S. audiences, exhorting Palestinians to rise up and framing the atrocities as the start of war. The ATA's definition of "international terrorism" encompasses not only physical violence but also conduct intended to intimidate or coerce a civilian population, 18 U.S.C. § 2331(1)(B), and al-Jazeera's amplification of Deif's call served that very purpose. Courts have long recognized that disseminating terrorist propaganda is actionable material support, not protected journalism. See *United States v. Mehanna*, 735 F.3d 32, 45-46 (1st Cir. 2013) (translating and distributing al-Qaeda propaganda can constitute material support).

Defendants' reliance on *Kaplan v. al-Jazeera*, 2011 U.S. Dist. LEXIS 61373 (S.D.N.Y. June 7, 2011), is misplaced. There, the plaintiffs alleged only that al-Jazeera broadcast Hezbollah rocket attacks, with no facts suggesting coordination, intent, or direct collaboration. The court dismissed precisely because there was no allegation that al-Jazeera acted with the purpose of assisting terrorism. By contrast, the FAC here details that AJMN aired Deif's operational statement in coordination with Hamas (FAC ¶¶ 113-14), employed Hamas commander Ismail Abu Omar who both participated in and filmed the massacre at Nir Oz and later posted watermarked incitement that AJMN ratified by continuing to call him its correspondent (FAC ¶¶ 61-66, 106-12), and repeatedly provided Hamas and PIJ leaders such as Haniyeh, Meshaal, Sinwar, and al-Nakhalah with airtime, interviews, and compensation (FAC ¶¶ 119-26, 137-43). al-Jazeera

correspondents including Al-Sharif and Amra glorified and justified the October 7 Terrorist Attacks while publicly presented as al-Jazeera journalists (FAC ¶¶ 144-49), and the network censored Gazans who criticized Hamas while amplifying Hamas's propaganda (FAC ¶¶ 155-58). Equally telling, al-Jazeera consistently downplayed or omitted the plight of Israeli and American hostages, devoting airtime to Hamas's staged "release" ceremonies while avoiding coverage of the hostages' suffering, thereby legitimizing Hamas's narrative and furthering its campaign of coercion (FAC ¶¶ 89-90, 158-59). These are not allegations of neutral coverage; they are allegations of knowing collaboration and material assistance.

Nor do Defendants' First Amendment arguments insulate them. The Supreme Court has held that speech coordinated with an FTO can itself constitute unlawful material support. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 26-27 (2010). The Court emphasized that it is impossible to disentangle support for an FTO's "nonviolent" activities from its violent operations. al-Jazeera's provision of platforms, personnel, and services to Hamas and PIJ leaders falls squarely within § 2339A's prohibition on providing "training," "expert advice or assistance," and "communications equipment." Courts have consistently upheld liability for analogous conduct. See *United States v. El-Mezain*, 664 F.3d 467, 517-18 (5th Cir. 2011) (material support could include non-monetary contributions, such as advocacy or coordination with a terrorist organization*). Defendants' argument that "every news organization" that covered 9/11 would otherwise be liable ignores the fundamental distinction between independent reporting and the conduct pled here: years of coordinated broadcasts of operational messaging, ongoing employment of terrorist operatives, and selective censorship designed to advance Hamas's narrative.

The scienter requirement is also satisfied. Defendants argue the FAC does not allege knowledge or intent, but the FAC pleads that AJMN knowingly employed and compensated

Hamas and PIJ operatives, kept them on the payroll after their affiliations were public, and celebrated their roles (FAC ¶¶ 61-66, 144-49). Hamas itself publicly thanked al-Jazeera for its collaboration after October 7 (FAC ¶ 118). AJMN's chairman personally visited Abu Omar in the hospital after he was injured as a Hamas commander, signaling endorsement and continued affiliation (FAC ¶ 65). These facts plausibly establish knowledge and intent, far beyond the conclusory allegations rejected in *Kaplan*.

Finally, Defendants cannot escape liability by asserting that Abu Omar, al-Sharif, or others acted only on "personal accounts." An employer may be held liable when they ratify or continue to employ individuals if the employer knew or should have known of their misconduct. *Citizens State Bank v Shearson Lehman Bros.*, 874 F Supp 307 (D Kan 1994). The FAC alleges exactly that: AJMN retained Abu Omar as its correspondent after his role as a Hamas commander was public (FAC ¶¶ 61-66), continued to employ al-Sharif and Amra despite their glorification of terrorism (FAC ¶¶ 144-49) and membership in U.S. designated terrorist groups, and systematically relied on such individuals to advance Hamas's messaging. That is ratification, which suffices to establish liability.

Taken as a whole, the FAC pleads that Defendants' conduct was not neutral journalism but the deliberate provision of platforms, personnel, and services to Hamas and the PIJ, knowing that such support would further terrorist violence. Those allegations plausibly state a violation of § 2339A, and Defendants' reliance on *Kaplan* and First Amendment boilerplate is unavailing.

### C.  **Financial Payments**

Defendants next argue that Plaintiffs' allegations concerning financial payments are speculative, conclusory, and made "out of whole cloth." That is incorrect. The FAC pleads specific facts that, taken together, plausibly allege that al-Jazeera compensated Hamas and PIJ leaders for

interviews and paid salaries to Hamas and PIJ operatives whom it employed as correspondents (FAC ¶¶ 5, 14, 58, 103, 119-26, 130-34, 137-43, 264-66, 278).

The FAC identifies Osama Hamdan, a senior Hamas official, who appeared multiple times on al-Jazeera's Washington, D.C.-based program *UpFront*, including in 2017 and 2023, and plausibly alleges that he was compensated for those appearances consistent with al-Jazeera's customary practice of paying interviewees (FAC ¶ 130). Defendants dismiss this allegation as speculative, but courts have long recognized that allegations made "on information and belief" are sufficient at the pleading stage when the necessary information lies within the defendant's control if supported by facts upon which the belief is based. *Kareem v. Haspel*, 986 F.3d 859, 866 (D.C. Cir. 2021). Here, Plaintiffs do more than speculate. They plead that al-Jazeera has a documented practice of paying interviewees, a practice corroborated by outside reporting (FAC ¶ 134). They allege that al-Jazeera repeatedly hosted senior Hamas and PIJ leaders on its flagship programs, including leaders responsible for orchestrating terrorist campaigns against Israel (FAC ¶¶ 119-26, 137-43). They allege that these appearances were not isolated, but part of an ongoing relationship between al-Jazeera and Hamas/PIJ leadership. Taken together, these facts support the inference that al-Jazeera compensated terrorist leaders for providing interviews that advanced Hamas's messaging. That is far more than the "conclusory" allegations Defendants caricature. Moreover, the details of al-Jazeera's payment arrangements, including whether cash was provided, how much was paid, and through what channels, are uniquely within Defendants' control and will be uncovered in discovery. At the pleading stage, Plaintiffs are not required to prove those payments but only to plausibly allege them.

The FAC also pleads that al-Jazeera paid salaries to "journalists" who were, in reality, Hamas or PIJ operatives (FAC ¶¶ 61-66, 103, 144-49). Defendants argue these affiliations were

not revealed until "after" October 7, when the IDF publicized them, but the FAC pleads that al-Jazeera knew or should have known of its employees' affiliations through its own vetting process and through publicly available information (FAC ¶ 103). More importantly, Plaintiffs allege that even after those affiliations were publicly documented, al-Jazeera continued to employ these individuals, promoted them as correspondents, and celebrated them as part of its news operation (FAC ¶¶ 61-66, 144-49). That is not mere negligence. An employer is liable when it ratifies or retains employees if the employer knew or should have known of misconduct. *Citizens State Bank v Shearson Lehman Bros.*, 874 F Supp 307 (D Kan 1994). The continued employment of known Hamas and PIJ operatives, coupled with their glorification of terrorism on air and online, plausibly alleges scienter and intentional support.

Defendants' suggestion that scienter cannot be pled because al-Jazeera did not "know" payments would be used in preparation for the October 7 Terrorist Attacks misstates the law. The ATA requires proximate causation, not clairvoyance. Payments to Hamas and PIJ leaders and operatives in the years and months leading to October 7 foreseeably facilitated those groups' terrorist infrastructure and propaganda campaigns. Courts have found similar conduct actionable. In *El-Mezain*, at 517-18 (5th Cir. 2011), fundraising and media activity that provided resources to Hamas sufficed for material support. Likewise, here, al-Jazeera's payments to Hamas and PIJ leaders and operatives provided resources, legitimacy, and platforms that strengthened Hamas's ability to carry out its campaign of violence, including October 7.

Defendants' final argument that Plaintiffs fail to plead that these payments were made with intent to further terrorism ignores that intent may be inferred from circumstantial facts. *Halberstam v. Welch*, 705 F.2d 472, 486 (D.C. Cir. 1983). The FAC pleads that al-Jazeera systematically built relationships with Hamas and PIJ leaders, paid them for interviews that legitimized their cause,

and employed operatives who themselves participated in or glorified terrorist attacks (FAC ¶¶ 61-66, 119-26, 137-43, 144-49). These allegations support a plausible inference that Defendants intended their payments and salaries to promote and facilitate Hamas's and PIJ's campaign of violence.

Taken as a whole, the FAC pleads that al-Jazeera's financial transactions were not incidental or speculative, but part of a consistent pattern of providing material support to terrorist organizations in the form of money, services, and legitimacy. Further discovery into al-Jazeera's internal records, accounting, and contracts will illuminate the scope of these payments. For now, Plaintiffs have more than plausibly alleged their existence and purpose, which is all Rule 8 requires.

### D.    Training

Defendants dismiss as "far-fetched" Plaintiffs' allegations that AJMN correspondents simultaneously served as Hamas operatives and provided training in weapons and drones. But the FAC pleads detailed factual allegations establishing that al-Jazeera knowingly employed individuals who were not merely sympathetic to Hamas and the PIJ but directly involved in their military training operations. Following the October 7 Terrorist Attacks, Israel publicly identified AJMN correspondent Ismail Abu Omar as a Hamas operative who served as a "training company commander" in the East Khan Younis Battalion (FAC ¶ 63). That identification was not speculative; it was based on battlefield intelligence corroborating Abu Omar's dual role as both journalist and Hamas commander. Similarly, the IDF identified another al-Jazeera journalist, Shabat, as a sniper in the Beit Hanoun Battalion who had "posed" as an al-Jazeera correspondent, and in October 2024 uncovered internal Hamas documents proving that Shabat participated in Hamas military training in 2019 (FAC ¶ 92). The FAC also alleges that AJMN correspondent

Hisham Zaqout publicly posted a photograph of himself in an IDF uniform holding an illegally obtained weapon during a training activity in Gaza, while already employed as a correspondent for al-Jazeera (FAC ¶ 99).

Defendants argue Plaintiffs fail to allege that this training was done "in [the] capacity" of AJMN employment, but that is a red herring. Section 2339A liability does not turn on whether an employee committed the act "on the clock," but whether Defendants knowingly provided material support through the resources, salaries, and legitimacy of their enterprise. By employing known Hamas and PIJ operatives who doubled as trainers in weapons and drones, al-Jazeera provided those individuals with cover, compensation, and global legitimacy, which in turn advanced their ability to strengthen Hamas's military apparatus. The FAC plausibly alleges that al-Jazeera retained these individuals despite public evidence of their terror affiliations, which constitutes ratification and knowing material support (FAC ¶¶ 61-66, 92, 99). An employer can be held liable when it ratifies or continues to employ an individual after notice of misconduct. *Citizens*, 874 F Supp 307.

Nor are these allegations "conclusory." They rest on concrete identifications by Israeli authorities, corroborated by documentary evidence and the employees' own admissions (FAC ¶¶ 63, 92, 99). At the pleading stage, that more than suffices to establish plausibility. And as with financial transactions, the precise scope of Abu Omar's, Shabat's, and Zaqout's activities, including whether they used their journalistic credentials or AJMN resources to facilitate training, is peculiarly within Defendants' possession and will be revealed through discovery. Plaintiffs need not prove those details at Rule 12(b)(6); they need only allege facts that make their claim plausible, which they have done. See *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Taken together, the allegations show that al-Jazeera knowingly employed and compensated individuals who were active Hamas and PIJ operatives. That employment provided material support in the form of salaries, cover, and legitimacy, which foreseeably advanced Hamas's and the PIJ's terrorist capacity. These allegations plausibly state a claim under § 2339A, and Defendants' attempt to dismiss them as "far-fetched" ignores both the factual record and the governing pleading standard.

### E.    Plaintiffs Plausibly Allege a Violation of § 2339B

Defendants argue that Plaintiffs' § 2339B claim merely rehashes the § 2339A theories and collapses under First Amendment protections. That characterization fails. Section 2339B imposes liability where a defendant knowingly provides "material support or resources" to a designated foreign terrorist organization. 18 U.S.C. § 2339B(a)(1). Unlike § 2339A, scienter is satisfied by knowledge that the recipient is an FTO, not intent to further a specific attack. *Holder*, 561 U.S. at 16-18. The FAC pleads not isolated reporting, but a decades-long pattern of coordinated services, payments, platforms, personnel, and resources knowingly furnished to Hamas, the PIJ, and their predecessors, the Muslim Brotherhood (FAC ¶¶ 10-14, 58-66, 89-99, 113-28, 130-34, 137-49, 151-59, 160-66, 274-80).

For years, governments across the Middle East have recognized al-Jazeera as a terrorist mouthpiece. In 2008, Israel imposed sanctions on al-Jazeera for incitement, declaring it "part of Hamas." Egypt banned it in 2013 for supporting the Muslim Brotherhood. In 2017, Saudi Arabia, the UAE, Bahrain, and Egypt demanded Qatar shut down al-Jazeera, accusing it of supporting terrorism. Israel and Jordan joined the boycott (FAC ¶ 160). In May 2024, Israel's cabinet unanimously voted to close al-Jazeera as a Hamas "mouthpiece," and in June 2024, a Tel Aviv court renewed the ban, finding it was perceived by Hamas "as its propaganda and intelligence arm"

(FAC ¶ 164). Qatar's former Prime Minister privately admitted to Muammar Gaddafi that AJMN is controlled by the Muslim Brotherhood, Hamas's predecessor (FAC ¶ 161). The Muslim Brotherhood itself was materially supported by al-Jazeera, which provided hotel suites in Qatar to its exiled leaders in 2013 (FAC ¶ 162). Even in the United States, senior officials have raised similar concerns. On April 8, 2024, Representative James Comer, Chairman of the House Committee on Oversight and Accountability, sent a letter to then-Attorney General Merrick Garland urging enforcement action against al-Jazeera under the Foreign Agents Registration Act ("FARA"), citing evidence that the network has been "increasingly…linked to Hamas-backed attacks" (FAC ¶ 105). These international and domestic determinations together corroborate that al-Jazeera's relationship with terrorist groups is not incidental journalism but sustained, knowing collaboration and material support.

Defendants' reliance on *Newman v. AP*, 758 F. Supp. 3d 1357 (S.D.N.Y. 2024), only underscores the distinction. *Newman* dismissed claims where a news agency unknowingly purchased photographs from freelancers with alleged Hamas ties, finding no allegations of coordination with Hamas. Here, the FAC alleges direct coordination with Hamas's and the PIJ's leadership, a dedicated "al-Jazeera Phone" for confidential contact, timed dissemination of Mohammed Deif's operational announcement during the October 7 invasion, exclusive Hamas/PIJ-supplied footage, repeated on-air platforms for Hamas and PIJ leaders, and Hamas's own public thanks for al-Jazeera's collaboration (FAC ¶¶ 113-14, 119-27, 133, 137-43, 151-59). These are not isolated events but part of a decades-long pattern: al-Jazeera has conducted interviews with virtually every major Hamas and PIJ leader, from Haniyeh, Meshaal, al-Nakhalah, and Sinwar, to commanders in Hamas tunnels and PIJ bases, access that by its nature required coordination with and approval from the terrorist groups themselves (FAC ¶¶ 119-27, 130-34). Al-

Jazeera has repeatedly glorified fallen Hamas and PIJ fighters as "martyrs" (FAC ¶¶ 137-41), selectively censored Gazans who criticized Hamas (FAC ¶¶ 155-57), and aired propaganda spectacles of hostage parades and staged releases (FAC ¶¶ 89-90, 159). This sustained pattern has been recognized worldwide: Israel, Egypt, Saudi Arabia, the UAE, and others have banned or restricted al-Jazeera for incitement and material support to terrorism, with Israeli courts as recently as 2024 describing the network as Hamas's "propaganda and intelligence arm," and U.S. officials raising similar concerns (FAC ¶¶ 105, 160-64). That is exactly the sort of "service" and "expert assistance" coordinated with an FTO that the Supreme Court in *Holder* held could be proscribed.

Nor does *Keren Kayemeth LeIsrael-Jewish Nat'l Fund v. Education for a Just Peace in the Middle East*, 66 F.4th 1007 (D.C. Cir. 2023), help Defendants. There, the complaint alleged only indirect "webs of connections" between a U.S. NGO and an alleged Hamas front. Plaintiffs here plead specific, repeated conduct directly to and with Hamas and the PIJ: employment of operatives later publicly identified as Hamas commanders (FAC ¶¶ 61-66, 92, 99, 144, 146); on-air promotion of Hamas narratives through exclusive footage and programming (FAC ¶¶ 116-18, 137-43, 158-59); selective censorship of Gazans criticizing Hamas (FAC ¶¶ 155-57); and even orchestrated propaganda spectacles for hostage releases (FAC ¶¶ 89-90, 159). That conduct is far from "guilt by association"; it is active provision of services, personnel, and equipment to designated FTOs.

Defendants also misstate § 2339B(h). Plaintiffs allege not "independent advocacy," but knowing provision of individuals to work under Hamas's control (FAC ¶¶ 61-66, 92, 99, 144, 146). By employing Abu Omar, identified as a Hamas training commander, and Al-Sharif, identified as a Hamas rocket squad leader, and giving them salaries, credentials, and broadcast legitimacy, Defendants knowingly provided "personnel" within the statute. The same applies to Shabat, identified as a Hamas sniper who posed as a correspondent (FAC ¶ 92). When a media

organization knowingly retains employees serving under the command of a terrorist organization, it is not engaging in protected independent activity; it is providing that organization with personnel and cover.

The FAC goes further, alleging that, in October 2024, the IDF uncovered internal Hamas documents "unequivocally" proving that six AJMN journalists, including al-Sharif, Salameh, Shabat, al-Sarraj, Abu Omar, and Arrouqi, were active operatives of Hamas or the PIJ (FAC ¶ 96). These documents contained personnel spreadsheets, training records, and salary documents identifying al-Jazeera correspondents as commanders, snipers, propaganda-unit, and training leaders in Hamas and PIJ battalions. Despite this revelation, AJMN rejected the evidence and continued to employ them. This is not accidental overlap; it is a documented pattern of embedding al-Jazeera employees within terrorist ranks.

Nor is this phenomenon confined to October 2023. Plaintiffs allege a long history of Hamas operatives occupying senior al-Jazeera positions (FAC ¶¶ 97-98). Wadah Khanfar, al-Jazeera's Director General from 2006 to 2011, was described by Palestinian media as "one of the senior political leaders of Hamas," heading Hamas's political bureau in Africa (FAC ¶ 97). Samer Allawi, al-Jazeera's bureau chief in Afghanistan, admitted to serving as a Hamas operative for over a decade and offered to leverage his role at al-Jazeera to further Hamas's operations (FAC ¶ 98). And AJMN correspondent Hisham Zaqout publicly posted a photograph of himself armed and in uniform during a Hamas training activity while already on al-Jazeera's payroll, yet AJMN still employed him (FAC ¶ 99).

These facts, taken together, show that Plaintiffs are not speculating that a few freelancers may have had Hamas sympathies. They allege a systemic practice of employing and retaining operatives known to be part of Hamas and the PIJ's command structure, thereby supplying those

terrorist groups with personnel, resources, salaries, credentials, and cover. That conduct falls squarely within § 2339B(h)'s prohibition and cannot be dismissed as "independent advocacy."

Finally, Defendants' invocation of First Amendment protections ignores the clear line drawn in *Holder*: independent reporting and commentary are protected, but services coordinated with an FTO are not. 561 U.S. at 26-27, 36. Plaintiffs do not allege liability based on editorial opinions alone. They allege a structured, years-long alliance between al-Jazeera and Hamas that included shared communications, coordinated broadcasts, employment of operatives, dissemination of operational messages, censorship of dissent, and financial payments (FAC ¶¶ 10-14, 58-66, 89-99, 113-27, 130-34, 137-49, 151-59, 160-66, 274-80). That is material support to Hamas, not "independent advocacy."

At the pleading stage, Plaintiffs are not required to prove the inner workings of al-Jazeera's payroll or its precise editorial agreements with Hamas. Those details lie uniquely within Defendants' control and will be revealed through discovery. What matters under Rule 8 is that the FAC sets out a plausible, detailed, historically corroborated pattern of al-Jazeera's knowing provision of material support to Hamas and the PIJ. That is more than sufficient to sustain Plaintiffs' § 2339B claim.

Defendants' reliance on *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 927-28 (1982), is misplaced. Plaintiffs do not assert a freestanding tort of "incitement," nor do they seek to impose liability under the "imminent lawless action" standard. The FAC uses "incitement" descriptively to capture a decades-long pattern of coordinated propaganda, glorification of terrorists, and legitimization of violence that evidences material support—a pattern so well recognized that multiple governments have banned al-Jazeera for "incitement" and collaboration with terrorist groups. Plaintiffs use the term not in the narrow First Amendment sense of speech urging imminent

lawless action, but in the counterterrorism sense of coordinated messaging and legitimization that materially advances the objectives of designated terrorist organizations. The FAC alleges, for example, that AJMN journalist Hossam Shabat, a known Hamas sniper, used his AJMN profile to call for global attacks on Israeli embassies, including in Washington, D.C., catalyzing a "Global Call to Action" campaign (FAC ¶ 15). On October 7, AJMN correspondent Ismail Abu Omar provided real-time Telegram updates, watermarked footage of murdered Israelis, and celebratory incitement, demonstrating foreknowledge of the invasion and direct coordination with Hamas (FAC ¶ 112). That same morning, AJMN broadcast Hamas commander Mohammed Deif's operational announcement launching "Operation Al-Aqsa Flood" at the precise moment of the attacks, amplifying and legitimizing his call for all Palestinians to rise up (FAC ¶ 114). In the months that followed, AJMN aired a documentary minimizing Hamas atrocities (FAC ¶ 116) and disseminated a fabricated video alleging mass rapes by the IDF at Shifa Hospital, which it later retracted only after the false claims had already spread globally (FAC ¶ 117). Beyond these examples, al-Jazeera has long facilitated incitement by repeatedly offering its platforms to Hamas and PIJ leaders to promote their agendas, recruit members, and glorify violence (FAC ¶¶ 119-26, 136-59), and by directly advancing their objectives through compensation, employment, and provision of cover for operatives (FAC ¶ 307).

This is not independent advocacy but the coordinated provision of services, platforms, and personnel to Hamas and the PIJ. As the Supreme Court confirmed in *Holder*, 561 U.S. at 23-27, 36, such coordinated services and personnel provided to designated FTOs are not protected speech. The FAC's references to "incitement," therefore, reinforce, rather than undermine, Plaintiffs' statutory claims under 18 U.S.C. §§ 2339A and 2339B.

F.  **The Amended Complaint Alleges that Defendants Engaged in Activities
that Satisfy § 2331(1)(B)'s "Appear to be Intended" Requirement**

Defendants' argument that the Amended Complaint fails to satisfy § 2331(1)(B)'s "appear
to be intended" requirement rests on an inapposite line of cases involving banks and neutral
commercial transactions. In *Owens v. BNP Paribas, S.A.*, 235 F. Supp. 3d 85, 90 (D.D.C. 2017),
aff'd, 897 F.3d 266 (D.C. Cir. 2018), the court held that ordinary banking services did not, by
themselves, "appear intended" to intimidate or coerce. Likewise, in *Linde v. Arab Bank, PLC*, 882
F.3d 314, 326 (2d Cir. 2018), the Second Circuit cautioned that the provision of material support
to an FTO, without more, does not invariably equate to an act of international terrorism. And in
*Kemper v. Deutsche Bank AG*, 911 F.3d 383, 390 (7th Cir. 2018), the court found that the bank's
interactions with Iranian entities, viewed objectively, appeared motivated by economics rather than
a desire to coerce civilians or influence governments.

Al-Jazeera's conduct cannot be analogized to these cases. Defendants are not banks
performing fungible transactions. They are media organizations that, for decades, have aligned
themselves with terrorists. The FAC alleges that al-Jazeera embedded with Hamas and PIJ
operatives on October 7, hired known Hamas and PIJ militants as "journalists," and amplified
Hamas's calls for global mobilization. Unlike the passive economic conduct in *Kemper* or the
neutral facilitation of banking services in *Owens*, al-Jazeera's deliberate choices in staffing,
coverage, and amplification "appear intended" to further Hamas's and the PIJ's objective of
intimidating civilian populations and coercing governments.

Courts have recognized that the "appear to be intended" prong must be applied with
attention to the nature of the defendant's conduct. See *Halberstam v. Welch*, 705 F.2d 472 (D.C.
Cir. 1983) (setting the framework adopted by JASTA). In *Atchley v. AstraZeneca UK Ltd.*, 22
F.4th 204, 218-19 (D.C. Cir. 2022), vacated and remanded in light of *Twitter, Inc. v. Taamneh*,

598 U.S. 471 (2023), the D.C. Circuit explained that commercial support knowingly funneled to a terrorist-controlled entity can satisfy § 2331(1)(B)'s requirement that international terrorism "appear to be intended" to intimidate civilians or influence government policy. In *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 44 (E.D.N.Y. 2019), the court recognized that providing services or platforms that facilitate terrorist propaganda and recruitment can qualify as acts of international terrorism because such conduct is designed to intimidate and coerce beyond the battlefield.

These authorities underscore that the "appear intended" inquiry is not limited to direct acts of physical violence. Where the defendant's conduct is alleged to have amplified or sustained the coercive impact of terrorism, the statutory requirement is satisfied. That is precisely the case here. Defendants' suggestion that their conduct amounts to "simply covering events unfolding in Israel and Gaza" mischaracterizes the allegations. This was not neutral news coverage. The FAC details how al-Jazeera adopted Hamas's framing of the October 7 massacre as legitimate "resistance" and provided a platform to Hamas and PIJ leaders precisely to maximize the coercive effect of the attacks. By definition, the propaganda that legitimizes terrorism and mobilizes global support for it "appears intended" to intimidate civilians and influence governments. To hold otherwise would exempt the very machinery of terrorist propaganda from ATA liability, contrary to the statute's text and purpose.

## G. **The Amended Complaint Plausibly Alleges Proximate Causation**

Defendants' proximate-cause argument collapses once the nature of their conduct is understood. The cases they invoke—*Owens*, *Ofisi*, *Rothstein*, and *Keren Kayemeth Leisrael-JNF*—all involved fungible banking services or attenuated economic transactions where plaintiffs could not plausibly connect dollars in and dollars out to the specific terrorist act that injured them. Those courts dismissed because the complaints failed to allege that the funds processed were

actually used to carry out the relevant attacks. *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 276 (D.C. Cir. 2018); *Ofisi v. BNP Paribas, S.A.*, 77 F.4th 858, 679 (D.C. Cir. 2023); *Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013).

*Rothstein* was decided before Congress enacted JASTA which expressly broadened ATA liability by codifying secondary liability for those who "aid and abet, by knowingly providing substantial assistance" to a designated FTO and directed courts to apply the common-law framework of *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). See 18 U.S.C. § 2333(d)(2). As the D.C. Circuit explained in *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 218-19 (D.C. Cir. 2022), Rothstein's narrow conception of proximate cause has been superseded by statute. What matters under JASTA is whether the defendant's conduct substantially contributed to sustaining the FTO's campaign of violence and whether the plaintiffs' injuries were a foreseeable result.

Al-Jazeera's conduct is categorically different from the banking cases. This is not a case where dollars were shuffled between intermediaries. Defendants themselves broadcast Hamas's and the PIJ's propaganda, provided platforms for their leaders, and employed operatives who doubled as combatants. The FAC alleges that al-Jazeera did not merely "cover" October 7 but participated in Hamas's strategy by amplifying the attacks in real time, giving them coercive effect, and sustaining Hamas's campaign afterward. Courts in this Circuit have held that proximate causation exists where a defendant's conduct is an integral part of the mechanism that gives terrorism its power to intimidate. In *Atchley*, 22 F.4th at 218-19, the D.C. Circuit sustained claims against companies accused of funneling value to Hezbollah's networks, reasoning that it was enough that the support "substantially contributed to sustaining [the FTO's] campaign of violence" and that the injuries were a foreseeable result. And in *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 860 (2d Cir. 2021), the Second Circuit confirmed that support directed to an FTO's

operational apparatus can constitute a "substantial factor" even if not tied dollar-for-dollar to the specific bomb that killed plaintiffs.

Defendants' reliance on cases involving neutral reporting (*Kaplan* and *Newman*) is misplaced for the same reason. Those cases dismissed claims against media outlets for lack of allegations that terrorists used news reports to physically target their attacks. Here, the allegations are different: Plaintiffs plead that al-Jazeera knowingly embedded with Hamas and PIJ fighters on October 7, employed Hamas and PIJ operatives as "journalists," and disseminated Hamas's calls for global mobilization. Those actions were not neutral reporting but active participation in the machinery of intimidation and coercion that defines terrorism under § 2331(1). To an objective observer, these acts were not "just journalism," but conduct that substantially furthered Hamas's and the PIJ's ability to terrorize civilians and pressure governments.

Nor does the multi-year planning of the October 7 Terrorist Attacks break the causal chain. That planning made Hamas dependent on sympathetic media infrastructure to project and legitimize its violence. Plaintiffs allege that al-Jazeera provided exactly that infrastructure, ensuring the attacks were amplified as terrorism rather than perceived as isolated acts of violence. Proximate cause in this context does not demand that al-Jazeera loaded the weapons or breached the fence; it requires only that Defendants' conduct was a substantial factor in the sequence of events and that Plaintiffs' injuries were a foreseeable result. That standard is met not only for Plaintiffs injured on October 7, but also for those injured in Hamas's continuing campaign of rocket fire, hostage-taking, terrorist attacks, and global intimidation that followed. Al-Jazeera's post-attack propaganda and mobilizations substantially furthered that ongoing terrorism, making Plaintiffs' injuries a foreseeable and natural consequence of Defendants' conduct.

Finally, Defendants' invocation of Plaintiffs' separate suit against Iran is a red herring. The fact that Iran provided massive financial support to Hamas does not immunize al-Jazeera from liability. Courts have repeatedly recognized that multiple actors can concurrently and proximately cause the same terrorist attack. *Atchley*, 22 F.4th at 219; *Kaplan*, 999 F.3d at 860. That Iran fueled Hamas's capacity does not erase the role of Defendants' propaganda machine in ensuring Hamas's atrocities achieved their intended effect of intimidation and coercion. Indeed, the existence of multiple suits underscores the very way Hamas operates through a web of financial, political, and propaganda arms, each indispensable to the enterprise of terrorism. Proximate cause does not require Plaintiffs to pick one strand of that web to the exclusion of others; it recognizes that each strand substantially contributed to the campaign of terror that injured them.

In short, proximate cause is plausibly pled. Plaintiffs' injuries were not only a foreseeable result of Defendants' decades-long alignment with Hamas and the PIJ, but the very purpose of Defendants' conduct.

## II.    The Secondary Liability Claims Are Plausibly Alleged

### A.    The Section 2333(d) Aiding and Abetting Standard: *Halberstam* and *Twitter*

Defendants invoke *Twitter v. Taamneh* to suggest that secondary liability under § 2333(d) requires allegations of a direct, culpable nexus to a particular attack. That argument ignores both the breadth of JASTA's adoption of *Halberstam* and the distinct posture of this case. Unlike *Twitter*, which had never been sanctioned and never historically aligned itself with terrorist operatives, al-Jazeera has repeatedly been banned by governments for incitement and has a long record of employing and coordinating with Hamas and PIJ operatives (FAC ¶¶97-99, 160-66). Plaintiffs do not allege mere failure to remove content, as in *Twitter*. They allege that al-Jazeera

consciously and culpably participated in Hamas's propaganda enterprise. Among many other allegations, al-Jazeera maintained an "al-Jazeera Phone" for confidential coordination with Hamas, granted exclusive airtime to Mohammed Deif at the very moment of the October 7 Terrorist Attacks, and broadcast Hamas-produced propaganda to global and U.S. audiences (FAC ¶¶ 113-114, 158-159). This is active alignment with a designated FTO, not passive hosting, and it falls squarely within the scope of aiding-and-abetting liability that JASTA and *Halberstam* envisioned. Indeed, as the D.C. Circuit emphasized in *Atchley*, 22 F.4th at 221, aiding-and-abetting liability reaches those who provide the system of support that sustains terrorist violence. Plaintiffs' allegations place al-Jazeera squarely in that category.

## B. **The FAC Plausibly Alleges General Awareness**

Defendants' contention that there is no plausible pleading of general awareness collapses under the allegations plainly contained in the FAC that al-Jazeera knowingly employed individuals who were publicly identified as Hamas or PIJ operatives and who openly proclaimed allegiance to those groups. The complaint describes in detail how Ismail Abu Omar, identified as a Hamas commander, filmed himself invading Kibbutz Nir Oz on October 7 and remained on al-Jazeera's payroll even after being publicly exposed (FAC ¶¶ 61-66, 106-11). It describes how Muhammad Washah, while employed as a correspondent, repeatedly met with PIJ and Hamas operatives, entered their tunnels and rocket sites, and by 2022 had risen to a Hamas commander in its anti-tank and air units (FAC ¶¶ 67-72). It further details how Hamza al-Dahdouh and Mustafa Thuria were killed while operating drones against the IDF and identified as commanders in Hamas and the PIJ (FAC ¶¶ 73-75). It alleges that Ismail al-Ghoul was hired as a correspondent in November 2023 despite his open support for Hamas, was later arrested as a member of Hamas's Nukhba unit, and was defended by AJMN even after his assassination (FAC ¶¶ 76-83). It alleges that Tamer

Almisshal produced Hamas propaganda, celebrated the October 7 attacks, orchestrated hostage parades, and coordinated events with Hamas commanders (FAC ¶¶ 84-90). It alleges that Hossam Shabat, presented as a journalist, was identified as a Hamas sniper and later used his social media platform to incite a global campaign to besiege Israeli embassies (FAC ¶¶ 91-95).

The FAC also underscores Defendants' awareness through their use of Hamas's own branding. al-Jazeera repeatedly broadcast videos at the very outset of its programming featuring the official "Al-Aqsa Flood" logo, Hamas's chosen name for the October 7 terrorist operation (FAC ¶ 143). By emblazoning Hamas's insignia on its programming, al-Jazeera not only signaled its knowledge of Hamas's orchestration of the attacks but also deliberately tied its reporting to Hamas's propaganda narrative. This cannot be dismissed as routine coverage; it is knowing adoption of a terrorist organization's operational branding. Nor was this a neutral editorial choice. al-Jazeera did not frame its programming with Israeli national symbols or other impartial identifiers. Instead, it chose Hamas's own logo, underscoring that its programming aligned with Hamas's narrative rather than reporting events from a balanced or detached perspective. Together with its journalists' decision to watermark atrocity videos with their own names (FAC ¶¶ 106-11), and Defendants' choice to continue employing and promoting those individuals even after their conduct was public, this demonstrates conscious participation in Hamas's campaign and further confirms Defendants' general awareness that their actions were furthering terrorist acts.

This is exactly the kind of general awareness that the D.C. Circuit has held sufficient under the ATA. In *Kaplan v. Lebanese Canadian Bank*, 999 F.3d at 860, the court explained that aiding-and-abetting liability attaches under the ATA when a defendant is generally aware of its role in an overall illegal activity from which an act of international terrorism was a foreseeable risk. That standard does not require intent to support the precise act of terrorism that caused the injury, only

awareness of participating in the broader illegal activity. The FAC's allegations here squarely meet that test.

These allegations extend beyond recent revelations. Washah's activities date back to 2015, while Wadah Khanfar, AJMN's Director General until 2011, was publicly described as a Hamas political leader, and Samer Allawi admitted working as a Hamas operative from 1993 to 2004 (FAC ¶¶ 97-99). The FAC also alleges that AJMN's pre-employment vetting process should have made these affiliations unmistakable, confirming that Defendants knew or should have known they were employing and compensating Hamas and PIJ operatives (FAC ¶ 103). Far from the situations in *Ofisi* and *LeIsrael*, where affiliations were revealed only after the fact, here Defendants' awareness is supported by decades of conduct, internal processes, and their continued defense of operatives even after exposure (FAC ¶¶ 103-04, 152-53).

## C.  The FAC Plausibly Alleges Defendants Knowingly Provided Substantial Assistance

The FAC also satisfies the knowing and substantial assistance requirements. Unlike banks that provide incidental services or platforms like *Twitter* that provide neutral tools, al-Jazeera's assistance was deliberate, targeted, and operational. The FAC alleges that AJMN granted Hamas exclusive airtime via the "al-Jazeera Phone" during the October 7 attacks, broadcasting Mohammed Deif's call to escalate violence in real time (FAC ¶¶ 113-14). It alleges that AJMN reporters embedded with Hamas and PIJ forces, watermarked their own footage of atrocities, and glorified the massacres as they unfolded (FAC ¶¶ 106-11, 144-47). It alleges that AJMN repeatedly aired Hamas-produced videos, often before official sources, thereby lending them legitimacy and ensuring their global spread (FAC ¶ 151). It further alleges that al-Jazeera branded its broadcasts with Hamas's own "Al-Aqsa Flood" logo (FAC ¶ 143), rather than using neutral or Israeli symbols.

By choosing Hamas's operational insignia to frame its programming, al-Jazeera consciously aligned itself with Hamas's narrative and amplified the group's message as its own, underscoring that its role was not journalistic neutrality but active participation in Hamas's propaganda campaign. It alleges that AJMN produced denialist programming and fabricated atrocity stories about Israel, such as the false rape video designed to inflame, and it continued to promote Hamas's narrative long after October 7 (FAC ¶¶ 116-17). It alleges that AJMN orchestrated hostage parades that portrayed Hamas as victorious, coordinated directly with Hamas commanders, and gave exclusive platforms to senior Hamas and PIJ leaders (FAC ¶¶ 89-90, 158-59).

These allegations show that al-Jazeera's conduct was both knowing and substantial. Hamas's campaign of terrorism has always been dependent on propaganda and incitement, and al-Jazeera provided precisely that infrastructure. The *Halberstam* factors reinforce this conclusion. The nature of the acts assisted was a terrorist campaign, heavily dependent on media projection. The assistance was repeated, important, and extended over decades, not incidental or trivial. The defendants' operatives were present at the scenes of massacres and celebrated them as they occurred. The relationship between al-Jazeera and Hamas and the PIJ was not arms-length but intimate, acknowledged by Hamas leaders themselves who praised the network as their "best pulpit" (FAC ¶ 152). The state of mind is shown by reporters' and anchors' own words glorifying the attacks, displaying graphic images accompanied by celebratory language, praising martyrs, and censoring dissent (FAC ¶¶ 144-47, 155-57). And the duration of this assistance spans decades, from Khanfar and Allawi to present-day operatives, reinforced by repeated bans of al-Jazeera for incitement (FAC ¶¶ 97-99, 160-66). The totality of these allegations easily surpasses the threshold of "significant and culpable" participation in another's wrongdoing.

**D. The FAC Plausibly Alleges Defendants Conspired with Hamas and the PIJ**

Defendants finally argue that Plaintiffs fail to allege conspiracy because al-Jazeera's goals were merely to "report on the news" and thus unrelated to Hamas's aims. The FAC alleges otherwise. It describes a coordinated relationship in which al-Jazeera served as an active partner in Hamas's campaign of terrorism. Among other allegations, the network maintained an "al-Jazeera Phone" for confidential communication with Hamas and broadcast Mohammed Deif's announcement of Operation Al-Aqsa Flood at the very moment Hamas's invasion began (FAC ¶¶ 113-14). It staged propaganda events such as hostage parades in coordination with Hamas commanders (FAC ¶¶ 89-90), and branded its programming with Hamas's own "Al-Aqsa Flood" logo (FAC ¶ 143), rather than neutral or Israeli symbols. These are overt acts reflecting agreement, not journalistic detachment.

The FAC further details how Hamas and PIJ leaders explicitly thanked al-Jazeera for its collaboration, calling it their "best pulpit" and praising its staff as "resistance fighters" (FAC ¶¶ 118, 152). Internal IDF-seized documents revealed spreadsheets and records tying multiple AJMN "journalists" directly to Hamas and PIJ military units (FAC ¶ 96), confirming that al-Jazeera's employment practices were part of a structured relationship rather than incidental overlap. The network simultaneously censored interviews that criticized Hamas (FAC ¶¶ 155-57), glorified Hamas and PIJ operatives as martyrs (FAC ¶ 142), and repeatedly disseminated Hamas-produced videos before official sources (FAC ¶ 151), ensuring that propaganda was legitimized and spread worldwide.

These allegations are fundamentally different from the situations in *Bernhardt* and *Ofisi*. In those cases, the courts found that defendants' economic motives (evading sanctions or banking profits) were "wholly unrelated" to al-Qaeda's or Hamas's aims of terrorist violence. Here, by

contrast, al-Jazeera's alignment with Hamas and the PIJ was neither incidental nor peripheral. From Wadah Khanfar, AJMN's Director General from 2006-2011, publicly described as a Hamas political leader, to Samer Allawi, its Afghanistan bureau chief who admitted working as a Hamas operative from 1993 to 2004 (FAC ¶¶ 97-98), to correspondents like Hisham Zaqout and Anas al-Sharif, who openly glorified Hamas operatives as martyrs while operating within Hamas tunnels (FAC ¶¶ 96, 146-47), the FAC shows decades of deliberate entwinement. Far from pursuing unrelated objectives, al-Jazeera repeatedly placed itself in service of Hamas's propaganda and incitement strategy, reinforcing the group's terror campaign across generations.

Historical bans of al-Jazeera by governments for incitement to violence (FAC ¶¶ 160-66), further corroborate that this relationship was long-recognized as a threat. Those sanctions and prohibitions arose precisely because al-Jazeera's work was understood as advancing Hamas's and the PIJ's goals, not simply reporting on them.

Taken together, these allegations show a years-long conspiracy in which al-Jazeera and Hamas and the PIJ shared common objectives: to glorify violence, to intimidate civilian populations, and to influence governments through terror. By consciously aligning its programming with Hamas/PIJ's narrative, coordinating real-time communications, employing operatives as "journalists," staging propaganda events, and receiving Hamas's public praise, al-Jazeera acted as a co-conspirator in furtherance of this terrorist enterprise. And crucially, these coordinated acts foreseeably caused harm to both the October 7 Plaintiffs, by normalizing and amplifying Hamas's and the PIJ's terrorist infrastructure over decades, and the post-October 7 Plaintiffs, by directly fueling the intimidation, hostage-taking, and ongoing campaign of violence that injured them. As the D.C. Circuit explained in *Halberstam*, conspiracy liability attaches where acts by co-conspirators are reasonably foreseeable and further the conspiracy's objectives; liability

does not require foreknowledge of the precise overt act that caused injury. Congress codified this principle in JASTA, expressly adopting *Halberstam* as the governing framework for secondary liability in terrorism cases. Under this settled framework, the FAC's allegations detailing al-Jazeera's long-running alignment with Hamas and the PIJ and its conscious participation easily state a conspiracy claim.

### III.    Plaintiffs Shnaider and Newman-Kelmanson Have Stated Valid ATA Claims for Their Own Emotional and Psychological Injuries

Defendants' attempt to dismiss the claims of Plaintiffs Shnaider and Newman-Kelmanson rests on an unduly narrow reading of the ATA. Section 2333(a) provides a cause of action for "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism." 18 U.S.C. § 2333(a). The statute does not contain any "immediate family" limitation for emotional injury claims. To the contrary, it creates a broad remedy for "any" U.S. national whose "person" is injured, and emotional and psychological trauma is an injury to one's person. The restrictive reading urged by Defendants conflicts with the statute's plain language and remedial purpose.

Courts have applied flexible standards when assessing claims for emotional distress. In *Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003), the court allowed recovery for intentional infliction of emotional distress to a woman who was not legally married but had lived with the victim for over twenty years, recognizing the "functional equivalent of marriage." That approach underscores that recovery turns on the reality of emotional bonds and the severity of the resulting harm, not rigid categories.

The FAC pleads exactly such close and devastating injuries. Plaintiff Maurice Shnaider, a U.S. citizen, is one of the only surviving close relatives of his murdered sister and brother-in-law

and of his nephew-in-law who was taken hostage and months later released, and of his niece and great-nephews who were taken hostage and brutally killed. This was not a case of a single relative lost in isolation. It was an entire branch of his family, multiple loved ones, including infants, wiped out in an act of terrorism deliberately designed to maximize public horror and family anguish. The kidnapping of the Bibas family, including baby Kfir and four-year-old Ariel, became one of the most infamous and heartbreaking symbols of October 7. The video circulated of Shiri Bibas clutching her babies as armed terrorists dragged them away was seared into the global consciousness, prompting prayers and vigils worldwide for their safe return. The Bibas story was not ordinary; it was the most infamous, tragic, and emblematic representation of Hamas's and the PIJ's brutality. Shnaider endured weeks of anguish without confirmation of his sister's fate, months awaiting the release of his nephew-in-law held hostage, the global circulation of his niece's terror-stricken face as she tried to shield her children, the grotesque spectacle of Hamas's staged return of the wrong body, and, ultimately, the confirmation of his niece's and her children's murders (FAC ¶¶ 178-84). These events inflicted direct, severe, and ongoing trauma on Shnaider himself.

Plaintiff Ayelet Nehama Newman-Kelmanson, likewise, alleges profound and ongoing injury from the October 7 Terrorist Attacks. Her husband was gravely wounded while attempting to save fellow civilians, and she endured the terror of his near-death and the lasting consequences of his injuries. At the same time, she suffered the brutal loss of her brother-in-law, Elchanan, who was murdered during the same rescue mission (FAC ¶¶ 192-93). These events left her facing both the trauma of watching her husband struggle with serious injuries and the grief of losing a close family member in circumstances that were both violent and heroic. The combination of fear for her husband's survival, the devastation of her brother-in-law's death, and the continuing threat of

terrorism in her community inflicted direct emotional and psychological injuries that are exactly the kind Congress intended the ATA to redress.

Both Plaintiffs seek recovery for their own injuries, not for the injuries of non-U.S. family members. Defendants' reliance on cases limiting solatium or derivative damages to immediate family members is misplaced. Those cases address who may recover on behalf of a deceased victim. Here, Plaintiffs plead direct personal injury.

Congress designed the ATA to provide meaningful compensation to U.S. nationals harmed by terrorism and to deter future attacks. Congress expressly found in JASTA that international terrorism is a "serious and deadly problem" that requires providing "the broadest possible basis" for recovery. Pub. L. No. 114-222, § 2(a), (b). To exclude Plaintiffs like Shnaider and Newman-Kelmanson, U.S. nationals who endured direct and foreseeable emotional injuries inflicted by Hamas's and the PIJ's psychological warfare, would frustrate that remedial scheme. One of the very purposes of terrorism is to inflict emotional distress and intimidation on family members of victims, whether immediate or extended, by exploiting kinship ties as part of a broader campaign of fear. Terrorists deliberately weaponize trauma by parading bodies, broadcasting hostage videos, and targeting family networks. Denying U.S. nationals a remedy for those harms would reward that strategy and contradict Congress's clear intent.

Both Plaintiffs have sufficiently alleged actionable injuries to their "person" under § 2333(a). Their claims fall squarely within the ATA's protective scope, and they should proceed.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Motion to Dismiss filed by Defendants in its entirety, and permit Plaintiffs to proceed with their claims under the Anti-Terrorism Act.

Dated: October 13, 2025
      Brooklyn, New York

                                      Respectfully submitted,

                                      THE BERKMAN LAW OFFICE, LLC
                                      *Attorneys for Plaintiff*

                                      by:   _____
                                              Robert J. Tolchin

                                      829 East 15th Street, Box 7
                                      Brooklyn, New York 11230
                                      (718) 855-3627

NITSANA DARSHAN-LEITNER & CO.
Nitsana Darshan-Leitner
*Israeli counsel for the plaintiffs*
10 Hata'as Street
Ramat Gan, 52512 Israel
Israeli #: 011-972-3-7514175
U.S. #: 212-591-0073